**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**
_____

| | | |
|---|---|---|
| **RENA ABRAN (Estate of Gene Wilson)** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| **v.** | : | **No. 18-1107** |
| **CITY OF PHILADELPJHIA et al,** | : | |
| **Defendant.** | : | |

**ORDER**

     **AND NOW**, this _____ day of _____, 2020, upon consideration of the Motion for

Summary Judgment of Defendants City of Philadelphia, Blanche Carney, Gerald May, Nancy Giannetta,

William Lawton, Cathy Talmadge, Aisha Cook, and Clyde Fearon, and any response thereto, it is hereby

**ORDERED** that the Defendants' Motion is granted.  Plaintiff's claims against Defendants are

**DISMISSED WITH PREJUDICE**.

                                        BY THE COURT:

                                        _____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RENA ABRAN (Estate of Gene Wilson)** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| **v.** | : | **No. 18-1107** |
| **CITY OF PHILADELPJHIA et al,** | : | |
| **Defendant.** | : | |

**DEFENDANTS CITY OF PHILADELPHIA, BLANCHE CARNEY, GERALD MAY,
NANCY GIANNETTA, WILLIAM LAWTON, CATHY TALMADGE, AISHA COOK
AND CLYDE FEARON'S MOTION FOR SUMMARY JUDGMENT**

Defendants, City of Philadelphia, Blanche Carney, Gerald May, Nancy Giannetta, William Lawton, Cathy Talmadge, Aisha Cook, and Clyde Fearon hereby file this Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Pursuant to Local Rule 7.1(c), and in support of this Motion for Summary Judgment, the City Defendants hereby incorporate by reference the attached Memorandum of law as though fully set forth at length.  The City Defendants respectfully request that this Court dismiss the claims asserted against them for the reasons set forth therein.

Date: _____          _____ mvm6856
                                **MARK V. MAGUIRE**
                                Divisional Deputy City Solicitor
                                1515 Arch Street, 14th Floor
                                Philadelphia, PA  19102-5397

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

RENA ABRAN (Estate of Gene Wilson)    :

          **Plaintiff,**    :

                                      **CIVIL ACTION**

   **v.**    :

                                       **No. 18-1107**

CITY OF PHILADELPJHIA et al,    :

          **Defendant.**    :

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS CITY OF PHILADELPHIA, BLANCHE CARNEY, GERALD MAY, NANCY GIANNETTA, WILLIAM LAWTON, CATHY TALMADGE, AISHA COOK, AND CLYDE FEARON'S MOTION FOR SUMMARY JUDGMENT**

Defendants City of Philadelphia ("City"), Commissioner Blanche Carney ("Carney"), Warden Gerald May ("May"), Nancy Giannetta ("Gianetta"), William Lawton ("Lawton"), Cathy Talmadge ("Talmadge"), Aisha Cook ("Cook"), and Clyde Fearon ("Fearon") , hereafter collectively referred to as "City Defendants" hereby move for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I.    Introduction

Plaintiff Rena Abran is the mother of Gene Wilson and the administratrix of his estate. She brings several claims on behalf of Mr. Wilson's estate alleging that his constitutional rights were violated by the Defendants and that those violations led to Wilson committing suicide.

Specifically, in Count I Plaintiff alleges that the City Defendants violated her son's constitutional rights under the Fourteenth Amendment.[1]  In Count II Plaintiff alleges that City

---

[1] Plaintiff does not explicitly identify the Amendment that she claims was violated but a logical reading of the Complaint leads me to address it as a 14th Amendment claim.

and Carney maintained policies that were the moving cause of the City Defendants'

unconstitutional conduct. In Count III Plaintiff alleges that City Defendants' conduct was

Negligent. In Counts IV and V Plaintiff sues City Defendants under Pennsylvania's Wrongful

Death and Survival Acts.  Finally, in Count VI Plaintiff alleges that City Defendants engaged in

a civil conspiracy with the private Defendants.

For the reasons discussed below, all of Plaintiff's claims against City Defendants must be

dismissed with prejudice.

## II.     Statement of Facts

1. On March 21, 2016 Gene Wilson was sentenced to serve a ten-day sentence in the Philadelphia

   Department of Prisons ("PDP). (See Exhibit "A" Complaint ¶26)

2. Upon arriving at PDP on March 21, 2016 Plaintiff was screened by medical and behavioral health care

   professionals. Wilson denied any medical or behavioral health issues.  (See Exhibit "B" Investigation

   page 7)

3. On March 23, 2016 Plaintiff was examined by a behavioral health care professional. Wilson denied any

   medical or behavioral health issues.  (See Exhibit "B" page 7)

4. On March 24, 2016 Wilson complained to medical and behavioral health professionals that he

   needed to get out of jail because he felt unsafe. His anxiety manifested as nausea. (See Exhibit

   "B" page 7)

5. Based on these complaints, the medical and behavioral health professionals informed

   correctional staff that Wilson should be placed in protective custody. (See Exhibit "B" page 7)

6. On March 25, 2016 Wilson was vomiting repeatedly and was sent to the Emergency Room to

   rule out appendicitis. He was diagnosed with abdominal pain and treated with IV fluids,

   Morphine, and Zofran. (See Exhibit "B" page 7)

7. When Wilson returned from the emergency room he told prison medical professionals that he did not want to return to his cell because he felt unsafe and wanted to go to protective custody. (See Exhibit "B" page 7)

8. Correctional Lieutenant Tbakadiparambil Thomson ("Thompson") was informed that Wilson complained to medical staff that he felt unsafe. (See Exhibit "B" page 5)

9. Thompson went to see Wilson in the medical area and I asked him why he felt unsafe.

10. Wilson responded that people in the facility were after him and mentioned that it may have been related to the robbery of barbershop that he owned a couple of years before. "I'm going to get hurt or I'm going to hurt somebody".  (See Exhibit "B" page 5)

11. Wilson did not tell Thompson that he wanted to hurt himself or correctional staff.  He explicitly stated that would not go back to his cell block because "I'm going to get hurt or I'm going to hurt somebody".  (See Exhibit "B" page 5)

12. Thompson asked Wilson to identify the people that he was afraid of, but Wilson refused to do so. (See Exhibit "B" page 5)

13. Thompson informed his supervisor, Deputy Warden Cathy Talmadge, of what Wilson had said to him. Talmadge instructed to place Wilson in Administrative Segregation because of Wilson's statements. (See Exhibit "B" page 5)

14. Specifically, she felt the statements met the standard such placement because they indicated that Wilson: "may… pose a threat to himself, herself, others or the security of the facility". (See Exhibit "B" page 5)

15. Prior to being placed in Administrative Segregation within the PDP, all inmates must be cleared by both medical staff and behavioral health staff. (See Exhibit "C" Policy 3.E.1)

16. Prior to being placed in Administrative Segregation Wilson was examined by medical and behavioral health staff. (See Exhibit "D" Review for segregation)

17. Medical staff found that there was no medical contraindication to Wilson being placed in Administrative Segregation. (See Exhibit "D")

18. Behavior health staff, specifically Dr. Olumide Oluwabusi, found that there was no contraindication to Wilson being placed in Administrative Segregation. (See Exhibit "D")

19. During Dr. Oluwabusi's examination, Wilson not only denied that he was suicidal but that he had no reason to kill himself and he was looking forward to his future. Wilson made it clear that the merely wanted to be segregated to avoid fights with other inmates. (See Exhibit "E" Oluwabusi pages 68-69)

20. Dr. Oluwabusi concluded that Wilson was not a risk to harm himself and cleared him to be place in Administrative Segregation. (See Exhibit "E" pages 65-72)

21. After being cleared by medical staff and Dr. Olumide Oluwabusi Wilson was taken to a cell in the Administrative Segregation section of the House of Corrections[2] ("HOC") (See Exhibit "D" page 1)

22. Lawton was the Warden of HOC during the relevant time period. (See Exhibit "F" Lawton pages ____ ____)[3]

23. Fearon was a Correctional Officer working in the Administrative Segregation section of the HOC. (See Exhibit "D" page 3)

24. Fearon did not believe that Wilson was suicidal because he had been cleared by Behavioral health staff to be placed in Administrative Segregation. (See Exhibit "G" Fearon page 72)

---

[2] HOC is one of several different jails that make up the PDP.
[3] Due to health issues, Lawton's deposition wasn't taken until January 14, 2020. Specific cites shall be provided upon receipt of the transcript.

25. At 5:59 a.m. on March 26, 2016 Fearon conducted his rounds of the Administrative Segregation cell block and observed Wilson lying in his bunk. (See Exhibit "D" page 3)

26. At 6:30 a.m. on March 26, 2016 Fearon conducted his rounds of the Administrative Segregation cell block and did not see Wilson in his bunk. He looked in the cell and observed Wilson crouched down between the wall and the toilet with a bed sheet tied around his neck and tied around the push rod. (See Exhibit "D" page 3)

27. Fearon untied the knot from the pushrod and immediately began CPR until his supervisor arrived and continued CPR until fire rescue arrived. (See Exhibit "D" page 3)

28. Wilson was not revived and he was pronounced dead at 6:52 a.m. (See Exhibit "D" page 7)

### III.    Standard of Review

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *See id.* All inferences must be drawn, and all doubts resolved in favor of the non-moving party. *See* United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985).

On motion for summary judgment, the moving party bears the initial burden of identifying these portions of the record that it believes demonstrate the absence of material fact disputes. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the moving party, and may not rest on mere

denials.  *See id.* at 321, n.3; First Natl. Bank of Pa. v. Lincoln Natl. Life Ins. Co., 824 F.2d 277, 282 (3d Cir. 1987).

In a case where the non-moving party is the plaintiff and therefore bears the burden of proof, the non-moving party must, by affidavits or by the depositions and admissions on file, "make a showing sufficient to establish the existence of [every] element essential to that party's case." Celotex, 477 U.S. at 322-24.  The non-moving party must adduce more than a mere scintilla of evidence in its favor to defeat the moving party's summary judgment motion.  *See* Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460 (3d Cir. 1989).  Although all justifiable inferences must be drawn in favor of the non-moving party, the "moving party is entitled to summary judgment where no reasonable resolution of conflicting evidence and inferences therefrom could result in a judgment for the non-moving party." Schwartz v. Hospital of Univ. of Pa., 1993 WL 153810 at *2 (E.D. Pa. May 7, 1993).  Furthermore, the "[p]laintiff cannot simply reassert factually unsupported allegations in its pleadings." Poles v. St. Joseph's Univ., 1995 WL 542246 at *5 (E.D. Pa. Sept. 11, 1995) (citing Celotex, 477 U.S. at 325).  "Plaintiff must present affirmative evidence in order to defeat this properly supported motion for judgment." *Id.*

## IV.   Argument

### A.   Plaintiff's Claims Against Carney, May, Gianetta, Cook, Lawton and Fearon Must be Dismissed Because They had No Personal Involvement in the Conduct Underlying Plaintiff's Claims

A Defendant in a civil rights action must have had personal involvement in committing the alleged violation. Rode v. Dellarciprete, 845 F.2d 1195 (3rd Cir. 1988). Agresta v. City of Philadelphia, 801 F. Supp. 1464, 1468 (E.D. Pa, 1992); see also Reaves v. Vaugh, 2001 WL 936392 at * 4 (E.D. Pa., Aug. 10, 2001) (vicarious liability does not apply to §1983 claims); Eppers v. Dragovich,1996 WL 420830 at * 4 (E.D. Pa., July 24, 1996) (defendant in civil rights claim must have "personal involvement" in alleged wrongs).  It is thus axiomatic that state actors

cannot be held vicariously liable under Section 1983 for the actions of other state actors.  See

Parratt v. Taylor, 451 U.S. 527, 537 n.1 (1981).  Any liability of an individual officer must "be

based on his own acts or omissions, not those of [other] individual officers."  Agresta v. City of

Philadelphia, 801 F. Supp. 1464, 1468 (E.D. Pa, 1992); see also Reaves v. Vaugh, 2001 WL

936392 at * 4 (E.D. Pa., Aug. 10, 2001) (vicarious liability does not apply to §1983 claims);

Eppers v. Dragovich, 1996 WL 420830 at * 4 (E.D. Pa., July 24, 1996) (defendant in civil rights

claim must have "personal involvement" in alleged wrongs).

In this matter, Plaintiff has not adduced any evidence that Carney, May, Gianetta, and

Lawton, had any personal involvement in Plaintiff's claims. Accordingly, Plaintiff's claims

against them must be dismissed.

> **B.  Plaintiff's Claims Against Carney, May, Gianetta, Lawton, Cook, Talmadge, and Fearon in Their Official Capacity Must be Dismissed Because Such Claims are Properly Brought Against City**

Plaintiff purports to sue Carney, May, Gianetta, Lawton, Talmadge, and Fearon in their

"official capacity."  Any such claims fail as a matter of law.  In Kentucky v. Graham, 473 U.S.

159, 165-66 (1985), the Supreme Court held that a suit brought against a public official in their

official capacity is equivalent to a suit brought against the public entity.  The Court explained

that official capacity suits "represent only another way of pleading an action against an entity of

which an officer is an agent."  Such suits, "in all respects other than name, to be treated as a suit

against the entity.  It is *not* suit against the official personally, for the real party in interest is the

entity." Id.  (citations omitted).

Therefore, all claims brought against Carney, May, Gianetta, Lawton, Talmadge, and

Fearon in their official capacity are properly are treated as an action against the City of

Philadelphia.  See Stana v. School District of Pittsburgh, 775 F.2d 122, 130 (3rd Cir. 1985)

(actions of an official acting in his or her official capacity are to be equated with the actions of the City itself).  Accordingly, Accordingly, Plaintiff's claims against them must be dismissed.

 **C.**  **Plaintiff's Fourteenth Amendment Claims Against Lawton, Talmage and Fearon Fail Because There is No Evidence of Deliberate Indifference to a Particular Vulnerability**

   When a plaintiff seeks to hold a prison official liable for failing to prevent a suicide a pre-trial detainee may bring a claim under the Due Process Clause of the Fourteenth Amendment that is essentially equivalent to the claim that a prisoner may bring under the Eighth Amendment. Thus, a plaintiff must show: (1) that the individual had a particular vulnerability to suicide, meaning that there was a "strong likelihood, rather than a mere possibility," that a suicide would be attempted; (2) that the prison  official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability. Palakovic v. Wetzel, 854 F.3d 209 (2017) Citing  Colburn v. Upper Darby Township (Colburn I), 838 F.2d 663 (3d Cir. 1988); Colburn v. Upper Darby Township (Colburn II), 946 F.2d 1017 (3d Cir. 1991); and Woloszyn v. County of Lawrence, 396 F.3d 314 (3d Cir. 2005). Plaintiff is unable to meet his burden as to any of these three elements.

   **1.** **There is no evidence that Plaintiff had a particular vulnerability to suicide**

   Wilson had no history of attempted suicide ideation and never gave any indication of mental health issues prior to March 25, 2016. (See Exhibit "B" page 7)  On that date, Wilson told a member of the correctional staff that he wanted to be placed in protective custody because there was tension between himself and inmates from another part of the city and that he might

get hurt or hurt himself or others. (See Exhibit "D") Wilson never told correctional staff that he planned to commit suicide.

After requesting protective custody Wilson was sent to see a mental health professional, Dr. Oluwabusi. Wilson not only denied that he was suicidal but that he had no reason to kill himself and he was looking forward to his future. Wilson made it clear that the merely wanted to be put in protective custody to avoid fights with other inmates. (See Exhibit "E" pages 68-69)

These facts do not rise to the level of a strong likelihood rather than a mere possibility of suicide.

> **2.   There is no evidence that Lawton or Fearon knew of any risk of suicide.**

Wilson was not brought to HOC where Fearon and Lawton worked until after he was cleared by Dr Oluwabusi. They appropriately relied upon his judgment and there is no evidence to support a claim that they saw any conduct contrary to his being cleared. See Spruill v. Gillis 372 F.3d 218, 222 (3d Cir.2004) (If a prisoner is under the care of medical experts ..., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, nonmedical officials could even have a perverse incentive *not* to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability)

> **3.   There is no evidence that Talmadge knew of a vulnerability to suicide or acted with reckless indifference.**

As discussed above, Talmadge was unaware of a vulnerability to suicide. Even if, arguendo, there was a vulnerability, she did not act with reckless indifference. To the contrary, Talmadge sent Wilson to Dr. Oluwabusi who had the expertise to determine whether he was a risk to himself and whether there was any contraindication to placing him in Administrative Segregation. This was neither reckless nor indifferent. Her conduct was appropriate and consistent with PDP policy.

**D.    Plaintiff's Fourteenth Amendment Claims Against Carney, May, Gianetta, Lawton, Talmadge and Fearon Must be Dismissed Because They are Entitled to Qualified Immunity**

Government officials performing discretionary functions generally are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity "seeks to ensure that defendants reasonably can anticipate when their conduct may give rise to liability by attaching liability only if the contours of the right violated are sufficiently clear that a reasonable official would understand that what he is doing violates that right." United States v. Lanier, 520 U.S. 259, 270-271 (1997) (internal quotations and citations omitted). Qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Anderson v. Creighton, 483 U.S. 635, 638 (1987), quoting Malley v. Briggs, 475 U.S. 335, 341 (1986).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court discussed a two-step inquiry that should be used to determine whether a state actor officers can be held liable for an alleged violation of a plaintiff's constitutional rights. Id. at 201. The first step is to ask: "Taken in a light most favorable to the party asserting injury, do the facts alleged show the officers' conduct violated a constitutional right?" Id. If no constitutional right would have been violated, then there is no need for further inquiries about qualified immunity, and summary judgment in favor

of the officer is appropriate.  id.  However, ". . . if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established."  Id.  "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, ***not as a broad general proposition***; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable."  Id. (emphasis added).

The Supreme Court modified the analysis in Saucier, in Pearson v. Callahan, 555 U.S. 223 (2009).  In Pearson, a unanimous Supreme Court concluded:

> …that, while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

Pearson, 555 U.S. at 236.

Recently, in Mullenix v. Luna, the Supreme Court reiterated the clearly established standard that must be applied when determining whether or not a government official is entitled to qualified immunity.   The Mullenix Court explained:

> 'We have repeatedly told courts . . . not to define clearly established law at a high level of generality.'  [quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742, 131 S.Ct. 2074 (2011).]  The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'  *Id.* (emphasis in the original).  This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'  Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).*Mullenix v. Luna*, 136 S.Ct. 305, 309 (2015).

Clearly established rights are those with contours sufficiently clear that "a reasonable official would understand that what [he or she] is doing violates that right."  McKee v. Hart, 436

F.3d 165, 171 (3d Cir. 2006) (citing <u>McLaughlin v. Watson</u>, 271 F.3d 566, 571 (3d Cir. 2001)).

"Put another way, 'there must be sufficient precedent at the time of the action, factually similar

to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is

constitutionally prohibited.'" <u>Id</u>. (citing <u>McLaughlin</u>, 271 F.3d at 572). This means that, to

decide whether or not Santa-Torres is entitled to qualified immunity, the Court must answer this

question: "Whether, in the circumstances confronted by Santa-Torres, it would have been clear to

a reasonable social worker investigating a GPS report that his or her conduct was unlawful in the

situation he or she confronted.  If it would not have been clear, then qualified immunity is

appropriate." <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 243 (3d Cir. 2004) (qualified

immunity analyzed). Finally, even if the wrongfulness of the officer's conduct would have been

clear, the court still must then determine whether he made a reasonable mistake." <u>Carswell v.</u>

<u>Borough of Homestead,</u> 381 F.3d 235, 243 (3d Cir. 2004).

 As discussed above, the record supports the conclusion that Fearon, Lawton and

Talmadge did not violate Wilson's rights. However, if the Court finds there is sufficient evidence

in the record for the issue to be decided by a jury, they would be entitled to qualified immunity

because such a constitutional violation is not clearly established under existing law.

 Under <u>Palakovic v. Wetzel</u>, 854 F.3d 209 (2017) Citing  <u>Colburn v. Upper Darby</u>

<u>Township (Colburn I)</u>, 838 F.2d 663 (3d Cir. 1988); <u>Colburn v. Upper Darby Township (Colburn</u>

<u>II)</u>, 946 F.2d 1017 (3d Cir. 1991); and <u>Woloszyn v. County of Lawrence</u>, 396 F.3d 314 (3d Cir.

2005) and <u>Spruill v. Gillis</u> 372 F.3d 218, 222 (3d Cir.2004) relying on medical and behavioral

health to determine whether an inmate is a risk for suicide is permissible and appropriate.

 **E.** **Plaintiff's Claims Against the City of Philadelphia Fail as a Matter of Law.**

Plaintiff alleges the City is liable for the death of Wilson because it failed, with deliberate indifference, to establish policies, practices, procedures and training regarding the treatment of arrestees going through drug overdoses.  (See Exhibit "A" ¶102)

Plaintiff's allegations are an attempt to sue the City under Monell v. Department of Social Services of New York City, 436 U.S. 658 (1978).  In Monell, the United States Supreme Court established that a municipality cannot be held liable on a *respondeat superior* theory.  Instead, liability can only be imposed against a municipality when there is evidence that a constitutional violation by a municipal actor was the result of a municipal policy, custom or practice.  *See* Monell, 436 U.S. at 691-95.  A policy occurs when a decisionmaker with final authority "issues an official proclamation, policy, or edict," while a custom occurs when practices are "so permanent and well-settled as to virtually constitute law."  Mulholland v. County of Berks, 706 F.3d 227, 237 (3d Cir. 2013) (citations and quotations omitted).  Municipal liability only attaches when "execution of [the] policy or custom . . . inflicts the injury."  Monell, 436 U.S. at 694.  "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible."  Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986) (emphasis in original).

A municipal "custom" within the meaning of § 1983 are practices engaged in by state officials that are so permanent and well settled as to constitute a "custom or usage" with the force and effect of law.  *See* Monell, 436 U.S. at 691.  Thus before municipal liability will be imposed, the plaintiff must prove that the municipality's alleged practices are "*so widespread as to have the force of law.*"  Bd. of Cty. Commrs. of Bryan Cty. v. Brown, 520 U.S. 397, 404 (1997) (emphasis added); *accord, Beck v. City of Pitt.*, 89 F.3d 966, 971 (3d Cir. 1996); Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (superseded by statute on other grounds).

15

Perhaps most importantly, in order to prevail on a <u>Monell</u> claim, the plaintiff must establish "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989).  This "link" must be so direct as to establish that the allegedly deficient policy or custom was the "*moving force*" behind the plaintiff's alleged injury. <u>Brown</u>, 520 U.S. at 407-08 (emphasis added); *see also* <u>Robinson v. City of Phila.</u>, No. 15-1574, 2015 WL 5965003, at *11 (E.D. Pa. Oct. 13, 2015) ("The plaintiff must [] demonstrate that, through its *deliberate* conduct, the municipality was the '*moving force*' behind the injury alleged.") (emphasis added) (citations and internal quotations omitted).

Finally, beyond identifying an offending policy or custom and the way in which it led to a violation of a plaintiff's rights, a plaintiff must demonstrate that an official with the power to make policy (i.e. a municipal "policymaker") is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom.  *See Andrews*, 895 F.2d at 1480.  A <u>Monel*l*</u> claim can only proceed if record evidence establishes that such policymaker was aware of similar unlawful conduct in the past but – with deliberate indifference – failed to take precautions against future violations, the failure of which directly led to the plaintiff's injury.  *See, e.g.,* <u>Bielevicz v. Dubinon</u>, 915 F.2d 845, 851 (3d Cir. 1990).

Here, Plaintiff's <u>Monell</u> claim fails because the City does in fact have policies and procedures in place to address inmates vulnerable to suicide.   Moreover, there is no evidence that any municipal "policymaker" was deliberately indifferent to a pattern of constitutional violations that led to suicides. As an initial matter, however, Plaintiff's <u>Monell</u> claim must be dismissed for the same reasons as the claims against Lawton, Talmadge, Fearon, May, Gianetti, May and Carney.

        **1.**      **Plaintiff's Failure to Establish an Underlying Constitutional Violation Necessitates the Dismissal of his <u>Monell</u> Claim.**

Plaintiff's <u>Monell</u> claim fails for numerous reasons, the first being the fact that Plaintiff cannot prevail on his underlying deliberate indifference claim against the Individual City Defendants.  In order to maintain a claim for municipal liability, Plaintiff must first establish a constitutional violation by a municipal actor.  *See, e.g.,* <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 798-99 (1986); <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1212 n.26 (3d Cir. 1995) (§ 1983 claim cannot stand if the underlying constitutional claim is invalid); <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1149-50 (3d Cir. 1995) (unless plaintiff establishes a constitutional injury, it is irrelevant for purposes of § 1983 liability whether the municipality's policies caused an injury), *cert denied* 516 U.S. 858 (1995).

Here, as discussed above, Plaintiff's claims against Lawton, Talmadge, Fearon, May, Gianetti, May and Carney should be dismissed.  Therefore, because no underlying constitutional violation occurred, Plaintiff's <u>Monell</u> claim must likewise fail.

**2.      Plaintiff has Adduced No Evidence of a Municipal "Policy" or "Custom" that Caused his Alleged Harms.**

Even if Plaintiff's underlying claims survive, Plaintiff's claim against the City must be dismissed because there is no record evidence that the harms Wilson allegedly suffered resulted from any policy or custom of the City.  Similarly, there is no evidence before this Court that the City, through its Police Commissioner or any other policymaker, had knowledge of or acquiesced in a widespread custom of of being recklessly indifferent to inmates vulnerable to suicide.   Further, none of the Individual City Defendants in this case were ever accused of conduct (or found to have in fact engaged in any conduct) that resulted in any inmates death.    Absent significantly more evidence, there is no basis on which to conclude that Wilson's death was caused by any deficient or unconstitutional municipal policy or custom.

**3.      Plaintiff has Adduced No Evidence of Deliberate Indifference on the Part of Any Municipal Policymaker.**

Perhaps the most glaring issue compelling the dismissal of Plaintiff's Monell claim is the complete absence of record evidence that any City of Philadelphia policymaker was deliberately indifferent to a risk of harm to Wilson or similarly situated persons resulting from the City's policies and procedures or the continued employment of the Individual City Defendants with the PDP.  To prove a Monell claim, the plaintiff must demonstrate that an official with the power to make policy (i.e. a municipal "policymaker") is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom.  *See, e.g.,* Jett v. Dallas Ind. School Dist., 491 U.S. 701, 737 (1989) (plaintiff must prove decision of final policymaker caused the deprivation of rights by policies or by acquiescence in a longstanding custom or practice that constitutes a standard operating procedure of the local governmental entity); *see also* Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (superseded by statute on other grounds).

Once a policymaker is so identified, "plaintiffs must 'present *scienter-like evidence of indifference* on the part of [such] policymaker."  Beswick v. City of Phila., 185 F. Supp. 2d 418, 427 (E.D. Pa. 2001) (emphasis added).  Liability can *only* attach if record evidence demonstrates that the policymaker made a deliberate choice to follow a particular course of action from among various alternatives.  *See* Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986).  Moreover, the plaintiff must adduce evidence establishing that such policymaker was aware of similar unlawful conduct in the past but – with deliberate indifference – failed to take precautions against future violations, the failure of which directly led to the plaintiff's injury.  *See, e.g.,* Bielevicz v. Dubinon, 915 F.2d 845, 851 (3d Cir. 1990).

Here, no such evidence exists.  The record contains no "scienter-type evidence" of any policymaker's deliberate indifference, nor is there any evidence at all that any City official was aware of a pattern of failing to adequately treat or respond to the needs of individuals suffering from opiate addictions but deliberately failed to address it.  According, Plaintiff's Monell claim should be dismissed

on this basis as well.

**F.  Plaintiff's Negligence claims Fail as a Matter of Law.**

The Tort Claims Act provides broad immunity to the City of Philadelphia and its

employees against tort claims.  The Act states:

> Except as otherwise provided in this subchapter, no local agency shall be liable
> for any damages on account of any injury to a person or property caused by any
> act of the local agency or an employee thereof or any other person.

42 Pa. C.S. §8541.  The Pennsylvania Supreme Court has held that this creates "the absolute rule

of governmental immunity" and represents "the expressed legislative intent to insulate political

subdivisions from tort liability."  Mascaro v. Youth Study Center, 514 Pa. 351, 361, 523 A.2d

1118, 1123 (1987).  The phrase "any injury" means all injuries, "whether physical, mental,

reputational, or economic."  E-Z Parks, Inc. v. Philadelphia Parking Authority, 110 Pa.

Commonw. 629, 637, 532 A.2d 1272, 1277 (1987), *alloc. denied*, 519 Pa. 656, 546 A.2d 60

(1988).

Plaintiff can recover against Defendants only in those limited instances permitted by the

Tort Claims Act.  Section 8542 provides for a limited waiver of that immunity in eight narrowly

drawn exceptions:

> (1)  operation of motor vehicles;
>
> (2)  care, custody, and control of personal property;
>
> (3)  care, custody, and control of real property;
>
> (4)  dangerous conditions of trees, traffic controls & street lighting;
>
> (5)  dangerous conditions of utility service facilities;
>
> (6)  dangerous conditions of streets;
>
> (7)  dangerous conditions of sidewalks; and
>
> (8)  care, custody and control of animals.

42 Pa. C.S. § 8542(b)(1)-(8).

It is plain that Plaintiffs' Negligence claim does not fall within any of the specifically enumerated exceptions to immunity conferred by the Tort Claims Act.  Accordingly, Plaintiff's claims as found in Count III must be dismissed with prejudice.

### G.  Plaintiff's Claims Under the Wrongful Death and Survival Acts Fail as a Matter of Law.

Counts IV and V are brought under the Pennsylvania Wrongful Death Act, 42 Pa.C.S. § 8301, and the Pennsylvania Survival Act, 32 Pa.C.S. § 8302, both fail because they require a valid underlying claim.  "Wrongful death and survival actions are not substantive causes of action; rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death."  Johnson v. City of Philadelphia, 105 F. Supp. 3d 474, 483 (E.D. Pa. 2015) (quoting Sullivan v. Warminster Twp., 765 F.Supp.2d 687, 707 (E.D. Pa.2011).  Here, Plaintiff's claims under these Acts necessarily fail since all underlying claims are not viable.  Accordingly, Plaintiff's claims as found in Count IV and V must be dismissed with prejudice.

### H.  Plaintiff's Civil Conspiracy Claims Fail as a Matter of Law.

To state a claim for civil conspiracy under Pennsylvania law, the plaintiff must prove: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose;  (2) an overt act done in pursuance of the common purpose; and  (3) actual legal damage.  McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 660 (Pa.Super. 2000). Additionally, proof of malicious intent is an essential element of a claim for conspiracy. Thompson Coal Company v. Pike Coal Company, 412 A.2d 466, 473 (Pa. 1969).

Agents of a single entity cannot conspire among themselves. Lackner v. Glosser, 892 A.2d 21, 35 (Pa. Super. Ct. 2006). In Shingara vs. Skiles, the plaintiff filed number of claims against employees of the Pennsylvania State Police, including a state law civil conspiracy claim.  2007 U.S. Dist. LEXIS 5052 at *2.  The plaintiff alleged, among other things, that the defendants conspired to discredit him in order to cover up their practice of issuing faulty traffic citations. However, the court granted the defendant's motion for summary judgment.  Shingara, 2007 U.S. Dist. LEXIS 5052 at *33.  The court stated:"All defendants in the instant action are agents of the State Police; therefore, they cannot be liable for civil conspiracy. Accordingly, defendants' motion for summary judgment will be granted with respect to Shingara's civil conspiracy claim." Id.  at *33 (citing Lackner v. Glosser, 892 A.2d 21, 35 (Pa. Super. Ct. 2006).

In this matter, no evidence has been adduced that supports a claim that Lawton, Talmadge, Fearon, May, Gianetti, May, Cook or Carney engaged in an overt unlawful act. Additionally, no evidence has been adduced to support a claim that Lawton, Talmadge, Fearon, May, Gianetti, May, Cook or Carney were acting with a common purpose with any parties not employed by the City of Philadelphia.

## V.    Conclusion

For all the foregoing reasons, City, Lawton, Talmadge, Fearon, May, Gianetti, May, Cook, and Carney respectfully request that the Court grant this Motion for Summary Judgment.

Date: _____                    _____ mvm6856
                                           **MARK V. MAGUIRE**
                                           Divisional Deputy City Solicitor
                                           1515 Arch Street, 14th Floor
                                           Philadelphia, PA  19102-5397

21