**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

RENA ABRAN (ESTATE OF GENE WILSON)                    CIVIL ACTION
                                   , Plaintiff

    v.
                                                      No. 18-1107

CITY OF PHILADELPHIA, et al.;
                                   Defendants

---

## O R D E R

    AND NOW TO WIT, on this             of              , 2020,

upon consideration of the Plaintiff's Rule 56(d) Motion and any responses thereto it is hereby

ordered that the Plaintiff's motion is GRANTED.  Defendant, City of Philadelphia, is hereby

ordered to deliver to the Plaintiff, within 14 days any and all additional discovery and requests

for production of documents listed in Plaintiff's Supplemental Request For Production of

Documents.

    Upon receipt of the same the Plaintiff will then be allowed to file any addendum it wished

to file in response to the defendants' Motion for Summary Judgment within 45 days from the

signing of this Order.

 

                                                                  J.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

RENA ABRAN (ESTATE OF GENE WILSON)                    CIVIL ACTION
                                        , Plaintiff

    v.
                                                      No. 18-1107

CITY OF PHILADELPHIA, et al.;

                              Defendants

## O R D E R

AND NOW TO WIT on this          day of             ,2020 upon consideration

of the Defendants' City of Philadelphia, Blanche Carney, Gerald May, Nancy Giannetta,

Williams Lawton, Deputy Warden Cathy Talmadge, Sgt. Aisha Cook and Clyde Fearon and the

Plaintiff's response thereto, it is hereby ORDERED  that the Defendants' Motion is DENIED

with prejudice.  Plaintiff's case will proceed to trial.

                              BY THE COURT:

                              _____
                                                      J.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

RENA ABRAN (ESTATE OF GENE WILSON)          CIVIL ACTION
                                , Plaintiff

v.
                                            No. 18-1107

CITY OF PHILADELPHIA, et al.;

                        Defendants

---

### PLAINTIFF'S REPLY/ANSWER TO DEFENDANTS
### CITY OF PHILADELPHIA, BLANCHE CARNEY, GERALD MAY, NANCY GIANNETTA, WILLIAM LAWTON, DEPUTY WARDEN CATHY TALMADGE, SGT. AISHA COOK, AND C.O. CLYDE FEARON'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Rena Abran does, pursuant to Local Rule 7.1( c) and in support of her response

to the above-listed defendants' Motion for Summary Judgment does hereby incorporate, by

reference, the attached Memorandum of Law as though fully set forth at length herein. The

Plaintiff respectfully requests that this honorable court deny the defendants' dispositive motion

and deny the same with prejudice.

Date: 2/28/20

Troy H. Wilson, Esquire
Attorney for Plaintiff
Rena Abran

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

RENA ABRAN (ESTATE OF GENE WILSON)                    CIVIL ACTION
                                    , Plaintiff

        v.
                                                      No. 18-1107

CITY OF PHILADELPHIA, et al.;

                            Defendants

## PLAINTIFF'S FORMAL RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT AND MEMORANDUM OF LAW

Plaintiff, Rena Abran brought a federal civil rights, 1983 action against the defendants, City of Philadelphia and Prison Commissioner Blanch Carney, Nancy Giannetta, Warden of House of Corrections, William Lawton, then Deputy Warden Cathy Talmadge, Sgt. Aisha Cook and Correctional Officer Clyde Fearon (hereinafter referred to as "Defendants") based on a set of instances which occurred while Ms. Abran's son, Gene Wilson was housed, as a post-trial detainee, then serving out a Driving Under Intoxication sentence at the Philadelphia Prison System in or around March, 2016.  At all times relevant hereto Ms. Abran is also the administratrix of Gene Wilson's estate.

Plaintiff alleges that her son's constitutional rights were violated under the Fourteenth and Eighth Amendments to the Constitution when Gene Wilson, while a prisoner in the Philadelphia Prison System was noted by prison officials as being nauseous, acting erratically, was depressed, expressed illogical ideas, expressed a noted level of anxiety, expressed physical complaints that did not seem real, appeared panicked, suspicious, paranoid, afraid of others for no apparent reason, angry and was, notably, expressing "bizarre thoughts or beliefs".  In addition to exhibiting this type of disturbing behavior Gene Wilson actually informed prison staff,

Page 4

including defendant Deputy Warden Cathy Talmadge that he wanted to harm himself and/or others. Instead of placing Gene Wilson into a suicide ward or into an anti-suicide cell Talmadge and the other defendants made the fatal decision to transfer Gene Wilson to the Philadelphia House of Corrections after undergoing what could best be termed as a "perfunctory" mental health evaluation of Mr. Wilson. However, defendant Talmadge admitted, during her deposition testimony, that she had, unilaterally, made up her mind to transfer Gene Wilson before the aforementioned evaluation even took place.

Once transferred to Warden Lawton's care at the House of Corrections Warden Lawton admitted that prison policy and procedure called for all prison inmates transferred into his prison must undergo a second mental health/behavioral evaluation. This procedure was ignored by the defendants' and Gene Wilson was subsequently placed into a punitive area at the House of Corrections called "D1", otherwise known as "The Hole". It should be further noted that Mr. Wilson was placed into, essentially, solitary confinement in a jail cell that took no precautions against suicide and this House of Corrections had no cameras to monitor these particular cells. Several hours after being placed into this segregated, solitary cell, Gene Wilson committed suicide.

Compounding matters was the fact that Lawton denied any knowledge of Gene Wilson's death when he did, according to other defense witnesses, possess said knowledge. Additionally, Lawton admitted that his "own" procedure was to tape record post jail incident meetings, reduce the statements made at the meeting to writing, have his assistant provide him with a written copy of the same and then sign this document before transferring a copy to his superiors. Lawton and the City's credibility are called into question since the defendants have failed to provide these

documents that their own witness readily admits exists. This information is relevant and discoverable and this court must order the defendants to provide the same to the Plaintiff forthwith.

Given the above this honorable court should delay making a final decision on the defendants' dispositive motion until the defendants provide the Plaintiff with the aforementioned relevant and discoverable documents. Assuming arguendo that this court denies this request it must still deny and dismiss the defendants' motion for summary judgment since the defendants have failed to sustain their burden as significant issues of fact exist to defeat said motion for summary judgment.

## II.     Reply to defendants' Statement of facts:

1.      Agreed.

2.      Agreed in part.  Denied in part.  While it is agreed that upon his initial incarceration Mr. Wilson was given a cursory screening on or about March 21, 2016 by prison medical staff it is denied that this is the full story relating to the proper screening and intake of Mr. Wilson during his stay in the Philadelphia prison system. After said March 21st date, according to prison records, Mr. Wilson developed physical intestinal problems where he was sent to the Emergency Room and he subsequently was seen as acting strangely, was seen as overly anxious, seeing things that weren't there and acting erratically and, according to prison staff, "acting bizzarely".

Additionally, prison officials also noted and testified that Mr. Wilson informed at least two prison officials (one of whom was, at the time, a Deputy prison Warden,

Talmadge) that he wished to harm himself or to harm others. Despite Mr. Wilson

informing these individuals that he wished to harm himself or others Mr. Wilson

was transferred and placed into a punitive jail cell area at the House of

Corrections called "The Hole" in a single, solitary prison cell where he

subsequently committed suicide less than several hours after being placed there.

Correctional officers also failed to properly monitor Mr. Wilson's cell and/or his

cell area which, in part lead to Mr. Wilson's suicide. (See Exhibit "A" Plaintiff's

Complaint)

3.     Denied. See above. Moreover, defendants City of Philadelphia, et al., in their

motion for summary judgment filing failed to attach the defendants' Exhibit "B"

which purported to show that on March 23, 2016 Mr. Wilson was allegedly

examined by a behavior health care professional where he denied medical or

behavior health issues. Assuming arguendo this to be the case however, there are

opposing facts which indicate that subsequent to being found hanged in his cell,

Mr. Wilson did notify prison officials that he wanted to either harm himself or

others. (See, Exhibit "B", Cathy Talmadge Deposition, N.T. 10/25/18, pp.28, 32).

Additionally, there are additional facts showing that prior to this admission Mr.

Wilson was acting erratically, was seeing things that were not there, was acting

with great anxiety with abnormal fear. Despite the same the defendants, in

concert, decided to send Mr. Wilson to a solitary confinement cell in a

disciplinary area of the House of Corrections called "The Hole" where he was

found dead by hanging mere hours after said defendants placed him into this

Page 7

cell.4.  Agreed in part and denied in part.  While it is agreed in part that Mr.

Wilson did, allegedly, complain to prison officials that he felt unsafe there is no

evidence that this manifested itself as nausea.  Defendants have made this bald

assertion without  proper attribution and this is in direct contradiction to the

internal prison documents which indicate that prison officials also knew that Mr.

Wilson appeared anxious, was acting erratically, was seeing things that was not

there and was, otherwise not making sense.  (See Exhibit "C", medical records,

"Powers 1").  Additionally, Mr. Wilson, willingly informed prison officials that he

wished to either harm himself or others.  The above observations and statements

by Mr. Wilson clearly contradict the baseless assertions made by the defendants

herein and only underscore the fact that a clear factual dispute exists on these

issues.  (See Exhibit "A" Plaintiff's Complaint).

5.      Denied.  The facts adduced during discovery clearly showed that Mr. Wilson was

        never placed in protective custody by prison officials.  Prison officials determined

        that he should be placed in "Ad Seg" (or administrative segregation).

6.      Agreed.

7-14.   Denied.  Defendants incorrect factual assertions that Mr. Wilson sought medical

        attention and that he then informed staff that he felt unsafe are inaccurate.  At a

        deposition on October 25, 2019 Warden Talmadge admitted, in sworn deposition

        testimony, that she instructed a Lieutenant Thompson to place Mr. Wilson into

        administrative placement because Mr. Wilson stated he would harm himself or

        harm others.  (See Exhibit "B", Deposition N.T. Talmadge, page 28, lines 17-28,

p. 32;). Talmadge further opined that she made the decision to place Mr. Wilson
into solitary, administrative custody based on her belief of Philadelphia prison
policy since she believed Mr. Wilson may, in part, pose a threat to himself. (See
her prison statement). Additionally, Ms. Talmadge provided prison investigators
with a written statement wherein she, herself, underlined and highlighted that she
believed Mr. Wilson, "...would hurt himself or someone else." (See Exhibit "D",
Talmadge statement to Lieutenant R. Murray).

15.    Denied. It is denied that prior to being placed in Administrative Segregation
within the PDP, all inmates must be cleared by both medical staff and behavioral
health staff. According to the defendant Warden of the House of Corrections once
a prisoner has been transferred from one prison to the House of Corrections this
prisoner must receive a new, second behavioral and medical staff mental health
evaluation. (See Exhibit "E", Warden Lawton Deposition, N.T. 1/14/20; pp. 73,
74). Therefore, according to a defendant City of Philadelphia employee the
defendants' blatant disregard of their own prison policy caused a violation of
Gene Wilson's constitutional rights and proximately caused his untimely death.

16.    Denied. Prior to being placed into "The Hole" at the House of Corrections Gene
Wilson was only negligently examined by behavioral health staff. (See Exhibit
"F", Oluwabusi Deposition N.T. 10/22/19, pp.55-59). As mentioned above the
defendants violated their own, internal rules, regulations and policies since they
failed to have Gene Wilson re-evaluated by both medical and mental health staff
once he was physically transferred to the House of Corrections. (See Exhibit "E"

Warden Lawton Deposition, 1/14/20, pp. 73, 74)

17. Denied. It is denied that medical staff found that there was no contraindication to Wilson being placed in Administrative Segregation. Medical staff, apparently on March 25, 2016 found no medical contraindication to segregation. However, on this date medical staff did confirm that Gene Wilson appeared overanxious, panicked, afraid and was angry, that he was acting and/or talking in a strange manner and that he was expressing bizarre thoughts or beliefs. (See Exhibit "G" "PPS Medical/Behavioral Health Review-3/25/16). Additionally, prior to this confirmation a prison Assistant Warden (Talmadge) did also note and confirm that Gene Wilson had expressed that he wished to harm himself and others. (See Exhibit "B", Talmadge N.T. 10/25/18, pp. 28, 32; See Exhibit "D" Wilson-1 Tallmadge Memorandum). Despite the above Mr. Wilson was placed into a cell, by himself, at the House of Corrections in "D" block in a disciplinary section reserved for punitive segregation of the prison otherwise known as "The Hole".(See Exhibit "B" Talmadge Deposition N.T.10/25/18, p. 70).

18. Agreed in part and denied in part. While it is agreed that Dr. Oluwabusi ultimately decided against finding that Gene Wilson had expressed suicidal ideation this very same doctor admitted, during his own deposition, that whenever a prisoner informs officials that he wishes to harm himself or others these statements alone may be a red flag for possible suicidal ideation. (See Exhibit "F" Oluwabusi Deposition N.T. 10/22/19, pp. 55-59).

19-20. Denied. The averment that Mr. Wilson, rather conveniently, just happened to

inform Dr. Oluwabusi that he did not want to get into any fights with other prisoners on these specific pages is factually incorrect. There is no mention of that on pages 68 and 69 of the applicable notes of testimony surrounding this particular allegation. Moreover, Dr. Oluwabusi, in all of his written documentation never made any mention of any of these alleged statements made by the deceased prisoner, Gene Wilson. (See Exhibit "H" Dr. Oluwabusi's "progress notes") I think here and place them with this response as an exhibit).

21.   Agreed.

22.   Agreed in part. Denied in part. While it is agreed that defendant Lawton was the Warden of the House of Corrections during the relevant period it must be emphasized that this defendant did, unilaterally, develop his very own pattern and practice of bringing together all parties who came into contact with the decedent, Gene Wilson, mere hours after Mr. Wilson's prison suicide death, in a secretly taped "debriefing" meeting. This defendant admitted that he, alone, developed this pattern and practice of debriefing during each so called "sentient" events like the Wilson matter. The contents of said secretly recorded meeting was denied by defendant Lawton despite the fact that confirmation of the same was made by at least two other defendant witnesses. Defendant nurse Orgasan and defendant Clyde Fearon both testified that they distinctly remembered defendant Lawton presiding over this meeting.

23.   Agreed.

24. Denied. Whether Correctional officer Fearon possessed any knowledge as to whether or not Gene Wilson was indeed suicidal is on one hand irrelevant to the matter at hand since Fearon was charged with conducting jail cell checks and he did not properly perform this task which lead directly to Gene Wilson's jail prison suicide. Additionally, Correctional officer Fearon also was one of a group of officers who had personal contact with Gene Wilson when he performed CPR on Mr. Wilson's "warm" body (meaning that he was still alive at the time). This key fact directly contradicts another defendant, nurse Orgasan, who conveniently alleged that Gene Wilson's body was cold at the moment that she, Fearon and other correctional officers were working on Mr. Wilson's body.  Additionally, Correctional officer Fearon did not possess any knowledge as to the exact reasons as to why Gene Wilson was placed into "The Hole"(disciplinary section of the House of Corrections. (See Exhibit "I", Correctional Officer Ferron Deposition N.T. 6/4/19, p.16)

25. Denied. It is denied that on March 26, 2016 at 5:59 a.m officer Fearon conducted rounds of the Administrative Segregation cell block.  Officer Fearon testified that his last tour was made at 6:30 a.m. (See Exhibit "I" Fearon Deposition, N.T. 6/4/19, p. 50).

26. Denied. This is factually in dispute and denied since officer Fearon, in his prison memorandum statement never stated that he observed Mr. Wilson "crouched down between the wall and the toilet" in said memorandum statement dated

March 26, 2016. (See Exhibit "J ", Fearon Memorandum/Fearon-2 attached to his N.T. 6/4/19)

27.    Denied. It is denied that Fearon "..untied the knot from the pushrod and immediately began CPR until his supervisor arrived…"According to the aforementioned memorandum Fearon removed the sheet, then checked to see if Gene Wilson was breathing and then spent time contacting Center Control to notify medical and his supervisor, Sergeant Cook for a "stretcher call". (See Exhibit "J", Fearon Memorandum/Fearon-2 attached to his N.T. 6/4/19). This is, however, inconsistent with his deposition testimony wherein he stated that he untied the sheet, physically picked Gene Wilson up and then carried him and placed him on the middle of the cell room floor and then, at that time, did he physically remove the sheet from Gene Wilson's neck. (See Exhibit "I" Fearon Deposition N.T. 6/4/19, p. 22)

28.    Agreed in part. Denied in part. While it is agreed that the discovery indicates that Mr. Wilson was pronounced dead at 6:52 a.m. it is denied that he was not alive prior to this time. Officer Fearon, in his deposition testimony, stated that when he was working on Mr. Wilson that he was "warm" to the touch. This directly and factually contradicts the testimony of defendant, nurse Orgasan who testified that she believed that Mr. Wilson was "cold" to the touch.


Respectfully submitted:

Troy H. Wilson, Esquire
Attorney for Plaintiff
Rena Abran