RENA ABRAN (ESTATE OF GENE WILSON)        CIVIL ACTION
            , Plaintiff

    v.

                             No. 18-1107

CITY OF PHILADELPHIA, et al.;
               Defendants

## ISSUE RELATING TO NECESSITY TO PROVIDE THE COURT WITH NOTICE OF ADDITIONAL DISCOVERY BEFORE COURT MAY MAKE A FINAL DECISION ON DEF'S SUMMARY JUDGEMENT MOTION- Rule 56 (d)

It must be duly noted that the Plaintiff's opposition to the defendants' motion for summary judgment includes a declaration that her counsel submitts pursuant to Rule 56(d). According to this declaration, the Plaintiff requires additional discovery from the defendants in order to properly respond to the defendants' summary judgment motion. Since said, additional discovery is both necessary and relevant to the 1983 civil rights matter at hand.

"[I]t is well established that a court 'is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery.'" Doe v. Abington Friends School, 480 F.3d 252, 480 F. 3d 252, 257 (3d Cir. 2007)(quoting Dowling v. City of Phila., 855 F.2d 136, 139 (3d Cir. 1988)). Rule 56(d) states that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed.R.Civ.P. 56(d).

Case law is clear that a formal motion is not required to request additional discovery under Rule 56 and this is the consistent with the analysis of other circuit courts of appeals. Although

the request for discovery is sometimes—rather casually—characterized as a "motion," courts recognize that the nonmoving party can respond to a motion for summary judgment by filing an affidavit or declaration requesting discovery. Shelton v. Bledsoe, 775 F. 3d 554 (Ct. of Appeals 3d Cir. 2015). Additionally, it is an abuse of discretion for a court to refuse to consider a Rule 56 request for additional discovery to more properly and fully address and respond to a defendant/movant's motion for summary judgment when the proper affidavit has been attached or otherwise asserted. Shelton, supra. (See also, Opus Bank v. Aramis Interactive, LLC, Dist. Ct. MD PA 2019; Civ. Action # 1:18 c.v. 833)

Where, as is the case here, the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course.'" Id. (quoting Costlow v. United States, 552 F. 2d 560, 564 (3d Cir. 1977)). Additionally, nothing precludes a party from requesting an opportunity for discovery under Rule 56(d) by simply attaching an appropriate affidavit or declaration to that party's response to a motion for summary judgment, and by asserting that summary judgment should not be granted without affording the responding nonmovant an opportunity for discovery. Moreover, it must be noted that district courts usually grant properly filed requests for discovery under Rule 56(d) "as a matter of course," whether the nonmovant's response to a summary judgment motion is characterized as a motion, affidavit, or declaration. Murphy v. Millennium Radio, 650 F.3d 295, 309 (quoting Doe v. Albright, 480 F.3d 252, 257); see also, Mid-South Grizzlies v. Nat'l Football League, 720 F.2d 772, 779 (3d Cir. 1983). This is particularly true when there are discovery requests outstanding or where relevant facts are under control of the party moving for summary judgment. Murphy, supra., 650 F.3d at 310.

If discovery is incomplete, a district court is rarely justified in granting summary judgment, unless the discovery request pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law. Doe, 480 F.3d at 257. Summary judgment may also be granted if the Rule 56(d) declaration is inadequate. See Koplove v. Ford Motor Co., 795 F.2d 15, 18 (3d Cir. 1986) (finding the affidavit insufficient because it did not specify what discovery was needed or why it had not previously been secured). An adequate affidavit or declaration specifies "what particular information that is sought; how, if disclosed, it would preclude summary judgment; and why it has not been previously obtained." Dowling, 855 F.2d at 140 (citing Hancock Indu. V. Schaeffer, 811 F.2d 225, 229-30 (3d Cir. 1987)).

### STATEMENT ON CITY FAILING TO PROVIDE ADDITIONAL DISCOVERY:

This honorable court should not consider granting the defendants' motion for summary judgment since the defendants have not yet provided full and complete discovery surrounding this matter. Due to various and sundry delays, soley from the deponent[1], Warden Lawton, the parties were finally able to take this particular defendant's deposition on January 14, 2020. Plaintiff had been attempting to secure this defendant's deposition since the spring of 2019. However this defendant could not be located and otherwise cancelled several previously scheduled depositions because he could not be located and because of an emergency. (See

---

[1] For example, Plaintiff did on May 16, 2019 send out a Notice of Deposition for Lawton's deposition however on June 27, 2019 counsel for the City stated that they could not locate Lawton and was forced to send out investigators to track him down. Lawton was "found" the following month and then on November 18, 2019 after rescheduling Lawton's deposition yet again it was cancelled, again, by counsel for the defendant due to an emergency. (See email attachments confirming history of securing Lawton's deposition, Exhibit "K"). Defendant Lawton's deposition was finally taken on January 14, 2020.

Exhibit "K"). (See also Plaintiffs affidavit attached at the end of this document). On or about February 25, 2020, Counsel for the Defendants emailed me additional discovery. Because of the deadline in submitting a response to the Defendants Motion for Summary Judgement, Plaintiff has not had the time to review said additional discovery as of yet. Upon review of the same, Plaintiff will, respectfully, submit an addendum to the court.

During said deposition the Warden freely admitted that he compiled and possessed tape recorded "debriefing" information related to all sentient events which took place at the House of Corrections when he was the warden. (See Exhibit "E" Warden Lawton Deposition N.T. 1/14/20, pp.19-34,35, 38,50,51) This witness also testified that he reduced said debriefing taping of meetings to writing and upon his review of said writings he would sign his name to this final summary and would send a copy of said final debriefing report to his superiors. During the taking of this deposition Plaintiff's counsel did request the receipt of all of these documents and did, subsequently, confirm the same via emails on both January 27, 2020 and February 3, 2020. (See Exhibit "K"). Defendants have failed to respond to this request as of the filing of this request.

Clearly this discoverable information, if provided by the defendants would clearly negate the defendants' dispositive motion. This information is both relevant and discoverable. Since it relates to the defendants' policy and practice and may, in the alternative, provide exculpatory evidence and will serve to provide additional evidence as to the defendants' lack of credibility as well. Additionally, receipt of this discoverable information will allow Plaintiff to provide additional information on her allegations of a civil conspiracy to conceal discoverable information related to the prison suicide of Gene Wilson The Plaintiff's refusal to provide this

information may not allow this court to decide and/or dispose of the defendants' dispositive motion. As such the defendants' motion should be denied, or at a minimum, stayed on this basis alone.

Assuming arguendo that this honorable court decides to make a ruling on the defendants' motion for summary judgment the defendants' motion must still fail since genuine issues of fact still exist compelling a jury to decide the same.

### III. Standard of Review:

Summary judgment may only be granted where the moving party shows that there is no genuine dispute of any material fact, and that judgment as a matter of law is warranted. Fed.R.Civ.P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case and on which he or she will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. Watson v. Abington Twp., 478 F.3d 144, 147 (3d Cir. 2007).

The burden on a motion for summary judgment is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible

evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof or that there is an absence of evidence to support the nonmoving party's case. Celotex Corp., 477 U.S. at 322, 325; Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).

Once the movant meets its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. Fed.R.Civ.P. 56(e); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex, 477 U.S. at 323-25. The nonmoving party must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. Celotex, 477 U.S. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 323-24. The summary judgment inquiry asks whether there is a need for trial-"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000) (citing decisions);

Liberty Lobby, 477 U.S. at 248-49; Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact-that is, a fact that would affect the outcome of the suit under the governing substantive law-will preclude the entry of summary judgment. Liberty Lobby, 477 U.S. at 248.

A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. Celotex, 477 U.S. at 322-23. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative, " the moving party is entitled to judgment as a matter of law. Liberty Lobby, 477 U.S. at 249. The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every challenged] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 Fed.Appx. 353, 354 (3d Cir.2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir.2002)). Inferences based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a motion for summary judgment. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990). Estate of Kempf v. Washington County, Civil Action 15-1125 W.D. Pa.

Moreover, the defendant City has produced two documents related to Gene Wilson that are, seemingly, doctored. This is additional proof that the defendants have attempted to hide the true circumstances surrounding the prison suicide death of Gene Wilson. In "Powers 1" the document is dated March 25, 2016. In part I of this document the signature of the defendant City of Philadelphia Prison supervisor is barely legible and the signature, in part II of the Physical Health Care staff was, likewise, illegible. (A defendant Corizon employee according to its Corporate Designee, (See Exhibit "T" McMillen Deposition, N.T. 1/08/20, p. 23) and in the section underneath this section every answer to questions surrounding the inmate were answered "No" (except for the question as to "inmate appears over anxious, panicked, afraid or angry which was, mysteriously, answered "Yes" and "No" and the question as to "inmate is expressing bizarre thoughts or beliefs" which was also answered "Yes" and "No"). (See Exhibit "C" for "Powers 1").

This contrasts with what is, ostensibly, supposed to be the same exact document in "Powers 2". In "Powers 2" the signature in part I is now, somehow, legible as is the signature in part II of the Physical Health Care staff portion of this document. However, it is extremely curious that the very important section relating to inmate questions concerning behavior in this section, is substantively different from the same section in "Powers 1". For example, the questions as to "inmate appears over anxious, panicked, afraid or angry has now been changed by someone to a "Yes" and someone wrote "error" and attempted to black out the "No" section for this particular question. (Along with what seems to be the letter "r" underneath the word "error"). And as to the question, "inmate is expressing bizarre thoughts or beliefs" the answer has now

been doctored and changed where someone, again, doctored and/or changed and wrote "error" (along with an indecipherable letter) in the "No" section. It must also be noted that the two lines used to, ostensibly, cross out the "No" section of this answer are located in different places than the two lines in the same section in "Powers 1" for the same question. And the ink for the signatures and answers is all much deeper and darker than that found on "Powers 1". (See Exhibit "O" for "Powers 2").

At all times relevant hereto the defendants have failed to provide any explanation for the aforementioned material discrepancies. As such the above-referenced paperwork alterations, combined with the defendants' testimony clearly showed that a civil conspiracy existed to attempt to cover up the fact that despite Gene Wilson blatantly informing the defendants that he wished to harm himself or others and despite knowing that Mr. Wilson was crying, nauseous, depressed, experiencing bizarre thoughts and the like the defendants, apparently, decided to note that he had been experiencing these feelings, which would dictate Mr. Wilson being sent to an anti suicide cell for constant monitoring. Instead of this happening the defendants doctored Gene Wilson's Medical/Behavioral Health Review document so that he could be placed into administrative segregation without any further review or restrictions. All to the detriment of Gene Wilson. Clearly a civil conspiracy existed and it caused Mr. Wilson's constitutional and section 1983 rights to be violated.

**IV. A. Plaintiff's response to defendants' argument that claims against Carney, May, Gianetta, Cook, Lawton and Fearon should be dismissed for lack of personal Involvement in the conduct underlying Plaintiff's Claims**

**Law surrounding this issue:**

Appellant claims that the trial court erred in granting Appellees' motion for summary judgment on her claim under Section 1983 of the United States Code, 42 U.S.C. § 1983, that she was intentionally, knowingly and with reckless disregard for her rights and safety, deprived of her substantive right to due process of law. Section 1983 states in relevant part: Every person who, under color of any statute ordinance, regulation, custom or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. 42 U.S.C. § 1983.

In determining whether a Section 1983 action has been stated, the initial inquiry must focus on whether a plaintiff has alleged that the defendant deprived him or her of a federally guaranteed right or interest while acting under the color of state law. Court have held that: When individuals are placed in custody by the government, or under the care of government, they have a liberty interest protected by the due process clause of the fourteenth amendment in safe conditions of confinement. Youngberg v. Romeo, 457 U.S. 307 [102 S.Ct. 2452, 73 L.Ed.2d 28] (1982). This interest arises out of a 'special relationship' between the government and the individual created by virtue of the constraints imposed on private action by placing individuals into custody. See Walker v. Roe, 791 F.2d 507, 511 (7th Cir.), cert denied, 479 U.S. 994 [107 S.Ct. 597, 93 L.Ed.2d 597] (1986). In Colburn v. Upper Darby Township, 838 F.2d 663 (3d Cir.1988), the Third Circuit held that a detainee is entitled under the Due Process Clause of the Fourteenth Amendment to protection of his or her personal security and safety and to reasonable medical care. It is well settled that there is no requirement under Section 1983 to show a specific intent to deprive a person of his or her federal rights, and injury to an individual's liberty interest

in safe confinement by negligent conduct does not implicate the due process protections of the Fourteenth Amendment, Daniels v. Williams, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). However, for the purposes of Section 1983, the Fourteenth Amendment does impose a duty on custodial officials not to act with deliberate indifference to an individual's serious medical needs and personal security. Colburn.

A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior. Parratt v. Taylor, 451 U.S. 527, 537 n.3, 101 S.Ct. 1908, 1913 n.3, 68 L.Ed. 2d 420 (1981); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1082 (3d Cir. 1976). Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity. Compare Boykins v. Ambridge Area School District, 621 F.2d 75, 80 (3d Cir. 1980) (civil rights complaint adequate where it states time, place, persons responsible); Hall v. Pennsylvania State Police, 570 F.2d 86, 89 (3d Cir. 1978).

### Argument:

Defendant Blanche Carney, is the Commissioner in charge of the entire Philadelphia Prison System (hereinafter referred to as "PPS"). As such she is, personally, in charge and, it has been alleged, did personally direct the development, implementation of any and all policies, rules, regulations and procedure related to the care, treatment of all prisoners, including Gene Wilson, housed at the Philadelphia House of Corrections. As such a civil rights action may be properly pursued against this particular defendant. Parratt, supra.

Defendant Gianetta was, at all times relevant hereto, the Warden of ASD (which was the original jail complex that housed Gene Wilson prior to his deliberately indifferent transfer to the House of Corrections. As such a civil rights action may be properly pursued against this particular defendant. Parratt, supra. Additionally this defendant headed the unit (ASD) where Gene Wilson initially began to experience physical and emotional problems which were systematically ignored by said defendants. For example, on March 24, 2016 Gene Wilson complaint of vomiting, nausea and stress. He also complained that he needed to get out of jail, that he was depressed, anxious and that he felt nauseous due to the aforementioned stress. Then on the following day Gene Wilson complained, again, of abdominal pain, was crying and hunched over in pain. He also informed the medical officer at ASD that he did not want to return to his cell because he was both scared and afraid. Officials at ASD, where this defendant is the direct supervisor, ignored all of the above-listed behaviors and complaints. (See Exhibit "N" McCauley Expert Report, pp. 4,5).

Sergeant Cook was the immediate supervisor on duty on the date of Gene Wilson's suicide and she also made rounds in the area where Gene Wilson's cell was located on the date of his death. (See Exhibit "L" Fearon Deposition N.T. 11/14/18, p.36). Additionally, this defendant had personal contact with Gene Wilson as she was one of the individuals who attempted to resuscitate Mr. Wilson upon entering his cell prior to his demise on or about March 26, 2016. (See Exhibit "L" Fearon Deposition N.T.11/14/18, p.43, 48); (See also Sergeant Cook's written investigative statement, attached, Exhibit "M").

Sergeant Cook did, on the date of Gene Wilson's death, work at the House of Corrections Control Center and she was correctional officer Fearon's supervisor. (See Exhibit "I" Fearon

Deposition N.T. 6/4/19, p. 24, 28). Additionally, Cook left her post at the Control Center and met Fearon at Gene Wilson's cell once Wilson's body had been discovered. (See Exhibit "L" Fearon Deposition N.T. 11/14/18, p.47) and Cook also called for another officer to assist Fearon in his initial treatment of Wilson and, according to Fearon, this defendant "walked him through" the procedures in caring for Wilson inside of his cell on the date in question. (See Exhibit "L" Fearon, N.T. 11/14/18, p.48, 61). Clearly, defendant Cook had direct involvement with Gene Wilson in reference to this matter.

Defendant Lawton was the prison warden in charge of the Philadelphia House of Corrections prior to, during and after the date of Gene Wilson's suicide death. (See Exhibit "E" Lawton Deposition, N.T.1/14/20, p.11,12). Additionally, this Warden possessed a personal knowledge about the Gene Wilson suicide and according to at least two other defendants (nurse Orgasan and correctional officer Clyde Fearon) did conduct an extensive mandatory "debriefing" meeting with all parties who came into contact with Gene Wilson prior to his suicide death. (See Exhibit "L" Fearon Deposition N.T.11/14/18, p.19, 20). Furthermore, this defendant readily admitted that he developed his own, proprietary policy concerning sentient major prison events (such as the Wilson suicide) where he gathers information and where he also admitted that he never retrained or disciplined anyone for any of the prison suicide deaths which took place under his watch. (See Exhibit "E" Lawton Deposition N.T 1/14/20.p.19, 24,25, 26, 50,51). This defendant also admitted, in his deposition testimony, that he discussed the Gene Wilson suicide with his deputy wardens at his weekly staff meetings. (See Exhibit "E" Lawton Deposition N.T. 1/14/20, pp. 50, 51). Furthermore defendant Lawton freely admitted during his deposition testimony that prison policy was violated when, upon being transferred to the House of

Page 27

Corrections, Mr. Wilson was not given a second behavioral, medical/mental health evaluative assessment. (See Exhibit "E" Lawton Deposition N.T. 1/14/20, p.74)

Defendant Clyde Fearon did, admittedly, have close contact with Gene Wilson as he was tasked with touring the D1 block cell area where Mr. Wilson was located on the date of his death. (See Exhibit "L" Fearon Deposition N.T. 11/14/18, pp. 35-37). Additionally, Officer Fearon was the first person who entered Mr. Wilson's cell and attempted to revive Mr. Wilson. (See Exhibit "L" Fearon Deposition N.T.11/14/18, pp. 39-41). This defendant also testified that Mr. Wilson was alive when he entered Gene Wilson's cell yet, it is alleged that this defendant, nevertheless, provided inadequate care to Mr. Wilson, since Mr. Wilson was still alive when found in his cell by this particular defendant, leading to his unfortunate demise. (See Exhibit "L" Fearon Deposition N.T. 11/14/18, pp. 48-50, 60).

Given the above, Plaintiff has sufficiently provided evidence that Carney, May, Gianetta, Cook, Lawton and Fearon did, indeed, possess personal involvement in respect to Plaintiff's claims. As such a genuine issue of fact exists as it relates to this issue and the defendants' request for summary judgment relief surrounding the same must be dismissed.

**IV. B. Plaintiff's response to defendants' contention that while claims against the City may continue in this matter claims against Carney, May, Gianetta, Lawson, Cook, Talmadge, and Fearon, in their official capacity must be dismissed because such claims are properly brought against the City**

**Law:**

Bringing a suit against a defendant in his official capacity is "another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (quoting Monell v. Dep't of Social Servs. of New York City, 436 U.S. 658, 690

n.55 (1978)). Consequently, an official capacity suit is treated as a suit against the governmental entity and damages are paid by the governmental entity. Id. at 166; Hill v. Borough of Kutztown, 455 F.3d 225, 233 n.9 (3d Cir. 2006). A governmental entity may not be held liable under § 1983 unless the entity's policy or custom caused plaintiff's injury. Monell, 436 U.S. at 694. In contrast, a suit brought against a defendant in his individual capacity seeks damages from the defendant's own assets for actions done by that defendant personally. See Graham, 473 U.S. at 165-66.

In deciding this issue the court must look to the Complaint and the "course of the proceedings" to determine in what capacity Plaintiff is suing Defendants. Melo v. Hafer, 912 F.2d 628, 635 (3d Cir. 1990) (quoting Graham, 473 U.S. at 167 n.14). Courts must consider the following factors: particularized allegations of personal involvement; from whom damages are sought; responses by defendants that reflect an understanding that their personal assets are at stake; and what immunity defenses are raised. See Garden State Elec. Inspection Servs., Inc. v. Levin, 144 F. App'x 247, 251-52 (3d Cir. 2005) (citations omitted).

**Argument:**

It is clear from a reading of the Plaintiff's complaint that this 1983 civil rights complaint was brought against the defendants Carney, May, Gianetta, Lawson, Cook, Talmadge and Fearon in both their official capacity and their individual capacity. The same was clearly stated on the case caption and in the initial paragraphs of this complaint for each of the aforementioned defendants. (See Exhibit "A" Plaintiff's Complaint). As such the claims against these particular defendants can not be dismissed, as a matter of law, since it has been sufficiently alleged that these specific defendants committed various and sundry acts, both their official and individual capacity, that caused Gene Wilson's constitutional rights to be violated when he, in direct

violation of internal prison policy, Gene Wilson was transferred to a solitary[2] cell at the House of

Corrections, was not given a second behavioral or mental health evaluation despite Mr. Wilson

informing defendants of his wish to harm himself. As such the defendants summary judgment

request as it relates to this particular issue should be dismissed.

**IV. C. Defendants' contention that Plaintiff's Fourteen Amendment Claims Against
Lawton, Talmadge and Fear Fail Because There is No Evidence of Deliberate Indifference
to a Particular Suicidal Vulnerability is incorrect and their request for summary judgment
relief on this issue must be dismissed.**

**Law:**

Deliberate indifference to serious medical needs of prisoners violates the Eighth

Amendment's prohibition on cruel and unusual punishments. Estelle v. Gamble, 429 U.S. 97, 97

S. Ct. 185, 50 L.Ed. 2d 251 (1976). A core principle of Eighth Amendment jurisprudence in the

area of medical care is that prison officials with knowledge of the need for care may not, by

failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to

needlessly suffer the pain resulting from his or her illness. Inadequate medical care in prison

implicates the Eighth Amendment because an inmate must rely on prison authorities to treat his

---

[2]A comprehensive meta-analysis of the existing literature on solitary confinement within
and beyond the criminal justice setting found that "[t]he empirical record compels an
unmistakable conclusion: this experience is psychologically painful, can be traumatic and
harmful, and puts many of those who have been subjected to it at risk of long-term ... damage."
Specifically, based on an examination of a representative sample of sensory deprivation studies,
the researchers found that virtually everyone exposed to such conditions is affected in some way.
They further explained that "[t]here is not a single study of solitary confinement wherein
non-voluntary confinement that lasted for longer than 10 days failed to result in negative
psychological effects." And as another researcher elaborated, "all [individuals subjected to
solitary confinement] will ... experience a degree of stupor, difficulties with thinking and
concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external
stimuli."Anxiety and panic are common side effects. Depression, post-traumatic stress disorder,
psychosis, hallucinations, paranoia, claustrophobia, and suicidal ideation are also frequent
results. Williams v. Secretary Pennsylvania Dept. of Corrections, 848 F.3d 549 (2017)

medical needs; if the authorities fail to do so, those needs will not be met. A failure might result in pain or suffering which no one suggests would serve any penological purpose, or in more severe cases, produce physical torture or a linger death—thus causing unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. Inadequate medical care in prison implicates the Eight Amendment because an inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met and a constitutional violation occurs. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 185, 50 L.Ed. 2d 251 (1976). This constitutional violation is also considered "cruel and unusual" punishment.

While the Eighth Amendment prohibits the infliction of cruel and unusual punishment upon prisoners, it applies only "after [the State] has secured a formal adjudication of guilt in accordance with due process of law." City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)(quoting Ingraham v. Wright, 430 U.S. 651, 671-72n.40, 97 S.Ct. 1401, 51 L.Ed. 2d 711 (1977).

The leading Supreme Court case setting for the Eighth Amendment deliberate indifference analysis for a prison conditions case is Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994). In Farmer, the Supreme Court reversed a grant of summary judgment for various defendant prison officials on the plaintiff's Eighth Amendment claim, which was based on the deliberate indifference that the officials allegedly showed to his risk of being sexually assaulted in prison. The Farmer court held that in deliberate indifference prison cases a prison official can be found liable under the Eighth Amendment for denying an inmate humane condition of confinement when the official knows of and disregards an excessive risk to inmate health or safety." Id. at 837, 114 S.Ct. 1970.

The Third Circuit has recognized that since "a 'particular vulnerability to suicide'
represents a 'serious medical need,'" the Estelle framework can apply to detainee suicide cases.
Colburn v. Upper Darby Township, 946 F.2d 1017, 1023-24 (3d Cir. 1991) ("Colburn II") (citing
Colburn v. Upper Darby Township, 838 F.2d 663, 669 (3d Cir. 1988), cert. denied, 489 U.S.
1065 (1989) ("Colburn I"); Partridge v. Two Unknown Police Officers of Houston, 791 F.2d
1182, 1187 (5th Cir. 1986)). Pursuant to that framework, a plaintiff raising a §1983 constitutional
claim on the basis of a detainee's suicide must establish the following elements: "(1) the detainee
had a 'particular vulnerability to suicide,' (2) the custodial officer or officers knew or should have
known of that vulnerability, and (3) those officers 'acted with reckless indifference'[21] to the
detainee's particular vulnerability." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir.
2005) (quoting Colburn II, 946 F.2d at 1023).

i. Element 1 - "Vulnerability to Suicide"

Whether a detainee bears a "particular vulnerability to suicide" depends on the "degree of
risk inherent in the detainee's condition." Id. at 320 (quoting Colburn II, 946 F.2d at 1024).
"[T]here must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will
occur." Id.

ii. Element 2 - "Knowledge" of a Particular Vulnerability to Suicide

"Even where a strong likelihood of suicide exists, it must be shown that the custodial
officials 'knew or should have known' of that strong likelihood.'" Colburn II, 946 F.2d at 1024. In
Colburn II, the Third Circuit emphasized that in the context of a pretrial-detainee suicide, a
plaintiff need not establish that a defendant had a subjective appreciation of a pretrial detainee's
particular vulnerability to suicide; rather, it was sufficient for a plaintiff to show that a defendant

should have known that the pretrial detainee had a particular vulnerability to suicide. 946 F.2d at 1024-25. The Colburn II court described the phrase "should have known" as follows:

[The phrase "should have known"] does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. It connotes something more than a negligent failure to appreciate the risk of suicide presented by the particular detainee, though something less than subjective appreciation of that risk. The strong likelihood of suicide must be so obvious that a lay person would easily recognize the necessity for preventative action; the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.
Id. (citations and internal quotation marks omitted).

Three years after the Third Circuit's decision in Colburn II, the Supreme Court in Farmer v. Brennan, 511 U.S. 825 (1994), raised the standard when addressing a convicted inmate's deliberate indifference claim under the Eighth Amendment. Specifically, the Court stated, in relevant part:

[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. 511 U.S. at 837. Seven years after Farmer, the Third Circuit in Beers-Capitol v. Whetzel, 256 F.3d 120 (3d Cir. 2001), also addressing an inmate's Eighth Amendment deliberate indifference claim, seemingly refined Farmer as follows:

To be liable on a deliberate indifference claim, a . . . prison official must both know of and

disregard an excessive risk to inmate health and safety. The . . . element of deliberate indifference

is subjective, not objective . . . meaning that the official must actually be aware of the existence

of the excessive risk; it is not sufficient that the official should have been aware. However,

subjective knowledge on the part of the official can be proved by circumstantial evidence to the

effect that the excessive risk was so obvious that the official must have known of the risk.

256 F.3d at 133.

**Argument:**

The City defendants cite the Palakovic v. Wetzel case as controlling here in situations

where a plaintiff, ". . .seeks to hold a prison official liable for failing to prevent a suicide a pre-

trial detainee may bring a claim under the Due Process Clause of the Fourteenth Amendment. . ."

However, the City's claim on this issue must then, based on the City's own wording, be

dismissed in full since, as the City well knows and all parties agree, Gene Wilson was, at all

times relevant hereto never a pre-trial detainee for this above-captioned case. He was a post-trial

detainee and was serving sentence for D.U.I. when he was found, hanged in his solitary jail cell

at the Philadelphia House of Corrections on March 26, 2016.

Assuming arguendo that somehow the City has correctly characterized the standards for

relief by the Plaintiff based on constitutional violations the City's claim must still fail on this

issue since the Plaintiff has shown that Gene Wilson had a particular vulnerability to suicide

when he blatantly stated to prison personnel, Deputy Warden Talmadge, that he wanted to harm

himself or others. (See Exhibit "B" Talmadge Deposition N.T.10/25/18, pp.33). And that,

therefore, Talmadge knew or should have known of Mr. Wilson's vulnerability and that she acted

with reckless or deliberate indifference to Mr. Wilson's vulnerability since he informed Deputy

Warden Talmadge that he wished to harm himself or others. Despite the blatant assertion by Gene Wilson Deputy Talmadge testified that she made the decision to have Gene Wilson placed into a solitary confinement cell located in the Philadelphia House of Correction in the punitive detention part of this prison called "The Hole". (See Exhibit "B" Talmadge Deposition N.T. 10/25/18, pp. 35, 70), where, a mere several hours later Gene Wilson committed suicide by hanging when other correctional officials failed to keep a proper lookout for Mr. Wilson and where Warden Lawton failed to implement established policies allegedly designed to protect and prevent such suicides. (McCauley expert report, See Exhibit "N"). Most telling is that this defendant also admitted that she performed this act based on Philadelphia Prison System policy. (See Exhibit "B" Talmadge Deposition N.T. 10/25/18, pp. 50, 51) As such Plaintiff has provided sufficient proof of the allegations of the deceased Plaintiff's Fourteen Amendment and Eight Amendment violations under the circumstances.

Moreover, it must be emphasized that the Wetzel case cited by the City as controlling is factually very similar to the facts found in the instant Wilson case. In Wetzel the Third Circuit held that detaining a young man in solitary confinement or segregation who does subsequently hang himself with a bed sheet while in segregated confinement who did, also, fail to receive either counseling or group therapy is a constitutional violating and is an example of Cruel and Unusual Punishment under the Eighth Amendment. Farmer, supra., Estelle, supra.

Additionally, the City's contention, in its motion for summary judgment, that, "...Wilson had no history of attempted suicide ideation and never gave any indication of mental health issues prior to March 25, 2016..." is factually incorrect. Prior to his suicide Wilson, according to Philadelphia prison officials and Corizon employees did exhibit bizarre behavior, heightened

anxiety, depression, appeared panicked, afraid or angry, expressed bizarre thoughts or beliefs and expressly told defendant Deputy Warden Talmadge that he definitively wanted to harm himself or others. (See Exhibit "B ", Talmadge Deposition N.T. 10/25/18, pp. 23, 24, 43) (See also attached Exhibit "C" "Powers 1" attached to Dr. Oluwabusi deposition dated, October 22, 2019).

This defendant, who at this time possessed minimal training in dealing with this particular type of issue then, made the unilateral decision to have Gene Wilson transferred to the House of Correction to be placed into a solitary cell in the punitive unit of the House of Corrections in section D1 otherwise known as "the Hole" without even reading or reviewing any mental health reports or, more specifically, BEFORE any mental health review was conducted with Gene Wilson! (See Exhibit "B" Talmadge Deposition N.T. 10/25/18, pp. 33, 35, 36, 41, 42, 70). Furthermore, this defendant did also, admittedly, bypass and willfully violate, PPS rules, regulations and policy when she refused to let her own prison Lieutenant make the decision on placing and transferring Gene Wilson to another prison. (See Exhibit "B" Talmadge Deposition N.T. 10/25/18, p. 37). Given the above, genuine issues of facts are evident and the City's motion must fail because of said genuine issues of fact that may only be resolved by a jury.

The defendants' allegation that since Gene Wilson was as "pre-trial detainee" the standards cited in Colburn are applicable to this matter is factually incorrect At all times hereto, as the defendants are fully aware, Gene Wilson was incarcerated at the House of Corrections based on previously being found guilty of a D.U.I. case. He was not, as was incorrectly stated by the defendants in their motion for summary of judgment legal brief, a "pre-trial detainee". As such not only is the Colburn case cited by the defendants in their supporting brief inapplicable but a clear, unequivocal factual dispute is evident here as it relates to the issue surrounding

whether or not Gene Wilson was either a "pre-trial detainee" or a convicted prisoner at the time of Gene Wilson's suicide death. However, assuming, arguendo that the defendants correctly cited Colburn as controlling the Colburn holding actually supports the Plaintiff's position since Colburn held, in part, that if such officials know or should have known of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment properly imposes on them (prison officials) an obligation not to act with reckless indifference to that vulnerability. Colburn, supra.

Moreover, the Palakovic v. Wetzel case cited by the defendants actually provides greater support for the plaintiff's case than it does the defendants. Palakovic held that when a young man who is detained and placed into solitary confinement or segregation (as was the case with Gene Wilson herein) and who then hangs himself with a bedsheet and who was provided with neither counseling nor group therapy, is a constitutional violation and is an example of "cruel and unusual" punishment under the Eighth Amendment.

It must be emphasized that at all times relevant hereto, Gene Wilson was acting in a bizarre fashion and was otherwise experiencing bizarre thoughts or beliefs, was nauseous, was experiencing severe anxiety, was afraid, panicked and angry. Additionally, and compounding matters in the instant case the defendants have admitted that Gene Wilson did, expressly, inform several defendants directly that he wanted to harm himself or others. Given the above the Plaintiff has unequivocally shown that Gene Wilson did possess a particular vulnerability to suicide (as a "strong likelihood") that suicide would be attempted, that the

defendant prison officials knew or should have known of Gene Wilson's particular vulnerability (especially since Mr. Wilson informed them of the same prior to his suicide death), and that, given the above, the defendants acted with reckless or deliberate indifference to Gene Wilson's particular vulnerability. This is especially so since the defendant Lawton has admitted that prison policy was violated when Gene Wilson was NOT provided with a second behavioral and/or mental health evaluation once imprisoned at the House of Corrections and when his own Deputy Warden of Operations failed to make the decision to house Gene Wilson at the House of Corrections in the first place. (See Exhibit "E" Lawton Deposition N.T.1/14/20, p.53, 54, 56,74).

The additional assertions or allegations made by the defendants to support their rather untenable contention that after requesting protective custody Mr. Wilson denied being suicidal and allegedly had no reason to kill himself and that he was, likewise, allegedly, "looking forward to his future" are singularly self serving. Additionally, it must be emphasized that Dr. Oluwabusi' contention that Gene Wilson made these alleged statements are neither supported by any record, report or other discovery related to this issue. They are neither supported nor corroborated in any of Dr. Oluwabusi's records for that matter. Furthermore, the defendants have provided no other supporting evidence to confirm these allegations and they have and can not provide any other independent witnesses to confirm that Gene Wilson did, indeed, makes these alleged statements to this doctor. The defendants are unable to do so because no such evidence exists.

Clearly, once again, based on this baseless allegation a significant issue of fact exists that would make the granting of the defendants' dispositive motion an error and as such this matter should be decided by a jury and the defendants' summary judgment motion should be dismissed as it relates to this particular issue.

Clearly, given the above the defendants knew of and disregarded the suicide risk presented by the Plaintiff to the defendants themselves. Therefore, under the applicable case law the vulnerability to suicide and the knowledge of the same existed. This combined with the disregard of the same by the defendants is enough to defeat their summary judgment motion on this particular issue. Farmer v. Brennan, 511 U.S. 825 (1994), Beers-Capitol v. Whetzel, 256 F.3d 120 (3d Cir. 2001).

### 2. Re: Lawton reply

Warden Lawton had knowledge of Gene Wilson's suicide since he formally requested and instructed his Lieutanant to begin an investigation into Gene Wilson's suicide death. (See Exhibit "E" Lawton Deposition N.T. 1/14/20, p. 40). Warden Lawton himself testified that prison policy was violated and broken because Gene Wilson was never given a second behavioral evaluation upon being physically placed at the House of Corrections. (See Exhibit "E" Lawton Deposition N.T. 1/14/20, p. 74).

Additionally, it should be added that defendant Warden Lawton did further admit that internal Philadelphia Prison System rules and regulations were

broken since his deputy warden of operations, Marvin Porter was required, under policy, to be the sole person to determine and/or order Gene Wilson to be placed into Administrative Segregation. (See Exhibit "E" Lawton Deposition N.T. 1/14/20, p. 53, 54, 56). This policy, clearly, was not followed since discovery uncovered the fact that defendant Talmadge unilaterally decided to make the ultimate decision to place Gene Wilson into Administrative Segregation despite the fact that, on the date that this decision was made, defendant Talmadge was only the deputy warden at the Alternative Special Detention Central Unit (also known as ASD). (See Exhibit "B" Talmadge Deposition N.T. 10/25/18, p. 17, 35).

### 3.    Re: Talmadge knowledge

The defendants' contention that there was no evidence that Deputy Warden Talmadge knew of a vulnerability to suicide or acted with reckless indifference is patently false. This allegation actually contradicts Talmadge's own deposition testimony and written statements. (See Exhibit "B" Talmadege Deposition N.T.10/25/18, p. 32, 33) This defendant even took the time to highlight a portion of her own statement where she purposely emphasized that Gene Wilson specifically told her that he wanted to harm himself. (See Exhibit "B" Talmadge Deposition N.T. 10/25/18, p. 28, lines 17-22, pp. 28-29, lines 23-24 (p. 28) and lines 1-9). Defendant Talmadge did, freely admit, that she alone made the decision to simply place Gene Wilson into Administrative Segregation at the House of Corrections even before Mr. Wilson was seen and evaluated by someone at the mental health unit. (See Exhibit "B" Talmadge Deposition N.T.

10/25/18, p. 37). This meant that this defendant made a unilateral decision, which clearly, according to her own testimony, violated internal Philadelphia Prison System rules and regulations because, in normal circumstances, the assigned Lieutenant is tasked with making this placement decision. Thus, this defendant circumvented clearly established Philadelphia Prison System policy and protocol, without conferring with anyone, she unilaterally decided to place Gene Wilson into Administrative Segregation at the House of Corrections even before Mr. Wilson had any sort of mental health review. This means that this defendant, at the moment that she made her fateful decision violated prison protocol and knew, at that moment, that Mr. Wilson wanted to harm himself or others. Despite knowing full well that Gene Wilson was a self admitted danger to himself and was, therefore, vulnerable to suicide and despite information as to Mr. Wilson's state of mind at that time (anxiety, depression, abnormal behavior, nausea, panicked, afraid, angry and that Mr. Wilson was expressing bizarre thoughts and beliefs) (See Exhibit "O" "Powers 2" exhibit, attached to deposition of Olumide Oluwabusi, N.T. 10/22/19), Talmadge's decision to ignore all of the above and to then order that Mr. Wilson be placed into a solitary cell, in an area normally reserved for punishment in a placed called "the Hole" is tantamount to reckless indifference.

**IV. D. Plaintiff's response to defendants' assertion that Plaintiff's Fourteenth Amendment and Eighth Amendment Claims Against Carney, May, Gianetta, Lawton, Talmadge and Fearon Must Be Dismissed Based on An Alleged Entitlement to Qualified Immunity**

**Law:**

The availability of a qualified immunity defense does not equal entitlement to its protection. Bamont v. PA Society For The Prevention of Cruelty to Animals, 163 F. Supp. 3rd 138 (2016)

The doctrine of qualified immunity shields government officials from civil liability as long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In considering a defendant's motion for summary judgment on the ground of qualified immunity, the task is to first determine whether the facts, and inferences drawn therefrom, taken in the light most favorable to the plaintiff, establish that the official's conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, "we must next determine whether, as a legal matter, the right that the defendant's conduct allegedly violates was a clearly established one, about which a reasonable person would have known." Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir.2000). Defendants are entitled to qualified immunity only if the constitutional or statutory violation alleged is not clearly established.

It is the defendants' burden to establish that they are entitled to such immunity. Beers-Capitol v. Wetzel , 256 F.3d 120 (Ct. of Appeals, 3rd Cir. 2001; see also Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir.1989). That is, the defendants have the burden on this issue and must show that their conduct did not violate clearly established statutory or constitutional rights of

which a reasonable person would have known. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The test for qualified immunity is objective. "Under the test announced in Harlow, reasonableness is measured by an objective standard; arguments that the defendants desired to handle or subjectively believed that they had handled the incidents properly are irrelevant." Stoneking, 882 F.2d at 726 (citing Anderson v. Creighton, 483 U.S. at 641, 107 S.Ct. 3034). That is, the defendants are entitled to qualified immunity only if they can show that a reasonable person in their position at the relevant time could have believed, in light of clearly established law, that their conduct comported with established legal standards.

And where the defendants were allegedly acting within the scope of their discretionary authority, to defeat their claim to qualified immunity, then, (1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of the defendant's conduct.

Additionally, case law indicates that defendants cannot receive qualified immunity protection when they have been sued in their individual capacity when the plaintiff's constitutional rights have been violated. (See, McGreevy v. Stroup, 413 F.3d 359 (Ct. of Appeals, 3rd Cir. 2005)).

Moreover, under Giles v. Kearney indifference to properly treating the

Page 43

medical needs of a prisoner in violation of established protocol does not, as a matter of law, allow for qualified immunity protection. Giles v. Kearney, 571 F.3d 318 (Ct. of Appeals, 3rd Cir. 2009).

Government officials who are either "plainly incompetent" or who violate the law or policies do not, as a matter of law, qualify for protection under the concept of qualified immunity. (See, Malley v. Briggs, 475 U.S. 335, 341 (1986); Orsatti v. New Jersey State Police, 71 F.3d 480 (Ct. of Appeals, 3rd Cir. 1995)).

And under Beers-Capitol v. Wetzel, 256 F.3d 120 (Ct. of Appeals, 3rd Cir. 2001) the defendants must sustain their burden of proving the applicability and protection under qualified immunity. As it relates to this issue the defendants' claim should be summarily dismissed since the defendants, in their motion for summary judgment on this issue have provided neither allegations nor proof, of any sort, as to this issue. As such under Beers-Capitol, and its progeny this court must summarily deny the defendants' request for dispositive relief on this basis.

### Argument:

Clearly the defendants, as it relates to its baseless assertion of qualified immunity for Carney, May, Gianetta, Lawton, Talmadge and Fearon have failed to sustain their burden on this issue and as such this court must dismiss the issue in the defendant's summary judgment motion.

Defendants' citing of the McLaughlin v. Watson case as "controlling" is incorrect since this case dealt with prosecutorial immunity in a Bivens based civil action. This is contrasted with the facts of the current matter here where there

Page 44

were facts that placed the defendants on notice that their conduct was prohibited (Gene Wilson informed prison officials that he wanted to harm himself and the defendants' knew, full well, that Gene Wilson was, at this time, acting erratically, was nervous, over anxious, depressed, expressed illogical and bizarre thoughts and still the defendants sent Mr. Wilson to solitary confinement in a punitive cell called "The Hole"). Moreover, the defendants' reference to whether or not someone named "Santa-Torres" is entitled to qualified immunity is erroneous and unrelated to the instant matter at hand. As such this court must dismiss this portion of the defendants' dispositive motion. (See Exhibit "P" Defendants Motion for Summary Judgement, page 14, line 5 of their motion for summary judgment).

Additionally, the defendants' assertion that the Woloszyn v. County of Lawrence somehow supports the defendants' summary judgment request is incorrect. This case cited by the defendants dealt with a jail house suicide of a pre-trial detainee who was seen laughing, joking, polite and acting in a non-agitated way (unlike Gene Wilson where Mr. Wilson informed defendants that he wanted to harm himself and was, according to defendants, anxious, agitated, nervous, nauseous, depressed and otherwise acting in a bizarre fashion). ("Powers 1" See Exhibit "C")

Moreover, the citing of the defendants of the Colburn v. Upper Darby Township is distinguishable from the present Gene Wilson matter since the Colburn case involved a suicide of a female, pre-trial detainee where said female

was, allegedly, negligently searched and that failure to properly conduct a thorough search lead to this pre-trial detainee shooting herself with a gun that she had secreted on her person. Additionally, there was a video camera overlooking the prison area in question and this prisoner was visibly intoxicated. The plaintiff, in this case asserted that intoxication and some "suicide hesitation cuts" were enough to put the prison on notice about this prisoner's propensity to want to commit suicide. Clearly, the facts in the current case are totally different than those found in Colburn.

Furthermore, the Spruill v. Gillis case cited by the defendants is clearly distinguishable from the current matter. In Spruill the case involved an appeal relating to the Prison Litigation Reform Act where the prisoner in question alleged that he received substandard medical care. This was not a suicide case.

And just as importantly all of these cases cited by the defendant do not, as defendants, incorrectly assert, have anything to do with each court "relying" on medical and behavioral health to determine whether an inmate is a risk for suicide is permissible and appropriate." (See Exhibit "P" Defendants' Motion for Summary Judgement, pg. 14, last paragraph). Since the defendants have misstated the holdings of these cases this court cannot utilize these cases to support the defendants' baseless assertion that solely relying on medical and behavioral health individuals to determine whether an inmate is a risk for suicide is permissible and appropriate. As such the defendants' assertion of qualified immunity based on their misguided interpretation of the above-mentioned cases should, on this basis

Page 46

alone, to deny the defendants' motion for summary judgment on the qualified immunity issue.

Assuming arguendo that the above analysis is insufficient to adequately resolve this issue the court must still deny the defendants' request for dismissal under a qualified immunity for defendants Carney, May, Gianetta, Lawton, Talmadge and Fearon since the defendants have failed to present this honorable court with any evidence whatsoever to support their immunity claim. It must be duly noted that in Section "D" of the defendants' motion for summary judgment they failed to present any specific proof or reasoning as to how or why the above-named defendants should receive any sort of qualified immunity. As such their claim should likewise fail on this basis as well. Beers-Capitol, supra.

Additionally, a review of the case law and the facts surrounding this matter clearly indicate that issues of fact are evident as it relates to this particular issue and as such the defendants' motion for summary judgment should be dismissed. Plaintiffs have properly plead and shown how Gene Wilson's constitutional rights were violated and how the Defendants were not protected by Qualified Immunity.

Plaintiff has alleged section 1983 violations as well as Fourteenth and Eighth Amendment violations against the defendants. Thus far several defendants have testified that they had express knowledge that in March, 2016 they possessed information directly from Gene Wilson himself that he wished to harm himself (See Exhibit "B" Talmadge Deposition N.T. 10/25/18, p.33), and defendant prison officials also possessed knowledge that Gene Wilson appeared overanxious,

panicked, afraid and was angry and was acting and/or talking in a strange manner and that he was expressing bizarre thoughts or beliefs. (See Exhibit "G" PPS Medical/Behavioral Health Review-3/25/16). Armed with this information defendant Talmadge did decide, based on her own interpretation of Philadelphia Prison System rules and regulations to unilaterally, without waiting for or having seen a mental health evaluation of Mr. Wilson, have Gene Wilson transferred to the House of Corrections. (See Exhibit "B" Talmadge Deposition N.T. 10/25/18, p. 35, 36).[3] However, according to another defendant, Warden Lawton (of the Philadelphia House of Corrections) a Philadelphia Prison System policy was violated when Gene Wilson was not given a second mental health evaluation. (See Exhibit "E" Lawton Deposition N.T. 1/14/20,p. 74). Despite these repeated aforementioned violations of policy the defendants then housed Gene Wilson in a cell, by himself, in a punitive segregation section at the House of Corrections called "the Hole". This area of the prison possessed no cameras to view vulnerable prisoners like Gene Wilson. Furthermore, the defendants did know, prior to Gene Wilson's suicide attempt, that prison suicide deaths were a problem and that the City had dealt with anywhere from 12-19 such prison suicide attempts in 2016 alone. (See Exhibit "E" Lawton Deposition N.T. 1/14/20, p.77, 78; where he confirms 19 suicide attempts at Philadelphia Prison Systems in 2016) ; and

---

[3] Defendant Talmadge also admitted during her deposition testimony that she violated PPS protocol and policy as to transferring and placing Gene Wilson to the House of Corrections since this decision was supposed to be made by a Lieutanant at ASD. (See Exhibit "B" Talmadge Deposition N.T.10/25/18, p.37).

defendants' discovery which showed at least 12 suicide deaths)/ (See Exhibit "Q"-City prison suicide files). Additionally, the defendants did not conduct a 30 minute tour of Mr. Wilson's cell and when defendant Fearon came upon Gene Wilson inside of his cell Mr. Wilson was still alive. (See Exhibit "L" Fearon Deposition N.T.11/14/18, p.45). However, due to a substantial delay in obtaining additional medical care and in this prison having an undermanned medical staff Gene Wilson expired from his suicide attempt.

Clearly, in the specific context of this case, based on the above by the defendants' own admissions and taken in the light most favorable to the party asserting injury, there is evidence that Gene Wilson's Fourteenth and Eighth Amendment constitutional rights were violated based on the aforementioned conduct of the defendants'. Saucier, supra.; Mullenix v. Luna, 136 S. Ct. 305 (2015).

Additionally, the defendants aforementioned conduct could be considered "deliberately indifferent" to an excessive risk to Gene Wilson, as a House of Correction prisoner and therefore this conduct cannot be objectively reasonable conduct. See Carter v. City of Philadelphia, 181 F.3d 339, 356 (3d Cir.1999) (holding that, if the plaintiff succeeds in establishing that the defendants acted with deliberate indifference to constitutional rights, then a fortiori the defendants' conduct was not objectively reasonable, and hence the defense of qualified immunity would not be available to defendants). Because there is a genuine issue of fact as to whether the defendants were deliberately indifferent, they have not

carried their burden to establish that they are entitled to qualified immunity.[4]

### E. Plaintiff's Response to defendants' assertion that Plaintiff's claims Against the City of Philadelphia fail as a matter of law.

In Estelle v. Gamble, 429 U.S. 97, 103-04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (finding that a failure to provide adequate medical care constitutes cruel and unusual punishment). In this case the Supreme Court held that the Eighth Amendment proscribes deliberate indifference to prisoners' serious medical needs. 429 U.S. at 103-04, 97 S.Ct. 285. In order to establish a violation of Gene Wilson's constitutional right to adequate medical care, evidence must show (i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3rd Cir. 1999).

Deliberate indifference is a "subjective standard of liability consistent with recklessness as that term is defined in criminal law." Nicini, 212 F.3d at 811. In Farmer v. Brennan, the Supreme Court held that finding a prison official liable for violating a prisoner's Eighth Amendment rights requires proof that the official "knows of and disregards an excessive risk to inmate health or safety." 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). He must be "both [ ] aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... draw the inference." Id. To survive a summary judgment

---

[4] In situations involving claims for inadequate medical care, courts have found deliberate indifference in situations where there was "objective evidence that [a] plaintiff had serious need for medical care," and prison officials ignored that evidence. Nicini, 212 F.3d at 815 n. 14.d. at 842, 114 S.Ct. 1970; Nicini v. Morra, 212 F.3d 798, 805 (3d Cir. 2000).

motion on this issue, the Plaintiff "must point to some evidence beyond [their] raw claim that [City of Philadelphia employees] w[ere] deliberately indifferent," or put another way, some evidence "that [the defendants] knew or w[ere] aware of [the risk to Gene Wilson]." Singletary v. Penn. Dept. Of Corrections, 266 F.3d 186 at 192 n. 2.

In situations involving claims for inadequate medical care, we have found deliberate indifference in situations where there was "objective evidence that [a] plaintiff had serious need for medical care," and prison officials ignored that evidence. Nicini, 212 F.3d at 815 n. 14. We have also found deliberate indifference in situations where "necessary medical treatment is delayed for non-medical reasons." Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir.1987) (citing Ancata v. Prison Health Servs., 769 F.2d 700, 704 (11th Cir.1985)).

42 U.S.C. § 1983 imposes civil liability upon any person who, acting under the color of state law, deprives another of the rights, privileges and immunities secured by the Constitution or federal laws. See Doe v. Delie, 257 F.3d 309, 314 (3d Cir.2001). This statutory provision "does not create any new substantive rights, but it provides a remedy for the violation of a federal constitutional or statutory right conferred elsewhere." Id. Where a plaintiff seeks to hold a municipal entity liable in a § 1983 action, she must prove that the alleged injury resulted from the implementation of a policy or custom of the municipality. See Monell v. New York City Dept. of Social Services, 436 U.S.

Page 51

658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir.1990). The municipality must be the moving force behind the alleged constitutional injury. See Board of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Therefore, the doctrine of respondeat superior does not apply to a § 1983 action against a municipality. See Monell, 436 U.S. at 694, 98 S.Ct. 2018.

In pleading a § 1983 action against a municipality or a municipal officer in his official capacity, a plaintiff need only comply with the Federal Rules of Civil Procedure's regime of notice pleading. The Supreme Court has held that there can be no heightened pleading requirement in § 1983 actions against municipalities and officers in their official capacities. See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); see also, Albright v. Virtue, 273 F.3d 564, 571 (3d Cir.2001). The Court found that such a requirement would be inconsistent with the ordinary notice pleading standard of Fed.R.Civ.P. (8)(a) and the specific limited exceptions listed in Fed.R.Civ.P. 9(b). See Leatherman, 507 U.S. at 168, 113 S.Ct. 1160; Serena H v. Kovarie, 209 F. Supp. 2nd 453 (Dis.Ct.E.D. 2003)

In Monell, the Supreme Court established the principle that, in order for a municipal defendant to be liable under § 1983, a plaintiff must (1) identify the policy in question, (2) attribute the policy to the municipality itself, and (3) show a causal link between the execution of the policy and the injury suffered. See Monell, 436 U.S. at 694, 98 S.Ct. 2018; Losch v. Borough of Parkesburg, 736

F.2d 903, 910 (3d Cir.1984). The Supreme Court has clarified the third prong of this standard, holding that there must be a "direct causal link between the municipal action and the deprivation of federal rights." See Brown, 520 U.S. at 404, 117 S.Ct. 1382.

And under Monell, Plaintiffs may make a failure to train allegation as well. In the City of Canton case in a prison suicide case, under section 1983 the plaintiff must (1) identify the specific training that has not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives. City of Canton v. Harris, 489 U.S. 378, 389, 109 S. Ct. 1196 (1989).

The defendants' contention that the Plaintiff has failed to provide any information concerning a link between defective policy and practice and a constitutional violation is patently incorrect. Plaintiff's expert conducted an extensive review of the defendants' policy and practice as it relates to the care of jailed prisoners similarly situated to Gene Wilson. What the expert found is that the defendants should have devised better, non-defective policies and that:

1. Had the Philadelphia Prison System (hereinafter referred to as "PPS" inputted complete inmate data and considered all available information, Gene Wilson would not have been placed in Administrative Segregation for the sole

purpose of protecting him from unnamed persons of whom he felt in fear of harm and ignored the need to protect him from self-harm/suicide.

2. Defendant, Warden Talmadge had not received any specialized training in suicidal behavior and did not recognize that based on the information known to the PPS on March 25, 2016, Gene Wilson needed to be protected from others and himself.

3. Placing Gene Wilson in Administrative Segregation in a standard, solitary, cell with a bed sheet, because of his potential for self-injury/suicide, was contrary to accepted correctional practices and PPS policies.

4. Recognizing in all of the prior suicide by hanging cases examined in this matter, a cloth bed sheet as a common ligature or instrument of death. Further, it is clear that the deceased inmates' self-reporting of no suicidal ideation were not reliable indicators of potential self-harm/suicide.

5. Under the circumstances, Gene Wilson should not have had a cloth bed sheet in a standard solitary cell where objects (ex. Push rods) were present upon which a sheet could be attached and used as a ligature for hanging.

6. The PPS practices failed to secure, observe, and monitor Wilson as a suicide risk which were substantial factors causing Wilson's in-custody death.

7. The policy, practice and custom of the PPS not issuing suicide resistant blankets to at risk inmates generally and to Mr. Wilson specifically reflects a deliberate indifference to reasonable inmate care and safety.

8. The harm and death suffered by Gene Wilson was foreseeable and the consequence of the casual, informal and grossly inadequate operations of the PPS as previously discussed. Had the PPS been adequately staffed, and officers and staff adequately trained and supervised this death reasonably would have been prevented.

9. The actions and/or inactions of the officers and the PPS, as discussed in this report, were substantial contributing factors causing the harm and subsequent death suffered by Gene Wilson.

Moreover, based on the expert's investigation into this matter he determined that:

Defendants failed to provide reasonably trained and competent correctional staff since reasonably trained and competent correctional staff would not have allowed Gene Wilson to be placed into a single-isolated cell with a bed sheet, knowing bed sheets are commonly used by jail inmates as weapons of self-destruction (suicide) and that Wilson's history included:

. Expressed concern/preoccupation about "What will happen to me?;"

. Depressed state indicated by crying.

. Extreme Restlessness, anxious, fearful, anger;

. Verbal and non-verbal cues, i.e., bizarre thoughts/behaviors;

. Complaint of significant pain, illness, injury;

. Self-harm ideation'

. Harming others ideation;

. Was potentially at increased risk following placement in segregated housing;

. During time of decreased staff supervision night weekend

Therefore, the Plaintiff's expert clearly laid out a case as to the defendant City's involvement along with the specific policies and practices which were violated. Additionally, said report clearly outlined how the defendant City's employees were poorly and improperly trained with said improper training leading directly to Gene Wilson's untimely demise while in prison. Losch, supra.; City of Canton, supra. (See Exhibit "N" McCauley expert report)

It must also be emphasized that Plaintiff's expert also concluded that the City's policies and procedures were also violated since they failed to conduct an examination of Gene Wilson to specifically ascertain his level of risk despite the fact that he should never have been allowed to have a bed sheet inside of his cell. Additionally the expert concluded that the defendant City of Philadelphia violated its own policy and procedures when they, ostensibly, cleared Gene Wilson for protective custody, alleged but no medical person determined that the level of self-injury precautions and, by written or verbal order they should have indicated the following: 1) the specific type of self-injury prevention watch that was necessary (Fifteen Minute Watch or Constant Watch); 2) Whether to use a suicide-resistant smock; 3) Whether blanket, clothing, feeding utensils or other

articles are permitted in the cell. (See Exhibit "N" McCauley expert report, pp. 12, 13)

Given the above the expert concluded that the defendants were neither properly nor reasonably trained and further concluded that no competent correctional staff would have or should have allowed Gene Wilson to be placed in a single, isolated jail cell with a bed sheet when the defendants knew that there had been a veritable "rash" of prison suicides and they also knew full well that bed sheets are commonly used by jail inmates as weapons of self destruction and given Wilson's extensive behavioral history, including, but not limited to, informing prison officials that he wanted to harm himself or others. (See Exhibit "N" McCauley expert report, p. 13)

It must also be noted that the court, in the Colburn case cited by defendants as controlling, reversed the district court's dismissal of the action against the township, holding that the factual averment of prior suicides in the jail facility was a sufficiently specific factual allegation to support an allegation that Upper Darby Township knew or should have known there was inadequate monitoring of jail cells, thereby establishing a governmental policy. Id. at 671. The Colburn court, in its discussion of the sufficiency of the complaint as to the township, relied on the Fifth Circuit Court of Appeals decision in Partridge v. Two Unknown Police Officers, 791 F.2d 1182 (5th Cir.1986). The Colburn opinion cannot be fully understood without reference to Partridge. The Fifth Circuit, in Partridge, reversed a district court's dismissal of a Section 1983

complaint filed against the City of Houston by the parents of Michael Partridge, who had committed suicide in the city's jail. The plaintiffs in Partridge "alleged that the Houston Police Department had a custom of inadequate monitoring of suicidal detainees which amounted to a policy of denying them medical care" which was familiar to the city. Id. at 1188 (emphasis added). The court held that detainees have a fourteenth amendment due process right to medical care and that "failure to take any steps to save a suicidal detainee from injuring himself may ... constitute a due process violation. ..." Id. at 1187. Therefore, under the Colburn case, which the defendants assert controls in this particular case, by clear logical reasoning the defendants must agree that, under Colburn, the plaintiff did, indeed, properly assert a claim and/or evidence of a distinctive municipal policy or custom that caused Gene Wilson's suicide death so as to defeat the defendants' motion for summary judgment on this issue related to the alleged failure to make a proper Monell claim.

Additionally, it must be emphasized that the Plaintiff's expert report, which confirmed various constitutional violations based on materially defective practices and policies in this case, were confirmed by the expert despite the additional information concerning the defendant Warden Lawton who did, apparently unilaterally, design, devise and develop his own, unchecked and unreviewed policy, practice, or custom of consistently failing to properly review all "prison sentient" events when he would order mandatory "debriefing" meetings for each such event. Yet despite conducting these "debriefing" meetings

he would provide no follow up reviews, discussions, criticisms, re-training or punishment of any kind. Therefore, the City, by and through Warden Lawton developed a practice and policy that allowed prison officials to violate a prisoner's constitutional rights without fear of repercussion or discipline of any sort. (See Exhibit "E" Lawton Deposition N.T. 1/14/20, pp. 24-37) Further troubling is the fact that Warden Lawton freely admitted to various and sundry violations of internal prison rules, regulations and policies since, according to this defendant, Gene Wilson was supposed to have a second behavior/mental health evaluation. This second behavioral/mental health evaluation was never conducted.(See Exhibit "E" Lawton Deposition N.T. 1/14/20, p. 73,74) Additionally, this defendant admitted that his deputy warden of operations was the sole person who should have made the ultimate decision to place Gene Wilson into Administrative Segregation at the House of Corrections and NOT the defendant Talmadge. (See Exhibit "E" Lawton Deposition N.T. 1/14/20, pp. 53, 54). Beswick v. City of Philadelphia., 185 F. Supp. 2d 418, 427 (E.D. Pa. 2001).

And it is equally troubling that this defendant Warden now claims to have "no knowledge" of directing a meeting related directly to the suicide death of Gene Wilson when at least two other defendants have provided sworn testimony that not only did Warden Lawton have full knowledge of the facts and circumstances surrounding Gene Wilson's death but that he also headed a meeting where he, apparently secretly, reviewed the facts and circumstances for each individual who came into contact with Mr. Wilson, or, in the alternative, played

some part in Gene Wilson's prison suicide. (See Exhibit "L" Fearon Deposition, N.T. 11/14/18, pp. 19, 20), (See Exhibit "R" Orgasan Deposition N.T. 4/16/19, pp. 79-82); (See Exhibit "E"Lawton Deposition N.T. 1/14/20, p.40, 43)

Moreover, as was stated above in Plaintiff's reply to defendants' motion, defendant Deputy Warden Talmadge testified that she alone went against established prison protocol and did not allow her Lieutenant to make the decision as to whether or not Gene Wilson would be transferred to another facility. (See Exhibit "B" Talmadge Deposition N.T. 10/25/18, pp.35,37). Talmadge admitted that she alone made this unilateral decision and that she did so before Gene Wilson was ever seen by anyone for a mental health evaluation. (See Exhibit "B" Talmadge Deposition N.T. 10/25/18, pp. 35, 37).

This decision, to transfer Gene Wilson into a single, solitary cell, in a punitive and segregated area of the House of Corrections, called "the Hole", that did not possess any sort of proper video monitoring system, despite Talmadge, admittedly, having full knowledge that Gene Wilson informed her that he wanted to harm himself or others, without more, is yet another example of the "scienter-like evidence of indifference" necessary to sustain a claim against the defendant City of Philadelphia. Beswick, supra.

Further compounding matters is the fact that the defendants knew full well, prior to Gene Wilson being transferred to the House of Corrections, that he was experiencing high levels of anxiety, he was panicked, afraid, angry, nauseous, and had otherwise experienced"bizarre" thoughts and beliefs yet they still decided

to transfer Mr. Wilson to "the Hole" in a solitary cell all without having had a
mandatory second mental health/behavioral health evaluation upon being
transferred to the House of Corrections. (See "Powers 1", Exhibit "C"), (See
Exhibit "E"Lawton Deposition N.T. 1/14/20, p. 74).

Based on investigative reports and memorandum provided to Plaintiff's
counsel by the defendant City of Philadelphia it is clear and unequivocal that the
City has a policy of emphasizing the importance of "Positive Static Risk Factors"
including, but not limited to, suicidal ideation/threats in the past as well as
"Positive Dynamic Risk Factors" such as, "anxiety, agitation as well as
disturbance in mood". Moreover the defendants, clearly had a policy of training
its employees to review with a prisoner whether there was any strong family
support, religious beliefs or employment. There is no evidence that this
background check was performed on Gene Wilson. Moreover, the "Positive
Static Risk Factors" and "Positive Dynamic Risk Factors" were clearly present in
the instant case as the defendants themselves noted these factors on prison
paperwork as it relates to Mr. Wilson. (See Exhibit "V" Defendants
Memorandum dated December 9, 2013) (See also Exhibit "N" McCauley expert
report)

And there were previous prison suicide cases (the 2013 inmate suicide
matter discussed by Lieutant Dofred R. Pieretti in a December 9, 2013
memorandum) where, clearly, the defendant City had a policy of erring on the side
of caution as it related to prisoners who may have shown signs of potential

suicidal ideation and the like. (See Exhibit "V", for example, page 17, City of Philadelphia Memorandum dated December 9, 2013, from Lt. Dofredo R. Pieretti). In this particular case despite the fact that the inmate in question was considered a "low suicide risk" he was, nevertheless, referred to the Psychiatrist/Nurse Practitioner for treatment. Unfortunately, in the Gene Wilson matter the defendants failed to adhere to their own, aforementioned policy when they ignored the clear and obvious signs that Gene Wilson wanted to harm himself or others and had exhibited blatant "Positive Static Risk Factors" as well as "Positive Dynamic Risk Factors" yet they ignored the same and placed Mr. Wilson at the House of Corrections in a solitary administrative segregation cell, thereby violating an additional policy of providing Mr. Wilson with a second behavioral/mental health evaluation. The defendants' clear violation of their own aforementioned polices caused an Eighth Amendment constitutional violation and proximately caused Gene Wilson's suicide death. It is clear that based on the policies and practices put into place by the Defendant, City of Philadelphia, they have systematically violated the same and in reviewing the Defendant's Monell materials the Defendants have rarely, if ever, disciplined or otherwise punished City prison employees as it relates to prisoner suicides. (See Exhibit "V" Defendants Memorandum dated December 9, 2013) (See also Exhibit "N" McCauley expert report)

Therefore based on the above it is clear that, based on the evidence, it can be inferred that the defendant, City of Philadelphia, that the defendant "knowingly

and unreasonably disregard[ed] an objectively intolerable risk of harm" related to

Gene Wilson. Farmer, supra. 511 U.S. at 846, 114 S.Ct. 1970.

**F.** **Plaintiff's response to defendants' contention that Plaintiff's Negligence claims Fail as a Matter of law despite sufficient evidence that said claim is legitimate.**

Law:

The Political Subdivision Tort Claims Act grants the City governmental

immunity from liability for any damages resulting from an injury to a person or

property caused by any act of the City, its employee, or any other person, except

as specifically provided for under 42 Pa.C.S.A. § 8542. This immunity extends to

an employee of the City who is liable for civil damages caused by acts which are

within the scope of his office or duties. An employee may be indemnified for the

payment of a judgment arising from a lawsuit when the employee was acting, or

reasonably believed that he was acting, within the scope of his duties. 42

Pa.C.S.A. § 8548(a). An employee's immunity does not extend to acts that are

judicially determined to be crimes, actual fraud, actual malice, or willful

misconduct. 42 Pa.C.S.A. § 8550. Schnupp v. Port Authority of Allegheny

County, 710 A.2d 1235 (Pa.Cmwlth. 1998) (conduct that is willful and wanton is

not protected by Pennsylvania's immunity statutes).

Willful misconduct, for the purposes of tort law, has been defined by

Pennsylvania Supreme Court to mean conduct whereby the actor desired to bring

about the result that followed or at least was aware that it was substantially certain

to follow, so that such desire can be implied. Evans v. Philadelphia Transportation

Page 63

Company, 418 Pa. 567, 212 A.2d 440 (1965). In other words, the term "willful misconduct" is synonymous with the term "intentional tort". See W. Prosser, Handbook of The Law of Torts, 31 (4th ed. 1971).

A municipality has an affirmative duty to prevent suicide. Dept. of Public Welfare v. Kallinger, 580 A.2d 887 (Pa. Cmmw. 1990). The Commonwealth must maintain prison security, order and discipline and must provide proper medical care to inmates, thus preserving life and preventing suicides. Kallinger, supra.

### Argument:

The Plaintiffs, throughout this response, have provided this court with proof that the defendants, knew that their prisoner, Gene Wilson told them he wanted to harm himself. Furthermore, the defendants knew, prior to placing Gene Wilson into a solitary confinement cell in a punitive segregation cell in the House of Corrections, that he was acting strangely, was overly anxious, panicked, angry, was nauseous and had expressed bizarre thoughts and beliefs. Armed with this information the defendants still decided to transfer Gene Wilson to the House of Corrections and then violated their own policy when they failed to provide Gene Wilson with a second mental health/behavior evaluation upon Mr. Wilson's arrival at the House of Corrections.

Compounding matters after Gene Wilson's suicide was the fact that the defendants secretly met at the House of Corrections mere hours after Gene Wilson's suicide death and covered up the contents and/or discussions which took

place during this secret meeting. The defendants, to this date, have failed to

provide the contents of this tape recorded meeting to Plaintiff and one defendant,

Warden Lawton, has categorically denied that this meeting took place. This,

despite the fact that at least two other defendants have provided sworn testimony

that defendant Lawton possessed knowledge of Gene Wilson's death (See Exhibit

"L" Fearon Deposition N.T. 11/14/18, p.19) and was instrumental in chairing and

running this meeting. Thus the credibility of the defendants is now called into

question. The defendants knew that Gene Wilson was suicidal and failed in their

affirmative duty to prevent Gene Wilson's suicide. Clearly, given the above, the

facts surrounding this issue are in dispute since the Plaintiff avers that the

defendants' behavior, in reference to Gene Wilson's prison suicide, taken

collectively, may indicate to a jury that the defendants' actions were tantamount to

willful conduct and therefore the Tort Claims Act provides no immunity to the

defendants under these circumstances. As such the defendants' motion for

summary judgment must be denied on this issue.

**G.      Plaintiff's response to defendants' contention that Plaintiff's
claims under the Wrongful Death and Survival Act must fail as a matter of
law.**

Law:

Cases may be brought under the Wrongful Death Act, 42 Pa. Cons.

Stat. Ann. § 8301, and the state's Survival Act, § 8302. But "wrongful death and

survival actions are not substantive causes of action; rather, they provide a vehicle

through which plaintiffs can recover for unlawful conduct that results in death."

Page 65

Sullivan v. Warminster Twp., 765 F.Supp.2d 687, 707 (E.D.Pa.2011); see also

Carroll v. Skloff, 415 Pa. 47, 202 A.2d 9, 10-11 (1964) ("The cause of action

created by the survival statute is strictly derivative.... It is grounded upon an

existing personal cause of action which the deceased could have but did not

institute during his or her lifetime."), overruled on other grounds by Amadio v.

Levin, 509 Pa. 199, 501 A.2d 1085 (1985); Sunderland v. R.A. Barlow

Homebuilders, 791 A.2d 384, 390-91 (2002) ("A wrongful death action is

derivative of the injury which would have supported the decedent's own cause of

action and is dependent upon the decedent's cause of action being viable at the

time of death."), aff'd, 576 Pa. 22, 838 A.2d 662 (2003). Essentially, cases

brought under the Wrongful Death Act and the state's Survival Act are,

essentially, predicated on the Plaintiff maintaining a viable cause of action.

    Given the above the Plaintiff asserts that she has a proper and viable

underlying case against the defendants. As such the Plaintiff's claims under these

Acts will succeed since all underlying claims are indeed viable. Accordingly, the

defendants' request for relief as to this particular issue must be dismissed by this

honorable court.

### H. Plaintiff's response to defendants' allegation that the Plaintiff's Civil Conspiracy Claim should fail as a matter of law.

**Law:**

    The essential elements of a claim for civil conspiracy are as

follows: (1) a combination of two or more persons acting with a common purpose

to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage. Phillips v. Selig, 959 A.2d 420, 437 (Pa. Super. 2008), appeal denied, 967 A.2d 960 (Pa. 2009)

See While Lackner v. Glosser, 892 A.2d (Pa. Super. 2006) held, in part, that agents of a single entity cannot conspire among themselves, if other defendants from different entities have been alleged to join in said conspiracy the party asserting a civil conspiracy may legitimately assert the same. (See, Frey v. Gold, No. 1120 WDA 2016, non-precedential, (Pa. Super. 2017) which held, in part, that a Plaintiff who alleges that multiple defendants from different entities who have otherwise engaged into a civil conspiracy may proceed on that claim.

Given the applicable law it is clear that the Plaintiff properly pleaded the aforementioned civil conspiracy elements. (See Exhibit "A" Plaintiff's Complaint, paragraph(s) ). In addition to the allegations the defendants deposition testimony and documents clearly indicate that the defendants, knew that their prisoner, Gene Wilson told them he wanted to harm himself. Furthermore, the defendants knew, prior to placing Gene Wilson into a solitary confinement cell in a punitive segregation cell in the House of Corrections, called "The Hole" that he was acting strangely, was overly anxious, panicked, angry, was nauseous and had expressed bizarre thoughts and beliefs. Armed with this information the defendants still decided to transfer Gene Wilson to the House of Corrections and then violated their own policy when they failed to provide Gene Wilson with an additional

Page 67

mental health/behavior evaluation. Compounding matters after Gene Wilson's suicide was the fact that the defendants secretly met at the House of Corrections mere hours after Gene Wilson's suicide death and covered up the contents and/or discussions which took place during this secret meeting. The defendants, to this date, have failed to provide the contents of this tape recorded meeting to Plaintiff and one defendant, Warden Lawton, has categorically denied that this meeting took place. This, despite the fact that at least two other defendants have provided sworn testimony that defendant Lawton was instrumental in chairing and running this meeting. One of these defendants, Nurse Orgasan, an employee of another defendant, Corizon Health Corporation was a part of this conspiracy (See Exhibit "R" Orgasan Deposition N.T., pp. 79-83, 97), as was another defendant, Dr. Oluwabusi and MHM. Thus the credibility of the defendants is now called into question. The defendants knew that Gene Wilson was suicidal and failed in their affirmative duty to prevent Gene Wilson's suicide. Clearly, given the above, the facts surrounding this issue are in dispute since the Plaintiff avers that all of the defendants' behavior, in reference to Gene Wilson's prison suicide, taken collectively, may indicate to a jury that the defendants' actions were tantamount to malicious behavior. As such the defendants contention that Plaintiffs allegations as to the existence of a civil conspiracy is incorrect and, therefore, the defendants' motion for summary judgment on this issue must be dismissed as a genuine issue of fact exists surrounding this particular issue.

### V. CONCLUSION:

For all of the foregoing reasons the plaintiff asserts that the defendants have failed to sustain their burden of proof in reference to their motion for summary judgment. Defendants have presented several cases which are factually distinguishable from the current case. The Plaintiff has presented proof and allegations from exhibits, testimony, statements and expert reports which showed that the defendants, at all times relevant hereto, knew, directly from Gene Wilson himself that prior to his demise that he was acting and behaving erratically, was anxious, panicked, angry, nauseous, depressed, paranoid, exhibited "bizarre" behavior and was, at times, incoherent. Additionally, the defendants knew, since they heard the same uttered by Gene Wilson to them prior to his suicide, that he wished to harm himself. Armed with a combination of these facts the defendants ultimately placed Gene Wilson into a solitary confinement cell in the D1, punitive disciplinary block at the House of Corrections, that possessed neither cameras nor adequate or consistent correctional officer tours of said cell area. Then, combined with all of this was the fact that the Philadelphia Prison System, prior to Gene Wilson's death, dealt with a rash of prison suicide deaths (approximately 19 in 2016 alone) and still, according to the warden of the House of Corrections, the defendants willfully violated their own policy and rules by blatantly failing to give Gene Wilson a mandatory second behavioral and mental health evaluation. All of the above lead directly to Gene Wilson's suicide.

Compounding matters was the fact that apparently all parties then secretly met to "review" the circumstances surrounding Gene Wilson's death yet failed to

disclose the same to either the assigned prison investigator and attempted to cover up the mistakes made surrounding the care of Gene Wilson. The defendant who scheduled and ran this meeting did tape record the same yet failed to disclose this information to anyone and, even worse, categorically denied that this meeting took place. This despite the assertions to the contrary from other defendants from both the City of Philadelphia and from the defendants Corizon and their employee, nurse Orgasan.

Respectfully submitted:

Troy H. Wilson, Esquire
Attorney for Plaintiff
Rena Abran