IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RENA ABRAN, individually and as mother and Administrator on the ESTATE OF GENE WILSON,
Plaintiff

NO. 2018-CV-01107-MSG

v.

MARILOU ORGASAN, R.N., CORIZON HEALTH INC. , et al.;
Defendants

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER ANSWER TO DISMISS THE DEFENDANTS' CORIZON AND ORGASAN'S MOTION FOR SUMMARY JUDGMENT**

I. MATTER BEFORE THIS COURT:

Defendants Corizon Health Care, Inc. and defendant nurse Marilou Orgasan jointly filed a motion for summary judgment seeking a dismissal of all counts as set forth in the Plaintiff's Amended Complaint. The defendants' motion was filed despite the fact that their Corporate Designee did, recently, testify that she was in possession of several additional discoverable documents that are directly relevant to this instant civil rights complaint and which defendants were legally required to provide to the Plaintiff prior to the expiration of the discovery deadline and which Plaintiff must receive in order to properly and fully respond to said dispositive motion.

II. FACTUAL BACKGROUND:

The non-movant, above-captioned Plaintiff, does hereby incorporate, by reference, her responses to defendants' mistakenly captioned "Undisputed Facts" in support of their motion for summary judgment. By way of further reply based on continuing discovery Plaintiff ultimately

filed an Amended Civil Complaint alleging various and sundry 1983 civil rights and constitutional violations as well as allegations of negligence, Wrongful Death, Survival and Civil Conspiracy against all defendants.

Plaintiff, Rena Abran brought a federal civil rights, 1983 action against the defendants, City of Philadelphia and Prison Commissioner Blanch Carney, Nancy Giannetta, Warden of House of Corrections, William Lawton, then Deputy Warden Cathy Talmadge, Sgt. Aisha Cook and Correctional Officer Clyde Fearon (hereinafter referred to as "Defendants") based on a set of instances which occurred while Ms. Abran's son, Gene Wilson was housed, as a post-trial detainee, then serving out a Driving Under Intoxication sentence at the Philadelphia Prison System in or around March, 2016. At all times relevant hereto Ms. Abran is also the administratrix of Gene Wilson's estate.

Plaintiff alleges that her son's constitutional rights were violated under the Fourteenth and Eighth Amendments to the Constitution when Gene Wilson, while a prisoner in the Philadelphia Prison System was noted by prison officials as being nauseous, acting erratically, was depressed, expressed illogical ideas, expressed a noted level of anxiety, expressed physical complaints that did not seem real, appeared panicked, suspicious, paranoid, afraid of others for no apparent reason, angry and was, notably, expressing "bizarre thoughts or beliefs". In addition to exhibiting this type of disturbing behavior Gene Wilson actually informed prison staff, including defendant Deputy Warden Cathy Talmadge that he wanted to harm himself and/or others. Instead of placing Gene Wilson into a suicide ward or into an anti-suicide cell Talmadge and the other defendants made the fatal decision to transfer Gene Wilson to the Philadelphia House of Corrections after undergoing what could best be termed as a "perfunctory" mental

health evaluation of Mr. Wilson. However, defendant Talmadge admitted, during her deposition testimony, that she had, unilaterally, made up her mind to transfer Gene Wilson before the aforementioned evaluation even took place.

Once transferred to Warden Lawton's care at the House of Corrections Warden Lawton admitted that prison policy and procedure called for all prison inmates transferred into his prison must undergo a second mental health/behavioral evaluation. This procedure was ignored by the defendants' and Gene Wilson was subsequently placed into a punitive area at the House of Corrections called "D1", otherwise known as "The Hole". It should be further noted that Mr. Wilson was placed into, essentially, solitary confinement in a jail cell that took no precautions against suicide and this House of Corrections had no cameras to monitor these particular cells. Several hours after being placed into this segregated, solitary cell, Gene Wilson committed suicide.

Compounding matters was the fact that Lawton denied any knowledge of Gene Wilson's death when he did, according to other defense witnesses, possess said knowledge. Additionally, Lawton admitted that his "own" procedure was to tape record post jail incident meetings, reduce the statements made at the meeting to writing, have his assistant provide him with a written copy of the same and then sign this document before transferring a copy to his superiors. Defendants' Corizon and nurse Orgasan attended this "secret meeting" and willfully failed to provide evidence of the same to Philadelphia Prison investigators. Additionally, all of the defendanats failed to provide any discovery to Plaintiff concerning said meeting. This was a blatant attempt to hide or to otherwise fail to disclose the true reasons and rationale for their aforementioned constitutionally violative behavior as it relates to Gene Wilson. Therefore, Lawton and the all

other defendants' credibility are called into question since the defendants have failed to provide these documents that their own witness readily admits exists. This information is relevant and discoverable and this court must order the defendants to provide the same to the Plaintiff forthwith.

Given the above this honorable court should delay making a final decision on the defendants' dispositive motion until the defendants provide the Plaintiff with the aforementioned relevant and discoverable documents. Assuming arguendo that this court denies this request it must still deny and dismiss the defendants' motion for summary judgment since the defendants have failed to sustain their burden as significant issues of fact exist to defeat said motion for summary judgment.

Although this honorable court did set December 18, 2019 as the applicable discovery deadline the parties (including these defendants) did agree to informally extend said deadline so that additional deposition testimony could be taken. As a result of this agreement the defendants' Corporate Designee deposition was finally taken on January 8, 2020 and House of Corrections Warden Lawton (defendant and former employee of the City of Philadelphia) deposition was subsequently taken on January 14, 2020. As a result of the taking of said deposition both depositions elicited testimony that indicated that these defendants possessed additional discoverable information and paperwork that is both relevant and pertinent to the above-captioned matter and, additionally, said discovery is required to be obtained so that Plaintiff may utilize the same to properly, correctly and fully respond to the defendants' motion for summary judgment.

The Plaintiff did, on the record, during said January 8, 2020 deposition formally request receipt of all of this additional discovery. (Despite the fact that, several months earlier, defendants had, or so Plaintiff thought, all discovery in its possession related to this particular prison suicide case). Plaintiff did also, several days

## III. QUESTIONS PRESENTED AND ANSWERED:

Should this honorable court grant the Plaintiff's request to stay making a ruling on the defendants' motion for summary judgment under Rule 56(d), which the Plaintiff would utilize to support its response to the defendants' motion for summary judgment, when the defendants have withheld discoverable and relevant documents well past the applicable discovery deadline and where the Plaintiff was only recently informed of the existence of these documents when the defendants' Corporate Designee revealed that she was in possession of the same?

Answered in the affirmative.

A. Assuming arguendo that this court wishes to attempt to resolve the defendants' motion for summary judgment should the defendant Orgasan's motion for summary judgment be denied since the Plaintiff has made out valid civil rights and constitutional claims against Orgasan?

Answered in the affirmative.

B. Should the defendant Corizon motion for summary judgment be denied since the Plaintiff has made out valid civil rights and constitutional claims against Corizon?

Answered in the affirmative.

C. Should the Plaintiff's count against the defendants related to the allegation of "Civil Conspiracy" be sustained and the defendants' motion for summary judgment be denied since Plaintiff has properly plead the same thereby negating a summary judgment motion on this particular issue?

---

Answered in the affirmative.

## IV. PLAINTIFF'S LEGAL ARGUMENT:

---

It must initially be noted that the defendant seeks to have this court grant its motion for summary judgment alleging that Plaintiff has failed to provide evidence of a policy or practice that was constitutionally, defective in this matter that caused the injuries and subsequent death to Gene Wilson. Plaintiff argues that under Federal Rule 56(d) the defendant Corizon has knowingly failed to, and/or otherwise refused to, provide the Plaintiff with complete discovery since, Corizon's own Corporate Designee, Latasha McMillan did, on January 8, 2020 testify to having in her possession various and sundry discoverable documents that would speak directly to the "practice and policy" issue. At least one year ago Plaintiff did receive discovery documents from defense counsel however Plaintiff has not received the below listed, relevant and discoverable documents to which defendant, Corizon's Corporate Designee Latasha McMillan testified to.

"[I]t is well established that a court `is obliged to give a party opposing summary judgment an adequate opportunity to obtain discovery.'" Doe v. Abington Friends Sch., 480 F.3d 252, 257 (3d Cir. 2007) **(quoting** Dowling v. City of Phila., 855 F.2d 136, 139 (3d Cir. 1988)). Rule 56(d) states that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed.R.Civ.P. 56(d).

A formal motion is not required to request discovery under Rule 56 and this is consistent with the analysis of other circuit courts of appeals. Although the request for discovery is sometimes—rather casually—characterized as a "motion," courts recognize that the nonmoving party can respond to a motion for summary judgment by filing an affidavit or declaration requesting discovery. Shelton v. Bledsoe, 775 F. 3d 554 (Ct. of Appeals 3d Cir. 2015). Additionally, it is an abuse of discretion for a court to refuse to consider a Rule 56 request for additional discovery to more properly and fully address and respond to a defendant/movant's motion for summary judgment when the proper affidavit has been attached. Shelton, supra. (See also, Opus Bank v. Aramis Interactive, LLC, Dist. Ct. MD PA 2019; Civ. Action # 1:18 c.v. 833)

Where the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course.'" Id. (quoting Costlow v. United States, 552 F.2d 560, 564 (3d Cir.1977)). Additionally, nothing precludes a party from requesting an opportunity for discovery under Rule 56(d) by simply attaching an appropriate affidavit or declaration to that party's response to a motion for summary judgment, and by asserting that summary judgment should not be granted without affording the responding nonmovant an opportunity for discovery. Moreover, we note that district courts usually grant properly filed requests for discovery under Rule 56(d) "as a matter of course," whether the nonmovant's response to a summary judgment motion is characterized as a motion, affidavit, or declaration. Murphy, 650 F.3d at 309-10 (quoting Doe, 480 F.3d at 257); cf. Mid-South Grizzlies v. Nat'l Football League, 720 F.2d 772, 779 (3d Cir. 1983). This is particularly true when there are discovery requests outstanding or where relevant facts are under control of the party moving for summary judgment. Murphy, 650 F.3d at 310.

If discovery is incomplete, a district court is rarely justified in granting summary judgment, unless the discovery request pertains to facts that are not material to the moving party's entitlement to judgment as a matter of law. Doe, 480 F.3d at 257. Summary judgment may also be granted if the Rule 56(d) declaration is inadequate. See Koplove v. Ford Motor Co., 795 F.2d 15, 18 (3d Cir. 1986) (finding the affidavit insufficient because it did not specify what discovery was needed or why it had not previously been secured). An adequate affidavit or declaration specifies "what particular information that is sought; how, if disclosed, it would preclude summary judgment; and why it has not been previously obtained." Dowling, 855 F.2d at 140 (citing Hancock Indus. v. Schaeffer, 811 F.2d 225, 229-30 (3d Cir. 1987)).

In this current case Ms. McMillan did testify that as a Corizon employee, Corporate Designee and Director of Operations for defendant Corizon she was, on the date of the incident involving Gene Wilson, a part of the sentinel death committee for Corizon which regularly conducted meetings after incidents such as the Wilson prison suicide and would have access to documents relating to the same. (See Exhibit "C" McMillan Deposition N.T. 1/8/20, pp. 17, 55, 56). She also testified how Corizon employees and non-Corizon/City of Philadelphia prisoner employees also attend and actively participate in these meetings. (p. 55, 56). She further testified that she possessed rules, regulations and policy information related to "stretcher calls" for all prisoners (p. 43), possessing emails concerning all post suicide deaths including Gene Wilson's death (See Exhibit "C" McMillan Deposition N.T.1/8/20, pp. 61, 62, 69) and she also possesses rules, regulations and policy information for defendant Corizon employee staffing issues at prison (which is one of the issues surrounding this particular case).

Additionally, this witness has testified that Corizon is in possession of information relating to all prison suicide deaths and prison deaths (See Exhibit "C" McMillan Depostion N.T. 1/8/20, pp. 26,27,69, 70) and that her office actually reviews and analyzes all of this suicide death information for trends or problems generally (See Exhibit "C" McMillan Deposition N.T. 1/8/20, P. 72). Furthermore, according to this witness the defendant Corizon also has nurse Peer Review information (p. 80), Emergency Response Manuals provided to all of its medical employees who care for prisoners (p. 83), and Ms. McMillan also testified that the defendant Corizon regularly shares some of this information and data with defendants City of Philadelphia as well as with defendant MHM Services (See Exhibit "C" McMillan Deposition N.T.1/4/20, pp. 18, 55, 56, 69, 71,72).

Not only did Plaintiff's counsel specifically request that all of the above discoverable information be delivered to counsel on January 8, 2020 but counsel followed up this request with both an email to defense counsel as well as a formal Supplemental Request for Production of Documents to said defense counsel on February 3, 2020. (See attached Exhibit "D" Plaintiff's Request).

As of the date of this filing defense counsel has failed to comply with the Plaintiff's request for the aforementioned additional documents. Given the above development under all relevant case law combined with Rule 56(d) this court must be compelled to, at a minimum, provide the Plaintiff with an order which will compel the defendant Corizon to provide any and all additional discovery to the Plaintiff so that the Plaintiff may read and review the same in order to provide a more detailed response to the defendants' assertions as to whether Plaintiff has made

out a sufficient policy and practice argument in order to deny the defendant Corizon's motion for summary judgment on this particular issue. Shelton, supra., Costlow, supra., Doe, supra., Dowling, supra. This is imperative since the defendants have, as well, withheld or otherwise failed to provide discovery related directly to the policy and practice issues that they contend the Plaintiff has failed to provide proof about in reference to this instant civil rights matter. (See also the Plaintiff's Affidavit in support of a delay in deciding on defendants' motion for summary judgment pending an order to provide Plaintiff with additional and complete discovery forthwith, attached at the end of this brief).

However, assuming arguendo that this honorable court fails to grant the Plaintiff's request under Rule 56(d) this court must still deny the defendant's request for summary judgment relief since the Plaintiff has presented sufficient information concerning policy and practice since the Plaintiff has sufficiently alleged a lack of and/or delay in obtaining medical treatment as it relates to Gene Wilson which was an Eighth Amendment constitutional violation since a reasonable jury could find that the defendant's failure to adequately provide medical emergency services in a proper and expeditious fashion constitutes a delay of medical treatment. This is therefore sufficient as a matter of law to survive a motion for summary judgment. (See Natale v. Camden County Correctional Facility, 318 F.3d 575, 582 (3rd Cir. 2003).

Summary Judgment Standard:

Summary judgment may only be granted where the moving party shows that there is no genuine dispute of any material fact, and that judgment as a matter of law is warranted. Fed.R.Civ.P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against a party who fails to make a showing sufficient to establish an element

essential to his or her case and on which he or she will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In evaluating the evidence, the court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. Watson v. Abington Twp., 478 F.3d 144, 147 (3d Cir. 2007).

The burden on a motion for summary judgment is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof or that there is an absence of evidence to support the nonmoving party's case. Celotex Corp., 477 U.S. at 322, 325; Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).

Once the movant meets its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. Fed.R.Civ.P. 56(e); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex, 477 U.S. at 323-25. The nonmoving party must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. Celotex, 477 U.S. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply

reasserting unsupported factual allegations contained in his or her pleadings. Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 323-24. The summary judgment inquiry asks whether there is a need for trial-"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000) (citing decisions); Liberty Lobby, 477 U.S. at 248-49; Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact-that is, a fact that would affect the outcome of the suit under the governing substantive law-will preclude the entry of summary judgment. Liberty Lobby, 477 U.S. at 248.

A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. Celotex, 477 U.S. at 322-23. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative, " the moving party is entitled to judgment as a matter of law. Liberty Lobby, 477 U.S. at 249. The nonmoving party must "do more than simply show that there is

some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every challenged] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 Fed.Appx. 353, 354 (3d Cir.2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir.2002)). Inferences based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a motion for summary judgment. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

Estate of Kempf v. Washington County, Civil Action 15-1125 W.D. Pa. September 12, 2018)

**A. Defendant Orgasan's contention that she is not liable on Plaintiff's 42 U.S.C. section 1983 Claim is erroneous.**

**Law:**

Prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care. Estelle v. Gamble, 429 U.S. 97, 104 (1978). In order to succeed on a claim of denial of medical treatment in violation of his Eighth Amendment rights, an inmate must show: (1) that he was suffering from a "serious" medical need; and (2) that the prison officials were "deliberately indifferent" to the serious medical need. Id. With respect to the first element of this standard, a medical need qualifies as "serious" when, for example, "it . . . has been diagnosed by a physician as requiring treatment." Monmouth Cnty Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). A medical need also may be "serious" if it is so obvious that even a

layperson would recognize the need for a doctor's attention. Morrison v. Phillips, No. 06-812, 2008 WL 4308215, at *13 (D.N.J. Sept. 16, 2008) (quoting Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006)).

With respect to the second element - deliberate indifference - the Supreme Court has adopted a subjective approach. Farmer v. Brennan, 511 U.S. 825, 842 (1994). This standard requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837; see also Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (quoting Farmer,511 U.S. at 837). The United States Court of Appeals for the Third Circuit has held that deliberate indifference may be demonstrated in several scenarios, including "when a doctor is intentionally inflicting pain on [a] prisoner," and when the denial of "reasonable requests for medical treatment . . . exposes the inmate to undue suffering[.]" Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (internal quotation marks and citations omitted). This standard also is met when "a prison official . . . knows of a prisoner's need for medical treatment but intentionally refuses to provide it" or "delays necessary medical treatment based on a nonmedical reason." Rouse v. Plantier,182 F.3d 192, 197 (3d Cir. 1999).

In order to sustain her constitutional claim under 42 U.S.C. § 1983, Abran must "make (1) a subjective showing that the defendants were deliberately indifferent to Gene Wilson's medical needs and (2) an objective showing that those needs were serious." Pearson v. Prison Health Serv., 850 F.3d 526, 534 (3d Cir. 2017) (internal quotation marks omitted); see also Estelle v. Gamble, 429 U.S. 97, 106 (1976) (to state an Eighth Amendment claim, "a prisoner must allege acts or omissions sufficiently harmful to evidence [1] deliberate indifference to [2]

serious medical needs" (emphasis added)). As to the subjective prong of the Eighth Amendment test, mere errors in medical judgment or other negligent behaviors do not meet the subjective mens rea requirement. See Estelle, 429 U.S. at 106-07;

**Argument:**

Defendants preoccupation with seeking a dismissal based, apparently according to the defendant, solely on analyzing Plaintiff's Amended Complaint is curious, misguided and ultimately erroneous to say the least. For example, the defendant, apparently, seeks to focus solely on just one section of the Plaintiff's complaint in an attempt to somehow show that this section of Plaintiff's complaint shows that Plaintiff has insufficiently proven that nurse Orgasan is not liable in this matter.

When reviewing a movant's motion for summary judgment the court must, as a matter of law, review all relevant materials, including but not limited to, the Plaintiff's pleadings, affidavits, articles and any other discoverable evidence which speaks directly to the issue at hand. Given this edict it is clear that the defendants' focus on just one small part of the Plaintiff's complaint is misguided as a matter of law. Throughout the Plaintiff's complaint the Plaintiff has alleged, with specificity, that this defendant nurse was, on the date of Gene Wilson's death, undermined since she was the sole Corizon medical employee stationed inside of the House of Corrections and that she was, therefore, "undermanned". Being undermanned this defendant was unable to provide clear, effective and timely care. This is evidenced, in part, by the fact that Gene Wilson's body was still warm and alive when she appeared inside of Mr. Wilson's cell, several minutes later in an apparently failed attempt to resuscitate him. This important fact, of

course, significantly contradicts the defendant's own deposition testimony wherein she contended that Gene Wilson's body was cold to the touch when she first encountered him. See, Celotex ,supra.(this is a "material fact"). This is a significant point of contention that alone, should, compel this court to dismiss this defendant's motion for summary judgment. (See Exhibit "B" Orgasan Deposition, N.T.4/16/19, p.56).

Moreover, this 60-year old witness, admitted during her deposition, that this was her first time dealing with a prison suicide attempt, that she had never, in her entire career, received any training in how to resuscitate an individual who may have attempted to commit suicide (See Exhibit "B" Orgasan Deposition N.T. 4/16/19, p. 38), that she received training in reference to reviving an unconscious patient , "maybe in the 70's" (See Exhibit "B" Orgasan Deposition N.T. 4/16/19, p. 39) and that she "walked" from her second floor office (once she received the emergency "stretcher call" about Gene Wilson) because there were no elevators in this facility on the date in question. (See Exhibit "B" Orgasan Deposition, N.T. 4/16/19, pp. 41-47, 52,72). Additionally, this witness also admitted that she was, while walking to Gene Wilson's cell, carrying a pulse oximeter, a stethoscope, the AED (automated external defibrillator) equipment and an emergency drug box and others had to carry the heavier medical equipment. (See Exhibit "B" Orgasan Deposition, N.T. 4/16/19, pp.50,51-61).

Furthermore, this defendant admitted that she and the three other City of Philadelphia defendant employees (who were, themselves, carrying heavy medical equipment as well at this time) had to walk down from the second floor of this prison facility to the first floor and then they had to walk across this circular area of this prison that divided said prison and finally walk to the "D" block area of the House of Corrections where Gene Wilson was housed in his cell to

administer medical aid to him. (See Exhibit "B" Orgasan Deposition, N.T. 4/16/19, p.54). And upon arriving at Gene Wilson's cell this defendant attempted to place a nasal cannula into Gene Wilson's nose and attempted to utilize the AED on Mr. Wilson but act was to no avail as she alleged that his body was cold at this particular time. (See Exhibit "B" Orgasan Deposition N.T. 4/16/19, p. 55-58). Shortly thereafter this defendant requested that 911 be called for additional assistance and then, according to this defendant, a full 15 minutes later an Emergency Medical Team arrived at Mr. Wilson's cell. (See Exhibit "B" Orgasan Deposition, N.T. 4/16/19, pp. 63).

The Plaintiff is of the position that, as it relates to this particular issue, defendant nurse Orgasan's motion for summary judgment should be denied. The defendant has not adequately sustained its burden of proof as it relates to this issue. Additionally, given the above, the evidence clearly shows that Gene Wilson had, prior to his death, a "serious medical need" and that he was clearly exposed to a "pervasive risk of harm" since he had expressed to defendant prison officials that he wished to harm himself and others, and had otherwise exhibited angry, panicked, anxious, depressive behavior and he had also expressed bizarre thoughts and beliefs as well as experiencing nausea. Compounding matters was the fact that after noting the above Gene Wilson was still transferred to the House of Corrections but was not properly monitored.

> And when he was finally found inside of his cell the understaffed medical person sent to treat him was a 69-year-old nurse who had no real, palpable experience in dealing with inmates in Gene Wilson's situation. Thus given the above, even a layperson would easily recognize that Gene Wilson had a serious need for a doctor's attention. (See, "Morrison v. Phillips, No. 06-812, 2008 WL 4308215, at *13 (D.N.J. Sept. 16, 2008) (quoting Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006))." Gravley v. Tretnik,

Civil Action No. 08-1125, 4 (W.D. Pa. Mar. 9, 2012)). Clearly then, there is a showing that prison officials, along with defendant nurse Orgasan knew of and disregarded Gene Wilson's serious medical needs and, in the case of the defendant nurse, did provide inadequate, substandard and non-emergency medical care to a man who required fast emergency care and who was still alive when she arrived inside of Gene Wilson's cell and who expired, in part, because she walked to this cell related suicide emergency and delayed in contacting an Emergency Medical Team to provide more urgent care to Mr. Wilson. (See Exhibit "B" Orgasan Deposition N.T. 4/16/19, p. 52, 64). Montgomery v. Pinchak, 294 F.3d 492, 499 (3rd Cir. 2002). Moreover, defendant nurse Orgasan also testified that she believed that Gene Wilson's body was cold to the touch when she encountered him. (See Exhibit "B" Orgasan Deposition N.T. 4/16/19, p.56) however this vitally important fact is contradicted by the deposition testimony of defendant Correctional Officer Clyde Fearon ,who contradicted defendant Orgasan when he admitted that Gene Wilson's body was warm to the touch and that Mr. Wilson was still warm to the touch (and still alive) when the defendant nurse encountered Gene Wilson and began to attempt treatment on Mr. Wilson. (See Exhibit "E" Fearon Deposition N.T. 11/14/18, pp. 45, 50)

Therefore, defendants' contention that Plaintiff's pleading was allegedly devoid of any information as to how any response and/or care rendered by the defendant nurse Orgasan is factually incorrect and focuses only on the complaint itself without any of the above-mentioned additional information and evidence.

**B. Plaintiff's response to defendant, Corizon Health, Inc.'s contention that it is not liable as to Plaintiff's section 1983 claim despite evidence to the contrary.**

**Law:**

When an inmate brings a section 1983 claim against a private entity, the analysis is akin to a municipal liability claim under Monell. Monell v. Department of Social Services, 436 U.S. 658 (1978); See Matos v. Prison Health Serv. Inc., No. CIV .A.14-4517, 2015 WL 2126928, AT *3 (E.D. Pa. May 7, 2015).

> In the City of Canton case in a prison suicide case, under section 1983 the plaintiff must (1) identify the specific training that has not provided that could reasonably be expected to prevent the suicide that occurred, and (2) must demonstrate that the risk reduction associated with the proposed training is so great and so obvious that the failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed in taking their lives. City of Canton v. Harris, 489 U.S. 378, 389, 109 S. Ct. 1196 (1989).
>
> The defendant Corizon, in this type of case, can indeed be held individually liable under section 1983 (based on a failure to implement proper training, policies and procedures). See Stoneking v. Bradford Area School District, 882 F.2d 720i, 725 (3rd Cir. 1989)

**Argument:**

In its motion for summary judgment on this particular issue the defendant alleges that, somehow, Plaintiff failed to present the requisite specificity required to assert a claim against

Corizon. In Paragraph 58 in Plaintiff's complaint she alleges, with specificity, that the defendant Corizon Health Care, Inc. at all times relevant hereto did, improperly train and fail to discipline nurse Orgasan and did, thereby, violate the constitutional rights of Gene Wilson due to improper medical care. In the very next paragraph the Plaintiff also alleged that due to the carelessness and negligence of the defendant, Corizon and Marilou Orgasan, Corizon failed to have the proper procedures in place in correctly treating a suicidal inmate in an emergency in a timely manner. Plaintiff then proceeded to provide additional allegations in the following paragraph when Plaintiff alleged that the defendant Corizon failed to provide proper staffing, manpower and/or medical facilities to properly care for the prisoner Gene Wilson. Plaintiff did , once again, in the next paragraph provide additional allegations further supporting the failure of the defendant Corizon in its care to Gene Wilson. The Plaintiff alleged that defendant Corizon failed to properly equip its medical staff employees (defendant Marilou Orgasan) and did, likewise, failed to train said employee and that said failure to equip and failure to train proximately caused Gene Wilson's personal injuries and untimely demise since, "…he was alive when prison staff and/or nurse Orgasan happened upon his [sic] body on the date in question." (See Exhibit "A" Plaintiff's Complaint, paragraph 61).

Plaintiff, additionally, alleged that Gene Wilson was, at all times relevant hereto under the care of the defendant, Corizon and, therefore, was responsible for Gene Wilson's protection, care, safety, well-being and life while in Corizon's custody. (See Exhibit "A"Plaintiff's Complaint, paragraphs 69,70). Plaintiff also alleged that defendant Corizon (as well as all other defendants) knew of a pattern of suicides and suicide attempts by detainees in jail cells throughout the City of Philadelphia. (See Exhibit "A" Plaintiff's Complaint, paragraph 72). This

allegation was indeed confirmed by Corizon's Corporate Designee. (See Exhibit "C" McMillan Deposition N.T. 1/8/20, p. 18, 26, 29, 69-71).[1]

The Plaintiff did also allege, with specificity, that the defendant nurse proximately caused Gene Wilson's suicide death since Corizon did not possess proper staffing in order to provide, "...prompt and proper medical care in a timely fashion. Since, said negligence carelessness, and/or recklessness indifference proximately cause Mr. Wilson's untimely demise. (See Exhibit "A"Plaintiff's Complaint, paragraph 76)

The defendant Corizon has readily admitted that it has a formal contract with the defendant City of Philadelphia to provide medical services and to screen prisoners during their stay at a Philadelphia Prison System prison. (See Exhibit "C" McMillan Deposition N.T.1/8/20, pp. 36, 37, 58). And Corizon also admits that they have agreed to adhere to, support and to otherwise follow any and all defendant City of Philadelphia prison policies and procedures implemented by said defendant. (See Exhibit "C" McMillan Deposition N.T. 1/8/20, p. 41) and all Corizon employees are consistently provided with mandatory training of all such prison policies and procedures. (See Exhibit "C" McMillan Deposition N.T. 1/8/20, p. 42).

Therefore, the defendant Corizon is, by inference, legally bound by all of the faulty policies implemented by the defendant City of Philadelphia in reference to the running of their prison system. (ie. Failure to properly evaluate suicidal prisoners like Gene Wilson along with the failure to conduct a second, mandatory, behavioral and/or mental health evaluation of

[1] According to the defendant City of Philadelphia there were at least 12 suicides by hanging with sheets used as ligatures from 2011-2016. According to media reports confirmed by defendant Warden Lawton of the House of Corrections, however, in 2016 alone, there were at least 16 total prison suicide deaths in the Philadelphia Prison System.

prisoners, like Gene Wilson, once they are formally transferred to the House of Corrections. (See Exhibit "F" Lawton, N.T. 1/14/20,p.74)). Additionally, Corizon itself, apparently, developed its own policies that undermined the ability of their nurse employee, defendant Orgasan, in properly carrying out her duties in failing to properly care for suicidal patients like Gene Wilson. For example, nurse Orgasan was never trained by defendant Corizon in how to properly deal with a prison who attempted to commit suicide in his cell (See Exhibit "B" Orgasan Deposition N.T. 4/14/19, p. 72). Additionally, the defendant Corizon failed to implement a policy to train the defendant nurse in how to perform a resuscitation attempt of an unconscious prisoner with this particular group of defendant officers (See Exhibit "B" Orgasan Deposition N.T. 4/14/19, p. 89). This is especially borne out by the fact that prior to March 26, 2016 nurse Orgasan had only conducted one other procedure in attempting to resuscitate a prisoner. (See Exhibit "B" Orgasan Deposition N.T. 4/14/19, p. 90). And most striking is that the defendant Corizon has admitted, through their Corporate Designee, that given Corizon's own rules and regulations on prison employee staffing that a single prison nurse at a correctional facility is not a part of Corizon's normal staffing pattern (See Exhibit "C" McMillan Deposition N.T. 1/8/20, p. 78) and that, "…it was at no time the expectation from myself as the Director of Operations for any nurse to attend any emergency by themselves. We have protocols for that." (See Exhibit "C" McMillan Deposition N.T.1/8/20, p. 66). Thus the Corizon's staffing plan policy and rules were violated because they were not properly reviewed since the failure to review said policy caused the Corizon House of Corrections medical unit to resort to having just one nurse (defendant Orgasan) which, in turn, caused a lack of efficient, emergency care for Gene Wilson. (See Exhibit "G")

Additionally, Corizon has violated its own policies as it relates to the care and treatment

of Gene Wilson since, for example, they failed to follow their own protocol and policy as it relates to investigating and documenting inmate deaths by suicide. (See Exhibit "H"). Uunder Corizon's own policy and..."procedure in the event of an inmate death" they possess, but failed to deliver to Plaintiff, a death report on the suicide of Gee Wilson and the defendant violated its own policy when they failed to present any sort of administrative review, clinical mortality review or a psychological autopsy (which is mandatory when the death is by suicide). (See Exhibit "H").

And finally, defendant Corizon violated its own policy and procedure as it relates to "Emergency Services" for prisoners since, in this particular situation, Gene Wilson was never seen by a full fledged "Emergency on-call physician when Corizon's lone nurse casually walked to Gene Wilson's cell in an attempt to treat him. (See Exhibit "I"). As such this fact, combined with the fact that Corizon was well aware that, during this time period there had been a double digit total of prison suicides in the Philadelphia prison system. (See Exhibit "J" McCauley's expert report); (See Exhibit "C" McMillen Deposition N.T., 1/8/20, pp. 70, 71).

Compounding matters is the fact that the defendant Corizon, admittedly continues to possess relevant and discoverable evidence, documents, reports and the like concerning prison suicides at the Philadelphia Prison System, including, but not limited to, additional discoverable information and documents relating directly to Gene Wilson's prison suicide. The defendant has yet to turn over this information to the Plaintiff so that they may further respond to Corizon's allegation that they must be dismissed from this matter. This court has the power, under Rule 56(d) to compel the same to be given to the Plaintiff so that she may buttress and or amend her response to Corizon's dispositive motion.

Assuming arguendo that this court fails to grant the above request the Plaintiff contends that there are sufficient issues of fact that would force this court to summarily deny Corizon's summary judgment request on this particular issue.

**C. Plaintiff's response to defendants' allegation that the Plaintiff's Civil Conspiracy Claim should fail as a matter of law.**

Law:

The essential elements of a claim for civil conspiracy are as follows: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose, (2) an overt act done in pursuance of the common purpose, and (3) actual legal damage. Phillips v. Selig, 959 A.2d 420, 437 (Pa. Super. 2008), appeal denied, 967 A.2d 960 (Pa. 2009)

See While Lackner v. Glosser, 892 A.2d (Pa. Super. 2006) held, in part, that agents of a single entity cannot conspire among themselves, if other defendants from different entities have been alleged to join in said conspiracy the party asserting a civil conspiracy may legitimately assert the same. (See, Frey v. Gold, No. 1120 WDA 2016, non-precedential, (Pa. Super. 2017) which held, in part, that a Plaintiff who alleges that multiple defendants from different entities who have otherwise engaged into a civil conspiracy may proceed on that claim. Given the applicable law it is clear that the Plaintiff properly pleaded the aforementioned civil conspiracy elements. (See Exhibit "A" Plaintiff's Complaint, paragraph(s) 127-129).

In addition to the allegations, the defendants' deposition testimony and documents clearly indicate that the defendants, knew that their prisoner, Gene Wilson told them he wanted to harm himself. Furthermore, the defendants knew, prior to placing Gene Wilson into a solitary confinement cell in a punitive segregation cell in the House of Corrections, called "The Hole"

that he was acting strangely, was overly anxious, panicked, angry, was nauseous and had expressed bizarre thoughts and beliefs. Armed with this information the defendants still decided to transfer Gene Wilson to the House of Corrections and then violated their own policy when they failed to provide Gene Wilson with an additional mental health/behavior evaluation. Compounding matters after Gene Wilson's suicide was the fact that the defendants secretly met at the House of Corrections mere hours after Gene Wilson's suicide death and covered up the contents and/or discussions which took place during this secret meeting. The defendants, to this date, have failed to provide the contents of this tape-recorded meeting to Plaintiff and one defendant, Warden Lawton, has categorically denied that this meeting took place. This, despite the fact that at least two other defendants have provided sworn testimony that defendant Lawton was instrumental in chairing and running this meeting. One of these defendants, Nurse Orgasan, an employee of another defendant, Corizon Health Corporation was a part of this conspiracy (See Exhibit "B" Orgasan Deposition N.T., pp. 79-83, 97), as was another defendant, Dr. Oluwabusi and MHM. Thus the credibility of the defendants is now called into question. The defendants knew that Gene Wilson was suicidal and failed in their affirmative duty to prevent Gene Wilson's suicide. And Corizon admitted during their own Corporate Designee deposition that they regularly conduct "sentinel death" meetings where they have Corizon employees meet with non-Corizon prison employees to discuss the details of each and every prison death and/or suicide and then they analyze data and review mistakes and the like. (See Exhibit "C" McMullen Deposition N.T. 1/8/20, pp. 15-18, 47, 54-56).

Clearly, given the above, the facts surrounding this issue are in dispute since the Plaintiff avers that all of the defendants' behavior, in reference to Gene Wilson's prison suicide, taken

collectively, may indicate to a jury that the defendants' actions were tantamount to malicious behavior. As such the defendants contention that Plaintiffs allegations as to the existence of a civil conspiracy is incorrect and, therefore, the defendants' motion for summary judgment on this issue must be dismissed as a genuine issue of fact exists surrounding this particular issue.

To be more specific in reference to this matter the defendant, nurse Orgasan, admitted that she was ordered to attend one meeting called by the defendant Lawton, at the House of Corrections, mere hours after the untimely demise of Gene Wilson. (See Exhbiti "B" Orgasan, N.T. 4/16/19, p.79). This, of course, contradicts the testimony of the Corizon Corporate Designee when she testified that Orgasan would have also met with her "sentinel death" committee to review her role in the suicide death of Gene Wilson. (See Exhibit "C" McMillan Deposition N.T. 1/8/20, p. 54-56). For that matter, equally as troubling is the fact that defendant nurse Orgasan testified that other than filling out her perfunctory report on her computer, about the Gene Wilson suicide, she provided no other statement to anyone in reference to this matter. (See Exhibit "B" Orgasan Deposition N.T.4/16/19, p. 85). This contradicts the clear fact that this defendant did, indeed, provide an interview and a subsequent signed statement to a Philadelphia prison investigator about her activities surrounding the suicide death of Gene Wilson. (See Exhibit "K" Attached PPS statement from Orgasan). Most telling though is that neither defendant Corizon nor its employee nurse defendant Orgasan ever provided or admitted to investigators that this secret meeting took place. Moreover, under Corizon's own policy and..."procedure in the event of an inmate death" (See Exhibit "B") they possess, but failed to deliver to Plaintiff, a death report on the suicide of Gee Wilson and the defendant violated its own policy when they failed to present any sort of administrative review, clinical mortality

review or a psychological autopsy (which is mandatory when the death is by suicide). (See Exhibit "H"). Ostensibly, the Plaintiff has alleged that this information was not reported because it was a part of the civil conspiracy to either hide or cover up the true facts and circumstances surrounding the reasons behind the lack of medical care and the non-emergency way that care was provided to Gene Wilson before, during and after his prison suicide death by these defendants.

**CONCLUSION:**

The defendants' approach to their motion for summary judgment is, seemingly, based on a misguided focus on a rather perfunctory review of the Plaintiff's own Amended Complaint. However, a review of the same clearly indicates that the Plaintiff has sufficiently made out its case against these defendants to move this matter forward and past the summary judgment stage. It is important to remind this honorable court that it is the defendants, as the "movants" who possess the initial burden of proof here. Their request for dispositive relief must be denied since the defendants have failed to sustain their own burden of showing that there are no factual issues that are being contested and that Plaintiff may not prevail as a matter of law. This is the furthest thing from the truth as the Plaintiff has initially provided the defendants and the court with various allegations combined with the requisite specificity required in the Rules of Civil Procedure to move this matter forward and to defeat the defendants motion.

Additionally, the Plaintiff has provided this honorable court with information and testimony showing that the defendant Orgasan was a 69-year-old, prison nurse, who had no real experience in handling or dealing with a prison emergency like the one she encountered on March 26, 2016. She admitted such during her deposition. Moreover, upon receiving a

"stretcher call" this defendant nurse, who was, admittedly, understaffed, proceeded to walk the flights of stairs and then cross over to the D1 block of the House of Corrections whereupon she provided virtually no care to Gene Wilson. At all times, according to other defense witnesses (correctional officer Fearon) Gene Wilson's body was warm to the touch and he was still alive. This materially contradicts the defendant nurse's testimony where she alleged that Gene Wilson's body was cold to the touch! This alone is a factual issue that is material to the case at hand and this discrepancy must, at the very least, be enough for this court to dismiss the defendant's motion for summary judgment.

Assuming it is not this court must still dismiss the defendants' motion because after this defendant did very little in an attempt to revive Gene Wilson she, finally, called an Emergency Medical Team. It took them an additional 15 minutes before they arrived at the scene. By then it was too late to do anything to save Mr. Wilson and the defendant Corizon knew or should have known that there were many prison suicides taking place within the Philadelphia Prison System before, during and after the time period of Gene Wilson's suicide and they knew or should have known that the severe understaffing was against all policy, protocol, rule and regulations put in place by Corizon to avoid just such an incident like this one from taking place. (See Exhibit "C" McMullen Deposition, N.T. 1/8/2020, p.66, 78). They also should have known that their own emergency services policy and procedure was violated since Gene Wilson was never seen by a Corizon emergency doctor. These violation lead to the death of Gene Wilson.

Compounding matters was the fact that after Mr. Wilson's death the defendant Orgasan had a secret meeting with the other defendants in reference to this matter and none of the parties who attended and participated in this meeting with Warden Lawton ever admitted to the same to

investigators. Additionally, the Corizon Corporate Designee admitted that after every "sentinel" prison event, including but not limited to suicide prison deaths, Corizon ALWAYS conducts their own, independent, death committee meetings where they, too, bring together both defendant Corizon employees as well as non-Corizon employees to discuss, review and provide insight on the details surrounding not only Gene Wilson's prison suicide death but any other prison incidents and deaths. Again, this important fact and meeting information was never provided to prison investigators investigating Gene Wilson's death or to anyone else for that matter. Ostensibly the Plaintiff has alleged that this information was not reported because it was a part of the civil conspiracy to either hide or cover up the true facts and circumstances surrounding the reasons behind the lack of medical care and the like provided to Gene Wilson before, during and after his prison suicide death.

Given the above it is imperative that this honorable court summarily deny the defendants Orgasan and Corizon's motions for summary judgment with prejudice since significant issues of fact still exist and as such these issues must be decided by a jury since Plaintiff has provided adequate information as to constitutional violations, deliberate indifference and civil conspiracy.

Respectfully submitted:

Troy H. Wilson, Esquire
Attorney for Plaintiff
Rena Abram