**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RENA ABRAN,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | **No. 18-cv-1107** |
| | : | |
| **CITY OF PHILADELPHIA, ET AL.,** | : | |
| | : | |
| *Defendants.* | : | |
| | : | |

**Goldberg, J.**                                                        **November 17, 2020**

## <u>MEMORANDUM OPINION</u>

Plaintiff Rena Abran, as the Administrator of Gene Wilson's Estate, has filed this prisoner's civil rights action on behalf of Wilson, who tragically committed suicide while incarcerated in the House of Corrections ("HOC"), a Philadelphia Department of Prisons ("PDP") facility.  Plaintiff filed suit against the City of Philadelphia and various PDP employees, including Blanche Carney, Gerald May, Nancy Giannetta, William Lawton, Cathy Talmadge, Aisha Cook, and Clyde Fearon (collectively with the City of Philadelphia, the "City Defendants") and Corizon Health, Inc., the PDP healthcare provider, and its employee, Marilou Orgasan, R.N. (together with Corizon Health, Inc., the "Medical Defendants").

Plaintiff alleged the following claims against all defendants, unless otherwise noted: deprivation of federally protected rights (Counts One and Two); negligence against all defendants, except for Corizon Health, Inc. and Marilou Orgasan, R.N. (Count Three); wrongful death (Count Four); survival (Count Five); and a civil conspiracy (Count Six).

Presently before me are motions for summary judgment filed by the Medical and City Defendants.  For the reasons set forth below, I will grant both motions.

1

# I.      STATEMENT OF FACTS

Unless otherwise indicated, the facts presented below are undisputed.[1]

On March 21, 2016, Wilson was convicted of driving under the influence and sentenced to ten days of incarceration.  (City Defs.' SOF ¶ 1, ECF No. 101.)  Upon his arrival at the PDP that same day, he was screened by medical and behavioral health care professionals and denied having any medical or behavioral issues.  (Id.)  On March 23, 2016, behavioral health professionals examined Wilson and he again denied having any medical or behavioral health issues.  (Id. ¶ 3.) The record is unclear as to which entity or individual conducted these evaluations.

On March 24, 2016, Wilson complained to medical and behavioral health professionals that he needed to get out of jail because he felt unsafe, anxious, and nauseous due to stress.  (Id. ¶ 4.)  Based on these complaints, the prison's medical and behavioral health professionals recommended that Wilson be placed in protective custody, which allows an inmate to be separated from the general population housing unit for various reasons, such as an inmate's health or safety. (Id. ¶ 5.)

On March 25, 2016, Wilson vomited repeatedly and was sent to the emergency room at a hospital outside of the PDP to rule out appendicitis.  (Id. ¶ 6.)  Wilson was treated for abdominal pain then returned to the PDP.  (Id.)  Upon his return, he informed prison medical professionals

---

[1]      The Medical Defendants' and City Defendants' Statements of Undisputed Facts will be cited to as "Med. Defs.' SOF" and "City Defs.' SOF," respectively.  The City Defendants did not attach exhibits to their motion and SOF but later filed exhibits with their reply brief.  Because their exhibits correspond with those referenced in their initial motion submissions, I will consider them.

Separately, while Plaintiff responded to both Defendants' SOFs, Plaintiff provides minimal cites to the record and often mischaracterizes the evidence cited.  In such instances, Plaintiff submits a denial and then cites to, at best, supplementally related information.  Additionally, as Plaintiff did not file a supplemental statement of facts along with either of her briefs, I will only consider the facts alleged in her submissions that have proper citations to the record.  See Fed. R. Civ. P. 56(c)(1)(A), 56(e); Malik v. Hannah, 799 F. Supp. 2d 355, 358 (D.N.J. 2011) (A party's expression of general disagreement "without identifying the facts disputed and without [citing] to evidence in the record that raises an issue of fact regarding that point, is insufficient to survive summary judgment.").

that he did not want to return to his cell because he felt unsafe and requested to be placed in protective custody.  (Id. ¶ 7.)

After PDP medical staff notified Defendant Correctional Officer Lieutenant Thakadiparambil Thomson about Wilson's concerns, Thompson visited Wilson to inquire about his complaints of feeling unsafe.  (Id. ¶¶ 8, 9.)  Wilson stated that he had previously owned a barbershop that had been robbed and that individuals in the prison were "after him."  (Id. ¶ 10.) Wilson declined to identify the individuals that were "after him" and refused to return to his cellblock, stating, "I'm going to get hurt or I'm going to hurt somebody."  (Id. ¶¶ 10, 12.)

Thomson then contacted his supervisor, Defendant Deputy Warden Cathy Talmadge, and informed her of Wilson's request for protective custody.  (Id. ¶ 13.)  In response, Talmadge ordered that Wilson be screened for and placed into administrative segregation.  (Id. ¶ 14.)  An internal memorandum prepared by Talmadge stated that Wilson may "pose a threat to himself, herself, others, or the security of the facility."  (Talmadge Memorandum at 1, dated March 27, 2016, ECF No. 111-7.)  Talmadge testified that if placed in protective custody, as opposed to administrative segregation, Wilson could have been housed alongside the individuals that he feared.  (Dep. of Cathy Talmadge ("Talmadge Dep.") at 22:12–18, 31–32, ECF No. 111-5.)  Alternatively, in administrative segregation, inmates are housed alone in a cell with a higher degree of supervision and less possibility of another inmate being able to access another inmate.  (Id.; see also Pl.'s Resp. to City Defs.' SOF ¶ 7, ECF No. 111.)  In a written report, Talmadge recounted her conversation with Thomson and stated, "I instructed Lt. Thomson to place [Wilson] in Administrative Placement because he stated that he would hurt himself or someone else."  (Talmadge Memorandum at 1 (emphasis in original).)

3

Before an inmate can be placed into administrative segregation, PDP policy mandates that medical and behavioral health staff first evaluate and clear the inmate.  (City Defs.' SOF ¶ 15.) This policy was followed on the same day and before he was transferred into administrative segregation, Wilson was examined by medical and behavioral staff.  (Id. ¶ 16.)  Defendant Corizon, Inc.'s registered nurse, Jims Idicual (who is not a party to this lawsuit) conducted the first medical evaluation of Wilson.  (Id.; Pl.'s Resp. to City Defs.' SOF ¶ 16.)[2]  According to Nurse Idicual's written report, there was no medical contraindication to placing Wilson into administrative segregation.  (City Defs.' SOF ¶ 17.)  Importantly, this report also indicates that Wilson: (1) was not thinking about killing himself; (2) was not expressing feelings of hopelessness; and (3) was not acting and/or talking in a strange manner.  (Id.)  The report also reflects that Wilson: (1) appeared over-anxious, panicked, afraid, or angry and (2) expressed bizarre thoughts or beliefs. (Id.)[3]  Ultimately, Nurse Idicual cleared Wilson for transfer.  (Id. ¶ 15.)

Defendant was next evaluated by behavioral health staff, psychiatrist Dr. Oluwabusi, of MHM Services, Inc.  (Id. ¶ 18.)[4]  Dr. Oluwabusi also determined that there was no contraindication to Wilson being placed in administrative segregation.  (Id.)  During this evaluation, Wilson again denied having suicidal ideations, claimed that he had no reason to kill himself, indicated that he was going home the following week and that he wanted to go home, and that he was looking forward to his future.  (Id. ¶ 19; Pl.'s Resp to City Defs.' SOF ¶ 19.)  Wilson expressed that he

---

[2]     The City Defendants indicate that Nurse Idicual was never deposed in relation to this lawsuit.  (City Defs.' Reply at 6, ECF No. 122.)

[3]     Plaintiff points out that there are two "versions" of this medical evaluation document in the record. Upon review of both documents, I do not find that a material issue of fact is present because, viewing the record in the light most favorable to Plaintiff, both documents reflect that Wilson's anxiousness and bizarre thoughts were apparent.  (Compare ECF No. 122-4, with ECF No. 111-6.)

[4]     Dr. Oluwabusi and MHM Services, Inc. were previously named as defendants in this action but were dismissed with prejudice on January 21, 2020 because the claims against them were barred by the statute of limitations.  (See January 21, 2020 Order, ECF No. 102.)

wished to be placed in protective custody because he was scared and because he was "no longer a young man," he "didn't want any trouble from the young people," and did not "want anybody to do anything to [him]."  (City Defs.' SOF ¶ 19; Pl.'s Resp. to City Defs.' SOF ¶ 19.)  Wilson explained that there was prison-related drama between South and West Philly and that he did not "want to get in trouble or people fighting."  (Id.)  Ultimately, Dr. Oluwabusi concluded that Wilson was not a risk to harm himself and cleared Wilson for transfer to administrative custody.  (City Defs.' SOF ¶ 20; Pl.'s Resp. to City Defs.' SOF ¶ 20.)

Wilson was then transferred to the administrative segregation housing unit, where defendant William Lawton was the warden and defendant Clyde A. Fearon was a correctional officer on staff.  (City Defs.' SOF ¶¶ 21–23.)  Officer Fearon knew from experience that if inmates were deemed suicidal, those inmates would not be placed in administrative segregation and, therefore, Officer Fearon did not believe that Wilson was suicidal.  (Id. ¶ 24.)

On March 26, 2016 at 5:59 a.m., Fearon conducted his rounds and observed Wilson in his cell, lying on his bunk.  (Id. ¶ 25.)  At 6:30 a.m., Fearon again conducted rounds but this time observed Wilson in his cell with a bed sheet tied around his neck and with the other end tied around a push rod of the cell's toilet.  (Id. ¶ 26.)  Fearon immediately entered the cell, untied the sheet from the push rod, checked to see if Wilson was breathing, and began performing CPR.  (Id. ¶ 27; Pl.'s Resp. to City Defs.' SOF ¶ 27.)  During this time, Fearon communicated over his radio requesting medical staff support and calling for his supervisor, Defendant Sergeant Aisha Cook, to join him in rendering medical assistance.  (Id.)  Sergeant Cook arrived and the two continued CPR until the medical staff arrived.  (Id.)

Defendant Marilou Orgasan, a registered nurse and employee of Defendant Corizon, responded to the call and reported to Wilson's cell with an automated external defibrillator

("AED") machine.  (Med. Defs.' SOF ¶ 11, ECF No. 100.)  Plaintiff highlights Nurse Orgasan's testimony that upon hearing the call for emergency assistance, she, along with at least two correctional officers, gathered medical equipment, traveled down one flight of stairs to a floor below, and walked to Wilson's cell.  (Pl.'s Br. at 27, ECF No. 112-1.)

According to Nurse Orgasan's progress notes, she received the call for help at 6:35 a.m. and arrived at Wilson's cell at 6:38 a.m.  (Med. Defs.' SOF ¶ 12.)  Her notes further reflect that upon her arrival to the cell, Wilson was lying on the floor and CPR was in progress.  (Id.)  She further indicates that Wilson was unresponsive to stimuli, cold to the touch, and that she could not detect his pulse.  (Id.)  Wilson's tongue was partially out of his mouth and unable to be pushed back in, so she attempted to administer oxygen to him through a nasal cannula device.  (Id.)  She set up the AED machine to deliver a shock to Wilson's heart, but the machine administered "no shock advised" message.  (Id.)[5]  Prison officials called 911, and the rescue squad arrived at 6:50 a.m.  (Id.)  Wilson was pronounced dead at 6:52 a.m.  (City Defs.' SOF ¶ 28.)

Plaintiff denies that Wilson was "cold to the touch" upon Orgasan's arrival to the cell.  In support, Plaintiff cites to the following deposition testimony by Officer Fearon, in which he explained the events that occurred after he found Wilson, began CPR, and called for medical assistance:

> A.      . . .  Then Medical finally comes down there, and Medical brings the AED machine.  Once they bring the AED machine, I stop performing CPR while the nurse sets up the AED machine.
> Q.      When – did anyone relieve you – other than the nurse, did anyone relieve you of doing CPR?
> A.      So they come down there.  Then Medical finally comes.
> A.      Yeah.  Officer Novak relieved me from doing CPR, too.
> Q.      Okay.  What happens next then?  What happened next in reference to Wilson then?
> A.      We got the AED machine hooked up to him.

---

[5]      The record is unclear as to why the AED machine issued the "no shock advised" message.

> Q.      When you say "we," does that mean you were involved in hooking up the AED machine?
>
> A.      Yes.
>
> Q.      Okay.  Did that nurse help assist you in doing that?
>
> A.      Yeah.  Well, she was trying to get the head tilt so he can open up his airway, so.
>
> Q.      She was trying to get his head tilted you said.
>
> A.      Yeah, to open up his airway.
>
> Q.      Okay.  And while she was trying to get his head tilted to open up his airway, is that when – were you the one physically applying whatever to his chest?
>
> A.      I can't remember if I applied the – I know I assisted with cutting his shirt open so we can actually get to his -- because you got to put the AED machine on.  It's got to be skin contact.
>
> Q.      Okay.
>
> A.      But I don't remember if I put the contacts on there or not.
>
> Q.      Okay.  And what happened next?
>
> A.      Then once we got the contacts on there, that's when me and [Officer] Novak kept switching out doing CPR.  If he got tired, I'd switch with him, and if I got tired, we keep flip flopping back and forth switching out.  And you got to wait until the AED machine actually give you the all clear to even send out a shock.  So we were doing that until it gave us the clear to send out a shock.
>
> Q.      Did you ever send out a shock?
>
> A.      I can't even remember if we send out a shock or not.
>
> Q.      Okay.  At that time you were conducting all this activity on Mr. Wilson's body, his body is still warm; is that correct?
>
> A.      Yes.

(Pl.'s Br. at 29, ECF No. 112-1 (citing Dep. of Clyde Fearon at 48:15–50:16, ECF No. 112-8).)

That same day, HOC Warden Lawton held a meeting to discuss the circumstances of Wilson's death, which included Officer Fearon, Nurse Orgasan, and Dr. Oluwabusi.  (Pl.'s Br. at 27, ECF No. 111-1.)  Plaintiff refers to this meeting as a "secret meeting" or a "sentinel meeting." However, the duration, other participants, and outcome of this meeting are unclear.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a

reasonable factfinder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view the evidence in the light most favorable to the non-moving party.  Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment.  Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case."  Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1)(A).

## III.   DISCUSSION

Counts One and Two of the Fourth Amended Complaint assert claims against the Medical and City Defendants for deliberate indifference to Wilson's serious medical needs in violation of the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983.[6]  Plaintiff also alleges that the Medical and City Defendants are liable because they failed to have a practice or custom in place to monitor suicidal inmates and failed to train their employees.  In Count Three, Plaintiff alleges a negligence claim against the City Defendants.  Finally, in Counts Four through Six, Plaintiff alleges various state law claims against both the Medical and City Defendants.  I address these claims in turn below.[7]

### A.   Section 1983 Medical Care Claims (Counts One and Two)

Section 1983 provides a remedy for deprivation of rights established in the Constitution or by federal law.  To state a claim under section 1983, a plaintiff must demonstrate that the defendant, acting under color of state law, deprived him of a right secured by the Constitution or

---

[6]      While Plaintiff's Fourth Amended Complaint cites to the Fourteenth Amendment, I will liberally construe Plaintiff's allegations as a claim under the Eighth Amendment.  Because Wilson was not a pre-trial detainee, and was instead convicted and serving a sentence, Plaintiff's claim should have been brought pursuant to the Eighth Amendment.  Even so, the legal standards for each claim remain the same.  See Palakovic v. Wetzel, 854 F.3d 209, 223 (3d Cir. 2017) ("[W]hen a plaintiff seeks to hold a prison official liable for failing to prevent a detainee's suicide, a pre-trial detainee may bring a claim under the Due Process Clause of the Fourteenth Amendment that is essentially equivalent to the claim that a prisoner may bring under the Eighth Amendment.").  Furthermore, Plaintiff fails to set forth argument relative to the Fourth Amendment, and consequently, this claim will be dismissed.

[7]      In opposition to the Medical Defendants' and City Defendants' motions, Plaintiff argues that summary judgment is improper based on outstanding discovery.  Plaintiff first requests records from the sentinel meeting held at the HOC following Wilson's death.  However, I previously concluded that Plaintiff was not entitled to these records based on the Patient Safety and Quality Improvement Act privilege, 42 U.S.C. § 299b-22.  (See November 8, 2019 Order, ECF No. 97.)  Plaintiff also requests the HOC records regarding prior inmate suicides.  Yet, following a telephone conference about production of these records, I determined that all, except one document, had already been produced.  (See April 2, 2020 Order, ECF No. 121.)  The remaining document was the mental health record of a prior HOC inmate that had committed suicide.  I afforded Plaintiff fourteen days to renew her request for this record and to set forth a good faith basis for its production, but she did not do so.  Accordingly, there are no remaining discovery disputes and resolution of the present motions is appropriate.

the laws of the United States.  Kaucher, 455 F.3d at 423.  The Medical Defendants acknowledge that "[b]ecause Corizon is deemed a state actor, employees of Corizon are considered prison officials."  (Med. Defs.' Br. at 6, ECF No. 100-2.)  Therefore, Nurse Orgasan may be held liable as a state actor under 42 U.S.C. § 1983.

"To impose liability under Section 1983, a plaintiff must establish with particularity that the named defendant was directly and personally involved in the deprivation of plaintiff's rights." Payton v. Vaughn, 798 F. Supp. 258, 260 (E.D. Pa. 1992) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).  The plaintiff must show actual participation or actual knowledge and acquiescence in the unlawful conduct.  Id.  The doctrine of respondeat superior is inapplicable in § 1983 claims.

### 1.  Individual Defendants

To state an Eighth Amendment claim for deliberate indifference resulting in suicide, a plaintiff must establish: "(1) that the individual had a particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility," that the individual would attempt suicide; "(2) that the prison official knew or should have known of the individual's particular vulnerability; and (3) that the official acted with reckless or deliberate indifference, meaning something beyond mere negligence, to the individual's particular vulnerability."  Palakovic v. Wetzel, 854 F.3d 209, 223 (3d Cir. 2017).  "The requirement of a 'particular vulnerability to suicide' speaks to the degree of risk inherent in the detainee's condition. . . . [and] implies that there must be 'a strong likelihood, rather than a mere possibility,' that self-inflicted harm will occur."  Colburn v. Upper Darby Twp., 946 F.2d 1017, 1024 (3d Cir. 1991) (citations omitted) (hereinafter, "Colburn II").

Furthermore, to state a constitutional claim based on inadequate or a delay in medical care, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs.  Farmer v. Brennan, 511 U.S. 825, 835 (1994).  Acts of negligence or medical malpractice, without more, are insufficient to support a constitutional violation.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

Plaintiff points to two "serious medical needs" about which she claims Defendants were deliberately indifferent: (1) that Wilson required medical attention once he was found in his cell with a bed sheet tied around his neck and (2) that he was vulnerable to self-harm or suicide.  With regard to being found in his cell, Defendants obviously do not dispute that he exhibited a serious medical need.  However, Defendants assert that Plaintiff has not established evidence that would allow a reasonable fact finder to conclude either that Wilson was vulnerable to self-harm or suicide or that Defendants were deliberately indifferent to his serious medical needs.

### (a)  Wilson's Vulnerability to Self-Harm or Suicide

The City Defendants insist that there are no material facts to support that Wilson had a particular vulnerability to self-harm or suicide, especially since he was evaluated by medical and mental health professionals before he was cleared for administrative segregation.  The City Defendants point out that Wilson insisted on being placed in protective custody because of tension with other inmates.  Specifically, Wilson expressed nervousness about those who were "after him" and that he wanted to be transferred so that he would not get hurt or hurt someone else, but that Wilson never told correctional staff that he planned to commit suicide.

In arguing that Wilson was vulnerable to self-harm or suicide, Plaintiff references the medical evaluation form by Nurse Idicual, which reflected that Wilson appeared over-anxious, panicked, afraid, or angry and expressed bizarre thoughts or beliefs.  Plaintiff also stresses that

11

Wilson "blatantly stated to prison personnel, Deputy Warden Talmadge, that he wanted to harm himself or others" and that Talmadge's internal memorandum reflects that "Wilson stated that he would hurt himself or someone else."  (Pl.'s Br. at 34, ECF No. 111-1; Talmadge Memorandum at 1 (emphasis in original).)  The record before me does not entirely support Plaintiff's position.

Upon entry to the PDP, Wilson was first evaluated by medical and behavioral health care professionals, during which Wilson denied having any medical or behavioral issues.  Wilson later aired a safety concern to Officer Thomson and requested placement into protective custody due to a fear of altercations with other inmates.  Thomson, in turn, contacted Deputy Warden Talmadge and relayed Wilson's concerns.  In response, Talmadge referred Wilson for consideration into administrative segregation for a higher level of supervision and to ensure his safety.

Importantly, the record before me is devoid of any evidence that Wilson mentioned anything to Thompson about harming himself or that such information was relayed to Talmage. Indeed the only indication that Wilson may have wanted to harm himself was a portion of Deputy Warden Talmadge's internal memorandum note, which stated,

> Inmate Wilson then informed [] [L]ieutenant [Thomson] that he either was going to get hurt or he was going to hurt someone.  I instructed Lt. Thomson to place inmate Wilson in Administrative Placement because he stated that he would hurt himself or someone else.  I based this decision on the specs [sic] of administrative placement:
>
> **The inmate, in the judgment of staff, may for any reason post a threat to himself, herself, others or the security of the facility.**

(Talmadge Memorandum at 1 (emphases in original).)[8]

---

[8]     Despite Plaintiff's arguments to the contrary, there is no evidence in the record to support that Talmadge spoke directly with Wilson.  Rather, the record indicates that Wilson spoke with Thomson, who relayed all information to Talmadge during a telephone call.  (See Talmadge Dep. at 21:16–22:10, ECF No. 111-5.)

When asked to explain the wording of this memorandum, Talmadge explained that "[i]t's from the policy for Administrative Segregation.  The definition of what is – it's part of the definition for Administrative Segregation Placement."  (Talmadge Dep. at 30:8–16.)  The PDP policy that Talmadge references defines administrative segregation as "[a] form of separation from the general population administered when the continued presence of the inmate in the general population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly running of the institution."  (See ECF No. 122-3 at 1.)  Consequently, the wording of Talmadge's written memorandum tracks the PDP policy language.

This one note in one memorandum appears to be the only reference to self-harm.  I am, nonetheless, obligated to draw all inferences in Plaintiff's favor.  In doing so, I conclude that a jury could reasonably find, based on Talmadge's memorandum, that Wilson had a "strong likelihood, rather than a mere possibility," of inflicting self-harm.  Accordingly, I must further analyze the process that followed, before Wilson was placed in administrative segregation, to determine whether Defendants "acted with reckless or deliberate indifference, meaning something beyond mere negligence," to these medical needs.  Palakovic, 854 F.3d at 223.

### (b)   Deliberate Indifference to Wilson's Vulnerability to Self-Harm or Suicide

The City Defendants stress that Plaintiff's Eighth Amendment claim fails because Plaintiff cannot establish that Deputy Warden Talmadge was reckless or deliberately indifferent to Wilson's vulnerability to self-harm or suicide.  Plaintiff counters that Talmadge acted with deliberate indifference by deciding to transfer Wilson to administrative custody before Wilson was evaluated by mental health professionals. The undisputed record does not support Plaintiff's position.

Deliberate indifference does not require a plaintiff to prove that a defendant have a purpose to cause the harm, or even knowledge that the harm is substantially certain to occur.  Rather,

deliberate indifference requires that an actor have subjective understanding of an excessive risk to an inmate's health, and then disregard that risk.  Farmer, 511 U.S. at 836–37; Kaucher, 455 F.3d at 427 (observing that deliberate indifference entails the conscious disregard of a substantial risk of serious harm).  A plaintiff can generally make the appropriate showing by producing evidence that officials intentionally denied or delayed care for a serious medical need.  Giles v. Kearney, 571 F.3d 318, 330 (3d Cir.2009).

Alternatively, where the question is not lack of care but inadequate care, a plaintiff may demonstrate deliberate indifference by showing that a doctor "insisted on continuing courses of treatment that the doctor knew were painful, ineffective, or entailed substantial risk of serious harm to prisoners."  White v. Napoleon, 897 F.2d 103, 109 (3d Cir.1990).  "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."  Green v. Coleman, 575 F. App'x 44, 47 (3d Cir. 2014) (quotation and citations omitted).  Negligent medical treatment does not rise to the level of a constitutional violation.  Estelle, 429 U.S. at 106.  While the precedent above pertains to medical providers, I find it analogous and applicable because Talmadge's actions were tethered to the medical treatment that she referred and that was subsequently provided.

Measured against this high standard, I find that there is no evidence from which a reasonable jury could conclude that Deputy Warden Talmadge was either reckless or deliberately indifferent to Wilson's vulnerability to suicide.  Rather, even in the light most favorable to Plaintiff, the record reflects that Talmadge took the "necessary precautions based on the available information and circumstances as they appeared."  Baez v. Lancaster Cnty., 487 F. App'x 30, 32 (3d Cir. 2012).

The undisputed evidence establishes that Talmadge referred Wilson out of general population and into administrative segregation, a unit that affords a higher degree of supervision for an inmate's safety and allows an inmate to be housed alone in a cell.  Talmadge knew that this transfer would require Wilson to be evaluated and cleared by medical and mental health professionals and this is exactly what occurred.  Talmadge acknowledged that these professionals could either agree or disagree with her decision to transfer Wilson.  "Absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official [] . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004). Talmadge utilized the division of labor in place in the HOC, and neither Nurse Idicual or Dr. Oluwabusi indicated a medical or mental health reason to prevent Wilson's transfer to administrative segregation.

There is also no evidence indicating that Talmadge had any reason to question Nurse Idicual or Dr. Oluwabusi's medical evaluations and judgments.  Idicual's written report indicates that Wilson was: (1) not thinking about killing himself; (2) not expressing feelings of hopelessness; and (3) not acting and/or talking in a strange manner.  (Id.)  The report also reflects that Wilson: (1) appeared over-anxious, panicked, afraid, or angry and (2) expressed bizarre thoughts or beliefs. (Id.)

Dr. Oluwabusi also evaluated and cleared Wilson for administrative segregation  During that evaluation, Wilson denied being suicidal, claimed that he had no reason to kill himself, indicated that he was going home the following week and wanted to go home, and that he was looking forward to his future.  Wilson reiterated that he wanted a transfer to protective custody because there was prison related drama between South and West Philly that that he did not "want

to get in trouble or people fighting." Ultimately, Dr. Oluwabusi concluded that Wilson was not a risk to harm himself and cleared him for placement in administrative segregation.

Plaintiff does not point to any evidence suggesting that Wilson's medical and mental health conditions were not appropriately evaluated by non-parties Nurse Idicual and Dr. Oluwabusi. Even if such evidence existed, "because the deliberate indifference standard 'affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients,' [the Court] must 'disavow any attempt to second-guess the propriety or adequacy of [Nurse Idicual's and Dr. Oluwabusi's] particular course of treatment' so long as it 'remains a question of sound professional judgment.'" Pearson v. Prison Health Serv., 850 F.3d 526, 538 (3d Cir. 2017) (quoting Inmates of Allegheny Cnty Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)). And, there is nothing in the record from which a reasonable jury could conclude that either Nurse Idicual or Dr. Oluwabusi "actually did not base [their] decision[s] on such judgment." Id. at 539 (quoting Youngberg v. Romeo, 457 U.S. 307 (1982)). Therefore, I conclude that no reasonable jury could determine that the City Defendants were deliberately indifferent to Wilson's vulnerability to suicide in referring him to administrative segregation.

### (c)  Deliberate Indifference to Wilson's Condition Once He was Found in His Cell

As to Plaintiff's Eighth Amendment claim based on Wilson requiring medical attention once found in his cell with the bed sheet tied around his neck, Defendants do not dispute that Wilson exhibited a serious medical need. Thus, I proceed evaluating whether the Medical or City Defendants were deliberately indifferent to Wilson's medical needs.

Reviewing the evidence before me, I find that, even viewed in the light most favorable to Plaintiff, there are no material facts to establish that the Medical or City Defendants exhibited the

requisite deliberate indifference in responding and attempting to treat Wilson once he was found in his cell.

### i. *Medical Defendants*

Plaintiff claims that there are facts to establish that Nurse Orgasan was deliberately indifferent and that the medical care that she provided was ineffective and untimely. Plaintiff points out that Orgasan "walked" to Wilson's cell while carrying heavy medical equipment after receiving the request for emergency services. Plaintiff also indicates that Orgasan never received training on treating a patient who attempted suicide. Finally, Plaintiff argues that Orgasan's testimony—that Wilson's body was cold to the touch upon her arrival to his cell—was directly contradicted by Officer Fearon.

The undisputed evidence establishes that Orgasan received the call for emergency help at 6:35 a.m. In response, she, along with at least two correctional officers, gathered medical equipment, traveled down one flight of stairs, and arrived at Wilson's cell at 6:38 a.m. Upon her arrival, prison staff was conducting CPR. Orgasan checked Wilson's vital signs but was unable to detect his pulse. She noted that he was unresponsive to stimuli and cold to the touch.[9] She also observed that Wilson's tongue was partially out of his mouth and was unable to be pushed back in, and, consequently, Nurse Orgasan administered oxygen through a nasal cannula device.

She proceeded to set up the AED machine, but, although not entirely clear as to why, the machine advised the medical staff not to administer a shock. Emergency services were called and arrived in Wilson's cell at 6:50 a.m. The undisputed facts show that Nurse Orgasan, who had been

---

[9]     Conversely, Officer Fearon testified that Wilson's body was still warm while he and the other officers were taking turns conducting CPR, while Orgasan was trying to administer oxygen to Wilson, and while the group initiated the AED machine. Based on the undisputed medical care that was being provided to Wilson by Fearon, Cook, and Orgasan at the time, I conclude that such discrepancy between Officer Fearon and Nurse Orgasan's testimony does not amount to a genuine issue of material fact.

trained in resuscitating unconscious patients, attempted numerous life-saving measures and had reported to Wilson's cell within three minutes of the emergency call.  I therefore conclude that no reasonable jury could find that her behavior constituted deliberate indifference to Wilson's medical needs.

### ii.   *City Defendants*[10]

Plaintiff next claims that the City Defendants were deliberately indifferent to Wilson's serious medical needs by providing ineffective medical assistance and for placing him into administrative segregation without first implementing the prison's mental health and behavioral health evaluations.

For a supervisor to be liable for a constitutional violation, he or she must have been "personally involved, meaning through personal direction or actual knowledge and acquiescence." McKenna v. City of Phila., 582 F.3d 447, 460 (3d Cir. 2009).  A number of the individually-named City Defendants were either clearly not present on the day of Wilson's suicide or worked at another prison facility.

Defendant Blanche Carney is the Commissioner of the Philadelphia Department of Prisons. Plaintiff claims that Commissioner Carney "is, personally, in charge and, it has been alleged, did personally direct the development, implementation of any and all policies, rules, regulations and procedures related to the care, treatment of all prisoners, including [] Wilson, housed at the Philadelphia House of Corrections."  (Pl.'s Br. at 25, ECF No. 111-1.)  Beyond this conclusory

---

[10]      Plaintiff has sued the City of Philadelphia and several municipal officials in both their official and individual capacities.  Claims against City officials named in their official capacity are indistinguishable from claims against the City.  See Kentucky v. Graham, 473 U.S. 159, 165–66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting Monell v. N.Y.C. Dept. of Soc. Servs., 436 U.S. 658, 690, n. 55 (1978)). Accordingly, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the [municipal] entity."  Id.   Therefore, I will dismiss all claims against the City officials in their official capacity.

allegation, Plaintiff fails to cite to any evidence of record that Commissioner Carney was present or had personal any involvement in the circumstances of Wilson's death.  Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 130 (3d Cir. 1998) ("[T]he nonmoving party must present affirmative evidence in order to defeat a properly supported motion for summary judgment."). Thus, Commissioner Carney is entitled to summary judgment.

As to Warden Gerald May, Plaintiff provides no argument or record support as to how he is at all personally involved in the present litigation.  Therefore, Warden May is also entitled to summary judgment.

Defendant Nancy Giannetta appears to have been the Warden of a different PDP facility in which Wilson was housed prior to being sent to the HOC.  Plaintiff claims that despite having knowledge of Wilson's physical and emotional problems, Wilson was subjected to a "deliberately indifferent transfer to the House of Corrections."  (Pl.'s Br. at 26, ECF No. 111-1.)  In attempt to support her claim against Warden Giannetta, Plaintiff cites to a purported expert report of R. Paul McCauley, Ph.D.  However, the information cited in McCauley's report simply lays out the factual timeline set forth above and fails to establish how Warden Giannetta was personally involved. Therefore, Warden Giannetta is also entitled to summary judgment.

Defendant William Lawton was the Warden of the HOC during the time of Wilson's death. Plaintiff provides no record support exhibiting any personal involvement by Warden Lawton prior to Wilson's death.  Moreover, Plaintiff fails to establish how Warden Lawton's involvement in the meeting after Wilson's death constitutes deliberate indifference to Wilson's medical needs. Therefore, Warden Lawton is also entitled to summary judgment.

Defendant Cathy Talmadge was the Deputy Warden at the HOC at the time of Wilson's death.  The undisputed record reflects that Deputy Warden Talmadge's personal involvement with

Wilson ended after she referred Wilson to administrative custody. She had no personal involvement in the administration of Wilson's medical care on the morning of March 26, 2016. Because I have already concluded that the undisputed facts establish that Talmadge was not deliberately indifferent to Wilson's medical needs as it pertained to his vulnerability to self-harm suicide, Talmadge is also entitled to summary judgment.

Finally, Defendant Correctional Officer Clyde Fearon conducted rounds of Wilson's cellblock on March 26, 2016. Defendant Sergeant Aisha Cook was the supervisor on duty on the date of Wilson's death. At 5:59 a.m., Officer Fearon observed Wilson sitting in his cell and on his bunk. At 6:30 a.m., Fearon discovered Wilson in his cell with a bed sheet tied around his neck and the push rod. Fearon immediately entered the cell, untied the bed sheet, and checked Wilson's breathing. He then began conducting CPR and communicated over his radio for medical help and for the assistance of his supervisor. As a result, Sergeant Cook arrived and the two alternated in conducting CPR before and after Nurse Orgasan arrived. Even viewing the record in the light most favorable to Plaintiff, the undisputed facts show that Fearon and Cook repeatedly attempted life-saving measures. Fearon immediately reported Wilson's condition to the medical staff and his supervisor for emergency assistance. Accordingly, no reasonable jury could find that their behavior constituted deliberate indifference to Wilson's medical needs. Thus, Fearon and Cook are entitled to summary judgment.

## 2. Municipal Liability

In addition to claims against the individually-named defendants, Plaintiff also alleged Monell claims against Corizon and the City of Philadelphia. Municipal entities will only be found liable under § 1983 when government custom or policy was the proximate cause of a constitutional violation. Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A

municipality cannot be held liable under a theory of respondeat superior.  Monell, 436 U.S. at 693–94.  Rather, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).  Additionally, the practice must be so widespread that the policy making officials have either actual or constructive notice.  Berg v. Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) (citing Silva v. Worden, 130 F.3d 26, 31 (1st Cir. 1997)).

Once a plaintiff has identified a policy or custom, she "must show that the municipal action was taken with the requisite degree of culpability, and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights."  Vulcan Pioneers of New Jersey v. City of Newark, 374 F. App'x 313, 317 (3d Cir. 2010) (citing Bd. of the County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404 (1997)).  If the policy does not facially violate federal law, "causation can be established only by 'demonstrat[ing] that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences.'"  Berg, 219 F.3d at 276 (citing Bd. of the County Comm'rs of Bryan County, 520 U.S. at 404).

Municipal liability can also be predicated upon a failure to train, but only where the "failure amounts to deliberate indifference to the [constitutional] rights of persons with whom the police come in contact."  Woloszyn v. Cnty. of Lawrence, 396 F.3d 314, 324 (3d Cir. 2005) (citation and quotation omitted).  To establish municipal liability for failure to train in a prison suicide case, the plaintiff must (1) identify specific training not provided that reasonably could be expected to prevent the suicide that occurred, and (2) demonstrate that the "risk reduction associated with training is so great that failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference to whether the detainees succeed

in taking their lives." Woloszyn, 396 F.3d at 325 (citing Colburn II). A failure to train, discipline, or control can only form the basis of municipal liability where a plaintiff can show "contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's action or inaction could be found to have communicated a message of approval to the offending subordinate." Diamond v. City of Philadelphia, No. 07-1258, 2007 WL 4242048 at *5 (E.D. Pa. Nov. 28, 2007) (citing Montgomery v. De Simone, 159 F.3d 120, 127 (3d Cir. 1998)).

To allege that a custom is the proximate cause of an injury, a plaintiff must assert that the defendant "had knowledge of similar unlawful conduct in the past, failed to take precautions against future violations, and that its failure, at least in part, led to his injury." Id. (internal quotations and alterations omitted).

Plaintiff has alleged Monell claims against both Corizon and the City of Philadelphia based on policies, practices, or customs that allegedly resulted in Wilson's death.

### (a)  Corizon

Plaintiff argues that Corizon: (a) failed to train Nurse Orgasan; (b) failed to have the proper procedures in place to timely treat a suicidal inmate; (c) failed to provide proper staffing; and (d) failed to follow their post-mortem investigatory and documentation policies. Plaintiff also argues that Corizon was aware of a "pattern of suicides and suicide attempts by detainees in jail cells throughout the City of Philadelphia." (Pl.'s Br. at 31, ECF No. 112-1.) Plaintiff argues that the aforementioned "negligence carelessness, and/or recklessness indifference proximately caused Mr. Wilson's untimely demise" and, thus, violated Wilson's constitutional rights. (Id. at 32.)

In order to hold a private health care company like Corizon liable for a constitutional violation under § 1983, a plaintiff must allege that the provider had "a relevant . . . policy or

22

custom, and that the policy caused the constitutional violation they allege."  Natale v. Camden

Cnty. Corr. Facility, 318 F.3d 575, 583–84 (3d Cir. 2003); see also Lomax v. City of Philadelphia,

No. 13-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017) ("Because [defendant] is a private

company contracted by a prison to provide health care for inmates, . . . it can only be held liable

for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a

prisoner's serious medical needs.") (citations and quotations omitted).

     With regard to the alleged failure to train and failure to have proper procedures in place in

responding to inmates who have attempted suicide, Plaintiff contends that Defendant Corizon

never trained Nurse Orgasan "in how to properly deal with a prison [sic] who attempted to commit

suicide in his cell."  (Pl.'s Br. at 33, ECF No. 112-1.)  However, Orgasan never testified that she

was not trained to properly treat patients who attempted to commit suicide, rather, she testified

that she had not "undergo[ne] any drills on how to deal with a prisoner who attempted to commit

suicide in his cell."  (Dep. of Marilou Orgasan at 72:20–24, ECF No. 112-5.)  Moreover, she

explicitly testified that she received trainings on how to resuscitate and revive unconscious

patients.  (Id. at 39.)

     Next, Plaintiff argues that Corizon violated its staffing policy, which Plaintiff contends

requires having more than one nurse on staff.  However, the record cited by Plaintiff merely

indicates that at the HOC, Corizon is required to have at least one registered nurse in the facility

at all times.  (Pl.'s Br. at 33, ECF No. 112-1.)  The undisputed record reflects that Nurse Orgasan

was registered and was present at the HOC during the time of Wilson's death.  To the extent that

Plaintiff argues Corizon nurses were not expected to attend to an emergency by themselves, the

undisputed record also reflects that Nurse Orgasan was not alone.  She reported to the emergency

call with at least two correctional officers, and two additional correctional officers were present in

the cell, tending the emergency as well.  (Med. Defs.' SOF ¶ 12; Pl.'s Br. at 27, 29, ECF No. 112-1.)

Finally, Plaintiff alleges that Corizon failed to follow its post-mortem investigatory and documentation policies.  Plaintiff fails to provide record support for if or how Corizon violated such policy.  Moreover, to the extent that Corizon violated such policy, Plaintiff fails to establish a direct causal link to an underlying constitutional deprivation.

Plaintiff has not set forth material facts from which a reasonable jury could conclude that Corizon violated Wilson's constitutional rights nor has Plaintiff pointed to facts to establish "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 388 (1989); see also Bowser v. Borough of Birdsboro, No. 11-598, 2011 WL 4479596, at *3 (E.D. Pa. Sept. 27, 2011) ("Because the plaintiff has not demonstrated that her constitutional rights were violated, these [Monell] claims fail as a matter of law").  The only evidence before me pertaining to Corizon describes the circumstances of Wilson's treatment.  This record "does not show that Corizon promulgated a policy, that Corizon itself violated federal law, or that Corizon failed to act in the face of an obvious need to prevent its agents from violating inmates' constitutional rights." Beard v. Corizon Health, Inc., No 14-4129, 2017 WL 368037, at *4 (E.D. Pa. Jan. 24, 2017).  Therefore, Corizon is entitled to summary judgment on the Monell claim.

### (b)  City of Philadelphia

Plaintiff also claims that the City of Philadelphia had various policies in place that were either not implemented or were not properly followed with regard to processing, evaluating, treating, and housing Wilson.  Plaintiff alleges that the City failed to train its prison staff in recognizing suicidal behavior; failed to implement proper mental health examinations; failed to

monitor Wilson; and failed to investigate Wilson's death.  In support, Plaintiff cites to the report of expert witness, criminologist R. Paul McCauley, Ph.D.  Dr. McCauley's report states that "[s]uicide by hanging in jails is well known in the corrections community."  (R. Paul McCauley, Ph.D. Report at 15, ECF No. 111-17.)  Dr. McCauley also contends that from February 17, 2011 through December 18, 2016, the PDP reported twelve suicides by inmates by hanging with the sheet.  (Id. at 16–17.)  McCauley claims that the City failed to investigate these prior suicides to identify the prevalent use of bed sheets.  (Id.)

Yet, neither Plaintiff nor Dr. McCauley set forth any disputed facts from which a reasonable jury could conclude that any of the alleged prior PDP inmate suicides illustrate a custom or policy that shows that the City or its employees' actions were "taken with the requisite degree of culpability."  Plaintiff also has not demonstrated "a direct causal link between the municipal action" and a deprivation of Wilson's federal rights.  Vulcan, 2010 WL 1226345 (citing Bryan County, 520 U.S. at 404).  To the extent that Plaintiff and Dr. McCauley cite to a 111-page document that they refer to as the "City Prison's Suicide Files," the record is unclear as to the nature and circumstances of this document and the details and meaning of its contents.  (Pl.'s Br. at 35, ECF No. 111-1 (citing ECF No. 111-20).)  The remainder of Dr. McCauley's report reiterates certain facts of the record, highlights various PDP policies, and interjects conclusory allegations as to how or why the City Defendants violated said policies.  (See McCauley Report at 4–6 (reiterating the timeline of facts); Id. at 6–12 (highlighting PDP policies on institutional operations, inmate classifications, administrative segregation, and self-injury prevention); Id. at 17–18 (setting forth conclusory allegations).)

Dr. McCauley's generalized, conclusory allegations regarding the City Defendants' purported wrongdoing cannot defeat summary judgment.  United States v. Bilzerian, 926 F.2d

1285, 1294 (2d Cir. 1991) (An "expert does not usurp [] the role of the trial judge in instructing

the jury as to the applicable law . . . [because] although an expert may opine on an issue of fact

within the jury's province, he may not give testimony stating ultimate legal conclusions based on

those facts.") (citing United States v. Scop, 846 F.2d 135, 139–40, modified, 856 F.2d 5 (2d Cir.

1988)).

In response to expert testimony proffered by Dr. McCauley in another case, the United

States Court of Appeals for the Third Circuit previously concluded, "[t]he training deficiencies

McCauley identified are as broad and general as they are conclusory.  Prof. McCauley does not

identify specific training that would have alerted [prison] personnel to the fact that [plaintiff] was

suicidal as [required by] Colburn v. Upper Darby Township, 838 F.2d 663 (3d Cir. 1988), cert.

denied, 489 U.S. 1065 (1989) and [Colburn II]. . ." Woloszyn, 396 F.3d at 325.[11]  Similarly here,

Plaintiff fails to set forth facts that would allow a reasonable jury to conclude that the City

Defendants were deliberately indifferent to a pattern of suicides or that the City failed to implement

policies related thereto.  Thus, the City Defendants are entitled to summary judgment on this

portion of Plaintiff's Monell claim.

As to the purported failure to investigate, "[one] case standing alone does not provide

sufficient proof of a policy or custom to satisfy the dictates of § 1983."  Groman v. Twp. of

---

[11]     At least three other courts within this district have found that Dr. McCauley's reports and opinions
do not suffice to defeat summary judgment on Monell claims.  See Henderson v. City of Philadelphia, No.
98-3861, 1999 WL 482305, at *22 (E.D. Pa. July 12, 1999), aff'd sub nom. Estate of Henderson v. City of
Philadelphia, 216 F.3d 1076 (3d Cir. 2000) ("[Dr. McCauley's] conclusory opinion that the city was
deliberately indifferent to the need for further training is insufficient to prevent summary judgment, as the
court is not obliged to accept conclusory legal allegations from either the plaintiffs or their experts.");
Taylor v. Moletsky, No. 07-4883, 2010 WL 299747, at *8 (E.D. Pa. Jan. 22, 2010) (granting summary
judgment to the municipal entity on the Monell claim, in part, because Dr. McCauley's expert report and
conclusions were "unfounded."); Small v. City of Philadelphia, No. 05-5291, 2007 WL 674629, at *10
(E.D. Pa. Feb. 26, 2007) (granting summary judgment to the municipal entity on the Monell claim because
Plaintiff produced "no probative evidence" and Plaintiff's reliance on Dr. McCauley's expert was
"misplaced.").

Manalapan, 47 F.3d 628, 637 (3d Cir. 1995); see Blakey v. City of Pittsburgh Police, No. 08-1332, 2010 WL 1254371, at *5 (W.D. Pa. Mar. 3, 2010) (stating that a failure to investigate may provide a means of establishing municipal liability, however the "law requires multiple prior instances of a failure to investigate before a municipality is deemed to have developed a policy or custom"). Plaintiff has not argued how any of the alleged prior suicides were improperly investigated, let alone if such circumstances were similar to those following Wilson's death.   Therefore, any purported failures in investigating Wilson's death, alone, do not support Plaintiff's Monell claim.

Beyond pointing to the aforementioned PDP records of alleged prior inmate suicides and Dr. McCauley's report, Plaintiff's remaining allegations—including a failure to train staff to recognize suicidal behavior; failure to implement proper mental health examinations; and failure to monitor Wilson—have no evidentiary support.  Moreover, the allegations in this case standing alone do not provide sufficient proof of a policy or custom to satisfy the dictates of § 1983. Oklahoma City v. Tuttle, 471 U.S. 808, 823–24 (1985).   As the record does not support a reasonable jury finding that the City had a municipal policy or custom in place which rises to the level of deliberate indifference required for § 1983 liability, the City Defendants are entitled to summary judgment on the entirety of Plaintiff's Monell claim.

B.   Negligence (Count Three)[12]

The City Defendants next argue that they are entitled to summary judgment on the negligence claim based on the Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa.C.S. § 8541, *et seq.*   The PSTCA states that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof

---

[12]      On May 13, 2019, I granted summary judgment in favor of the Medical Defendants on the negligence claim (Count Three) due to Plaintiff's failure to file a certificate of merit in accordance with Pennsylvania Rule of Civil Procedure 1042.3(a).  (See May 13, 2019 Order, ECF Co. 64.)

or any other person."  42 Pa. Cons. Stat. § 8541.  This limitation extends to an employee of a local agency to the extent that his or her acts were within the scope of their office or duties and so long as their actions were not "a crime, actual fraud, actual malice or willful misconduct."  Id. §§ 8545, 8550.  Immunity is also abrogated for negligent acts falling within one of the following eight proscribed categories: (1) vehicle liability; (2) care, custody or control of personal property; (3) real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; and (8) care, custody or control of animals.  Id. § 8542(b).

According to the Pennsylvania Supreme Court "willful misconduct" has been defined to mean "conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied . . . To prove willful misconduct, a plaintiff must establish that the actor desired to bring about the result that followed, or at least it was substantially certain to follow, i.e., specific intent."  Bright v. Westmoreland Cnty., 443 F.3d 276, 287 (3d Cir. 2006) (citations omitted).

Here, Plaintiff's negligence claim does not fall within any of the exceptions enumerated above.  Plaintiff argues, without support in the record, that the City Defendants' conduct, in hosting a "secret" meeting following Wilson's death, but purportedly denying that such meeting occurred, constitutes willful misconduct.  However, Plaintiff's allegations do not establish that the City Defendants acted with the requisite intent to injure Wilson or that any such actions after Wilson's death resulted in any identifiable harm.  Accordingly, the City Defendants are entitled to summary judgment on the negligence claim.

C.  Civil Conspiracy (Count Six)

Both the Medical and City Defendants move for summary judgment on Plaintiff's civil conspiracy claim.  Defendants argue that Plaintiff cannot establish any facts to support the

elements of such claim.   In response, Plaintiff argues that unspecified individual defendants conspired to place Wilson in solitary confinement despite his anxious behaviors.   Plaintiff also claims that by conducting the "secret" meeting after Wilson's death, Warden Lawton, Nurse Orgasan, and non-party Dr. Oluwabusi conspired to cover up his suicide.

A cause of action for civil conspiracy requires: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.   Goldstein v. Phillip Morris, Inc., 854 A.2d 585, 590 (Pa. Super. Ct. 2004).   As set forth in more detail above, Plaintiffs have produced no evidence that Warden Lawton, Nurse Orgasan, and non-party Dr. Oluwabusi acted with a common purpose to do an unlawful act.   Therefore, the Medical and City Defendants are entitled to summary judgment on the civil conspiracy claim.

D.   Wrongful Death and Survival Act Claims (Counts Four and Five)

Wrongful death and survival claims are not substantive causes of action.   Rather, they provide a means of recovery for state law tort claims that result in death.   Sullivan v. Warminster Twp., No. 07-4447, 2010 WL 2164520 *6 (E.D. Pa. May 27, 2010).   Therefore, these claims are entirely derivative of any state law claim that may be properly presented to a jury.   Id.

Because Plaintiff lacks an underlying viable claim, I conclude that the Medical and City Defendants are entitled to summary judgment on the wrongful death and survival claims.

IV.   **CONCLUSION**

For the reasons set forth above, the Medical and City Defendants' motions for summary judgment will be granted.[13]   An appropriate Order follows.

---

[13]   Because I have determined that the individually-named City Defendants are entitled to summary judgment on all claims, I do not reach the merits of the City Defendants' argument as to qualified immunity.